FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 JUN -7  PM 4: 25

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ROBERT SANTOPIETRO, Individually and on Behalf of all Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>OCA INC., BARTHOLOMEW F. PALMISANO, SR. and DAVID E. VERRET, )<br><br>Defendants. ) | Civil Action No.<br><br>**05-2165**<br><br>**SECT. R MAG. 3**<br><br>JURY TRIAL DEMANDED |

### CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Fee _250.00_
Process_____
Dktd _____
CtRmDep_____
Doc. No _____

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by OCA, Inc. ("OCA" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of purchasers of the common stock of OCA between May 18, 2004 and June 7, 2005, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b), as and many of the acts and practices complained of herein occurred in substantial part in this District.

5.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff Robert Santopietro, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of OCA at artificially inflated prices during the Class Period and has been damaged thereby.

7.      Defendant OCA is a Delaware corporation with its principal place of business located at 3850 N Causeway Boulevard, Suite 800, Metairie, LA 70002.  The Company provides business services to orthodontic and pediatric dental practices in the United States. The company provides affiliated practices with a range of operational, purchasing, financial, marketing, administrative, and other business services, as well as capital and proprietary information systems.

8.      (a)     Defendant Bartholomew F. Palmisano, Sr. ("Palmisano") is, and was at all relevant times, OCA's Chairman, President and Chief Executive Officer ("CEO").

        (b)     Defendant David E. Verret ("Verret") is, and was at all relevant times, OCA's Chief Financial Officer ("CFO") and Senior Vice President of Finance.

        (c)     Defendants Palmisano and Verret are collectively referred to herein as the "Individual Defendants."

9.      Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements and markets via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

10.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's

- 2 -

public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the above officers of OCA, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

11.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management and earnings, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

12.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of

their Board membership and/or executive and managerial positions with OCA, each of the Individual Defendants had access to the adverse undisclosed information about OCA's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about OCA and its business issued or adopted by the Company materially false and misleading.

13.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

14.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of OCA common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding OCA's business, operations, management and the intrinsic value of OCA common stock; and (ii) caused plaintiff and other members of the Class to purchase OCA's common stock at artificially inflated prices.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

15.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of OCA between May 18, 2004 and June 7, 2005, inclusive ("the Class") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors

- 4 -

of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

16.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, OCA common shares were actively traded on the NYSE.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by OCA or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

17.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

18.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

19.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of OCA; and

- 5 -

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

20.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### SUBSTANTIVE ALLEGATIONS

21.     Defendant OCA describes itself as the "leading provider of business services to orthodontists and pediatric dentists. The Company's client practices provide treatment to patients throughout the United States and in Japan, Mexico, Spain, Brazil and Puerto Rico."

22.     Throughout the Class Period, defendants issued numerous positive statements and filed quarterly reports with the SEC which described the Company's financial performance.  These statements were materially false and misleading because they failed to disclose and misrepresented the following adverse facts, among others: (a) that defendants had engaged in improper accounting practices. As detailed herein, OCA has admitted that its prior financial reports are materially false and misleading as it announced that it is going to restate its results for the first three quarters of 2004 and potentially prior periods;  (b) that certain journal entries in the Company's general ledger were improperly recorded; (c) that certain data provided to the Company's independent accounting firm had been improperly changed; (d) that the Company lacked adequate internal controls and was therefore unable to ascertain its true financial condition; and (e) that as a result of the foregoing, the values of the Company's patient receivables and patient revenue were materially overstated at all relevant times.

23.     On June 7, 2005, the Company shocked the market when it issued a press release announcing that it was further delaying the filing of its annual report, that it intended to restate its quarterly financial statements for 2004 and that it had placed the Company's Chief Operating Officer, Bartholomew E. Palmisano Jr., on administrative leave.   Specifically, the Company admitted that, among other things, it had materially overstated its patient receivables and patient revenue for the first three quarters of 2004.

24.     Upon this shocking news, shares of the Company's stock fell $1.53 per share or almost 38% to close at $2.50 per share, on unusually heavy trading volume.

**Materially False And Misleading Statements Issued During The Class Period**

25.     The Class Period begins on May 18, 2004.  On that day, OCA issued a press release announcing it had adopted Financial Accounting Standards Board ("FASB") Interpretation No. 46R, "Consolidation of Variable Interest Entities - an Interpretation of ARB No. 51" ("FIN 46R"), which requires the consolidation of financial results of variable interest entities ("VIEs") in certain circumstances if a company has an ownership, contractual or other financial interests in the VIEs. The Company also announced its preliminary financial results for the first quarter of 2004, the period ending March 31, 2004.  The press release stated, in pertinent part, as follows:

> "We are now making the necessary changes to our financial reporting," said Bart F. Palmisano, Sr., President, Chairman and Chief Executive Officer. **"We believe the changes in our accounting and financial reporting under FIN 46R simplify our accounting and make it more transparent for our shareholders and other stakeholders to measure our progress**. Although this changes the way we recognize our revenue, it does not affect our cash flows, which continue to be healthy. This is a watershed event for OCA because it permits us to report our results on a basis that is more consistent with the way we manage the business and our relationships with our affiliated practices."
>
> As a result of the Company's adoption of FIN 46R, the Company was required to make a number of changes in its accounting and financial statement presentation effective as of January 1, 2004, including the following:
>
> **-- Patient revenue. The Company will now record patient revenue under patient contracts between affiliated practices and their patients, rather than the fee**

revenue portion that represented the Company's service fees. The Company will now recognize patient revenue on a straight-line basis over the term of treatment (which averages about 25 months), except that a portion of patient contracts relating to retainers will be recognized in the final month of treatment when braces are removed and retainers are provided to patients. This eliminates the recognition of revenue related to the retainers over the term of treatment, which resulted in increasing unbilled service fees receivable under the Company's prior revenue recognition policy.

-- Amounts retained by affiliated practices. The portion of patient revenue that is retained by affiliated practices will now be reflected as an expense in the Company's condensed consolidated statements of income.

-- Patient receivables. The Company will now record patient receivables owed to affiliated practices under their patient contracts. It will no longer record service fees receivable, including service fees receivable relating to the final retainer payment. This change will cause patient receivables to more closely match the actual timing of billing and collection for retainers, which is typically in the final month of treatment. The Company will also no longer record the financed practice-related expense portion of service fees receivable. Practice-related expenses will be expensed on the Company's condensed consolidated income statement, and to the extent that an affiliated practice repays its portion of these amounts, it will result in a decrease in amounts retained by affiliated practices.

*     *     *

In conjunction with the Company's normal quarterly review process, the Company and its independent auditors continue to analyze the impact of adopting FIN 46R on the Company's financial results. Based on its preliminary analysis, the Company currently estimates that, after applying its adoption of FIN 46R, for the first quarter of 2004, estimated patient revenue was $110.9 million, generating estimated after-tax income of approximately $7.2 million, or $0.14 per diluted share, before a cumulative effect of accounting change, which the Company currently estimates to be $72.3 million, net of income tax benefit. On a pro forma basis as if the Company's adoption of FIN 46R and change in revenue recognition were effective as of January 1, 2003, the Company currently estimates that for the first quarter of 2003 pro forma patient revenue was $112.9 million, generating estimated after-tax income of $6.7 million, or $0.13 per diluted share. These pro forma results reflect an estimated 12% increase in patient revenue from the Company's base affiliated practices and a corresponding decrease in patient revenue from non-performing practices that are engaged in litigation with the Company and/or ceased to pay service fees. [Emphasis added.]

26.     On May 20, 2004, OCA issued a press release announcing its financial results for the first quarter of 2004, the period ending March 31, 2004. The Company reported revenues of $110.9 million and income before cumulative effect of change in accounting principle of $7.2 million, or

- 8 -

$0.14 per diluted share.  Defendant Palmisano, commenting on the results, stated, in pertinent part, as follows:

> **We continue to make progress on a number of fronts that are important to the long range future of the Company, including improved transparency of our accounting.** We have a core group of practices with highly motivated doctors who value their relationship with us. This successful base business gives us the means and the opportunity to transform OCA into an international business services company. Through OCA OutSource, we are already well on our way to providing business services to general dentists with physicians to follow later in the year. Driving this effort is OCA's unique experience and the valuable franchise we created over the past ten years by developing a comprehensive suite of services that can now be offered to the full spectrum of medical professionals. **We are very excited about the world of opportunity we have before us.** [Emphasis added.]

The press release continued, in pertinent part, as follows:

> As previously announced, the Company has made a number of changes in its accounting and financial statement presentation effective as of January 1, 2004, in connection with its adoption of FIN 46R. These include:
>
> -- Consolidation. The Company now consolidates the assets, liabilities, equity and financial results of its affiliated practices, other than non-performing practices that are engaged in litigation with the Company and/or have ceased paying service fees.
>
> **-- Patient revenue. The Company now records patient revenue under patient contracts between affiliated practices and their patients, rather than the fee revenue portion that represented the Company's service fees.**
>
> **-- Revenue recognition. The Company now recognizes patient revenue based upon a straight-line allocation of patient contract balances over the term of treatment (which averages about 25 months), except that a portion relating to retainers will be recognized in the final month of treatment when braces are removed and retainers are provided to patients. This eliminates the recognition of revenue related to retainers over the term of treatment, which resulted in increasing amounts of unbilled service fees receivable under the Company's prior revenue recognition policy.**
>
> -- Amounts retained by practitioners. The portion of patient revenue that is retained by practitioners is now reflected as an expense in the Company's consolidated income statements.
>
> **-- Patient receivables. The Company now records patient receivables owed to affiliated practices under their patient contracts. The Company no longer records service fees receivable.**

-- Identifiable intangibles and goodwill. The Company now records amounts paid to affiliate with practices or amend service agreements as goodwill, rather than identifiable intangibles. As a result, the Company will test goodwill for impairment rather than record amortization expense relating to its intangible investments in service agreements. The Company will continue to amortize identifiable intangible assets associated with non-performing practices that are engaged in litigation with the Company and/or have ceased paying service fees.

-- Advances to practitioners. The Company now records cash advances to practitioners during the start-up or expansion phase of a new center as expenses when incurred, as amounts retained by practitioners, rather than as a receivable. Repayment of the cash advances will now reduce amounts retained by practitioners during the period in which the advance is repaid. [Emphasis added.]

27.     OCA's financial results for the first quarter of 2004, the period ending March 31, 2004, were repeated in the Company's Report on Form 10-Q filed with the SEC on or about May 20, 2004, which was signed by defendants Palmisano and Verret.

28.     On August 10, 2004, OCA issued a press release announcing its financial results for the second quarter of 2004, the period ending June 30, 2004.  For the quarter, the Company reported revenues of $104.3 million and net income of $2.3 million or $0.05 diluted net income per share. Defendant Palmisano commented on the Company's performance, stating, in pertinent part, as follows:

We are pleased with our results for the second quarter and first half of 2004. Our base business continued to improve, as comparable practice patient revenue increased in both the second quarter and the first six months of 2004 compared to the same periods of 2003 on a pro forma basis. We intend to build on this success by continuing our strategy of growing our base business and expanding our opportunities with OCA OutSource. **We are optimistic about our prospects for the future**. [Emphasis added.]

29.     OCA's financial results for the second quarter of 2004, the period ending June 30, 2004, were repeated in the Company's Report on Form 10-Q filed with the SEC on or about August 9, 2004, which was signed by defendants Palmisano and Verret.

30.     On November 15, 2004, OCA issued a press release announcing its preliminary

financial results for the third quarter of 2004, the period ending September 30, 2003.  The press

release stated, in pertinent part, as follows:

> For the quarter ended September 30, 2004, the Company currently anticipates that:
>
> -- Patient revenue was $104.0 million, reflecting strong demand for orthodontic services from the Company's affiliated practices despite weather-related disruptions in Gulf-coast areas in which the Company has a number of affiliated practices.
>
> -- Comparable patient revenue for practices for which the Company recorded revenue throughout the third quarter of 2004 and 2003 increased 2.6% compared to the same period of 2003 on a pro forma basis as if the Company's change in accounting principle under FIN 46R was effective as of January 1, 2003 ("Pro Forma Basis").
>
> -- Earnings per share, excluding provision for assets associated with inactive practices, loss on sale of assets, asset impairments and other non-recurring and extraordinary charges and write-offs, is expected to range from $0.10 to $0.13 per share.
>
> For the nine months ended September 30, 2004, the Company currently anticipates that:
>
> -- Patient revenue was $319.2 million.
>
> -- Comparable patient revenue for practices for which the Company recorded revenue throughout the nine months ended September 30, 2004 and 2003 increased 7.8% compared to the same period of 2003 on a Pro Forma Basis.
>
> -- Earnings per share, excluding the cumulative effect of a change in accounting principle, provision for assets associated with inactive practices, loss on sale of assets, asset impairments and other non-recurring and extraordinary charges and write-offs, is expected to range from $0.31 to $0.34 per share.

31.     On December 23, 2004, OCA issued a press release announcing its financial results

for the third quarter of 2004, the period ending September 30, 2004.  For the quarter, the Company

reported revenues of $104.0 million and adjusted net income, excluding charges, of $6.1 million, or

$0.12 per diluted share. The press release stated, in pertinent part, as follows:

> For the three months ended September 30, 2004:
>
> -- Patient revenue was $104.0 million, reflecting strong demand for orthodontic services from the Company's affiliated practices despite weather-related disruptions

in Florida and other Gulf-coast areas in which the Company has a number of affiliated practices.

-- The Company recorded a $13.5 million non-cash charge to increase the allowance for assets associated with inactive practices and a $1.7 million loss on sale of assets in connection with practices' buyouts of their service agreements, resulting in a net loss of $3.5 million, or $0.07 net loss per diluted share. This compares with net income for the third quarter of 2003 of $4.3 million, or $0.09 per diluted share, on a pro forma basis as if the Company's change in accounting principle under FIN 46R was effective as of January 1, 2003 ("Pro Forma Basis"), and $11.9 million, or $0.24 per diluted share, on an actual basis.

-- Adjusted net income, excluding those charges, was $6.1 million, or $0.12 per diluted share. For the third quarter of 2003, adjusted net income was $4.8 million, or $0.09 per diluted share, on a Pro Forma Basis, and $12.4 million, or $0.25 per diluted share, on an actual basis.

-- The $13.5 million non-cash provision for assets associated with inactive practices reflects management's assessment of the collectibility of those assets, in light of certain recent settlement payments to OCA and a recent court award to OCA that were significantly less than the net book value of the goodwill, identifiable intangibles and other assets associated with the related inactive practices. It also reflects renewed efforts by the Company to try to settle pending litigation on mutually agreeable terms.

-- The Company's results were also affected by increased startup losses associated with the Company's strategy of continued investment in de novo centers, which typically incur operating losses during the centers' first 12 to 18 months of operation as they build a patient base. During the third quarter of 2004, de novo centers that had been operating for 18 months or less and had not begun to generate operating profits on a cash basis ("De Novo Centers") generated $1.1 million of operating losses, an increase of 164.1% compared to the third quarter of 2003.

Defendant Palmisano commented on the Company's performance, stating, in pertinent part, as follows:

> **We are pleased with our operational results for the third quarter of 2004, which reflected strong contribution by our base affiliated practices**. Excluding a non-cash provision and loss on sale, our operations produced increased earnings over the third quarter of 2003 on a pro forma basis. Although the past three years presented some significant challenges, as we worked to integrate OrthAlliance's affiliated practices into our system and address related litigation, **I believe that we are well-positioned to capitalize on our strengths and grow our business**. [Emphasis added.]

32.     OCA's financial results for the third quarter of 2004, the period ending September 30, 2004, were repeated in the Company's Report on Form 10-Q filed with the SEC on or about December 23, 2004, which was signed by defendants Palmisano and Verret.

33.     On March 17, 2005, the Company issued a press release announcing that it was delaying the filing of its annual report on Form 10-K for the year ended December 31, 2004. The press release continued, in pertinent part, as follows:

> The Company is reviewing its accounting for leases and its depreciation and capitalization of leasehold improvements, equipment and other fixed assets. In addition, the Company is reviewing the appropriateness of capitalization of startup costs and certain balance sheet accounts for its Japanese subsidiary. The Company has identified certain errors and potential errors related to 2004 and prior years, but has not completed its review or made a final determination about the impact of any adjustments or whether these errors or potential errors are material to warrant a restatement of any previously issued financial statements.

> The Company currently anticipates that it will file its 2004 Form 10-K by early May 2005; however, the filing could be delayed further if the Company experiences delays in completing its financial statements or assessing its internal controls. The Company is seeking a waiver and extension from the lenders under its credit facility with respect to a covenant requiring delivery of audited 2004 financial statements by a specified date.

> Bart Palmisano, Sr., Chief Executive Officer of the Company, commented: **"While we are disappointed to delay issuance of our 2004 financial statements, it does not impact the underlying strength of our business or how we continue to provide quality business services to our client practices**. We are particularly pleased with our success in developing new centers for our affiliated practices. During 2004, we opened 62 de novo centers, most of which were for high-performing practices seeking to expand. At December 31, 2004, approximately 100 of our affiliated centers had been open less than two years. We believe these de novo centers provide a tremendous opportunity for future growth." [Emphasis added.]

34.     The statements referenced above in ¶¶25-33 were each materially false and misleading because they failed to disclose and misrepresented the following material adverse facts which were then known to Defendants or recklessly disregarded by them:

        (a)     that defendants had engaged in improper accounting practices. As detailed herein, OCA has admitted that its prior financial reports are materially false and misleading as it

- 13 -

announced that it is going to restate its results for the first three quarters of 2004 and potentially prior periods;

(b)     that certain journal entries in the Company's general ledger were improperly recorded;

(c)     that certain data provided to the Company's independent accounting firm had been improperly changed;

(d)     that the Company lacked adequate internal controls and was therefore unable to ascertain its true financial condition; and

(e)     that as a result of the foregoing, the values of the Company's patient receivables and patient revenue were materially overstated at all relevant times.

35.     Then, on June 7, 2005, the Company shocked the market when it issued a press release announcing that it was further delaying the filing of its annual report, that it intended to restate its quarterly financial statements for 2004, and that it had placed the Company's Chief Operating Officer, Bartholomew E. Palmisano Jr., on administrative leave. The press release stated, in pertinent part, as follows:

> OCA, Inc. (NYSE:OCA) today announced that its bank lenders have agreed to extend until June 30, 2005 the deadlines under OCA's senior credit facility for filing its 2004 Form 10-K and Form 10-Q for the first quarter of 2005. The Company anticipates further delay in completing its 2004 financial close process and audit and in filing the Form 10-K and Form 10-Q, and is currently in discussions with its lenders about obtaining an additional extension and waiver.
>
> *     *     *
>
> **The Company also announced that it has identified certain errors in its calculation of patient receivables reported during 2004, and has determined that the amount of patient receivables reported at each of March 31, June 30 and September 30, 2004 was overstated by material amounts**. The Company continues to review these receivables and their impact on patient revenue, and has not yet determined the amount by which they were overstated. **The Company's Audit Committee has concluded that, due to these overstatements, these previously issued quarterly financial statements will need to be restated and should no longer be relied upon. The Company is also reviewing a number of other**

**accounting matters and accounts, and has identified a number of potential prior period financial statement account errors.**

*          *          *

The Company also announced that its Board of Directors has appointed a Special Committee to review certain journal entries recorded in the Company's general ledger, the circumstances in which they originated and their impact on the Company's financial statements. In addition, the Special Committee is reviewing certain alleged changes in data provided to the Company's independent registered public accounting firm. The Special Committee, comprised of independent directors Ashton J. Ryan, Jr. and Kevin M. Dolan, is engaging special counsel to advise it in connection with the review. Pending completion of the internal review, the Company has placed Bartholomew F. Palmisano, Jr., the Company's Chief Operating Officer, on administrative leave. [Emphasis added.]

36.     Upon this shocking news, shares of the Company's stock fell $1.53 per share or almost 38% to close at $2.50 per share, on unusually heavy trading volume.

37.     The market for OCA's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, OCA's common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired OCA common stock relying upon the integrity of the market price of OCA's common stock and market information relating to OCA, and have been damaged thereby.

38.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of OCA's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

39.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the

damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about OCA's business and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of OCA and its business and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

40.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding OCA, their control over, and/or receipt and/or modification of OCA's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning OCA, participated in the fraudulent scheme alleged herein.

## Applicability Of Presumption Of Reliance:
## Fraud On The Market Doctrine

41.     At all relevant times, the market for OCA's common stock was an efficient market for the following reasons, among others:

(a)     OCA's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

- 16 -

(b)     As a regulated issuer, OCA filed periodic public reports with the SEC and the NYSE;

(c)     OCA regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     OCA was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

42.     As a result of the foregoing, the market for OCA's common stock promptly digested current information regarding OCA from all publicly available sources and reflected such information in OCA's stock price. Under these circumstances, all purchasers of OCA's common stock during the Class Period suffered similar injury through their purchase of OCA's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

43.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking

statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of OCA who knew that those statements were false when made.

**LOSS CAUSATION/ECONOMIC LOSS**

44.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated OCA's stock price and operated as a fraud or deceit on Class Period purchasers of OCA stock by misrepresenting the Company's business.  During the Class Period, defendants materially overstated the values of the Company's patient receivables and patient revenues.  Later, however, when defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, OCA stock fell precipitously as the prior artificial inflation came out of OCA's stock price.  As a result of their purchases of OCA stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

45.     By improperly concealing important facts concerning its business, the defendants presented a misleading picture of OCA's business and performance.

46.     Defendants' false and misleading statements had their intended effect and caused OCA stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $8.55 per share.

47.     On June 7, 2004, the Company stated that its quarterly financial statements for the first three quarters of 2004, and potentially prior periods, should no longer be relied upon.  Specifically, the Company announced its intention to restate those financial results due to the Company's material overstatement of its revenues and net income, among other things.

48.     On this final disclosure, OCA stock fell $1.53 per share or more than 38% to close at $2.50 per share, on extremely heavy trading volume.

## COUNT I

### Violation Of Section 10(b) Of
### The Exchange Act Against And Rule 10b-5
### Promulgated Thereunder Against All Defendants

49.      Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

50.      During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding OCA's business, operations, management and the intrinsic value of OCA common stock; and (ii) cause plaintiff and other members of the Class to purchase OCA's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

51.      Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for OCA's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

52.      Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business and operations of OCA as specified herein.

53.      These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of

conduct as alleged herein in an effort to assure investors of OCA's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about OCA and its business operations in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of OCA common stock during the Class Period.

54.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

55.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing OCA's operating condition from the investing public and

supporting the artificially inflated price of its common stock.  As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

56.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of OCA's common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of OCA's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired OCA common stock during the Class Period at artificially high prices and were damaged thereby.

57.     At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known the truth regarding OCA's financial results, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their OCA common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

58.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

59.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

**COUNT II**

**Violation Of Section 20(a) Of
The Exchange Act Against the Individual Defendants**

60.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

61.     The Individual Defendants acted as controlling persons of OCA within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

62.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

63.     As set forth above, OCA and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions

as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

(b)    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: June 7, 2005                LEMMON LAW FIRM
                                   ANDREW LEMMON


                                   _____
                                   ANDREW LEMMON (Bar No. 18302)

                                   650 Poydras Street, Suite 2335, New Orleans,
                                   Louisiana
                                   Telephone: 504-581-5644
                                   Fax: 504-581-2156

- 23 -

LERACH COUGHLIN STOIA
 GELLER RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARIO ALBA JR.
200 Broadhollow Road, Suite 406
Melville, NY 11747
Telephone:  631/367-7100
631/367-1173 (fax)

ADEMI AND O'REILLY, LLP
GURI ADEMI
3520 E. Layton Avenue
Cudahy, WI 53110
Telephone:  414/482-8000
414/482-8001(fax)

Attorneys for Plaintiff

## PLAINTIFF'S CERTIFICATE

I, Robert Santopietro ("Plaintiff"), declare, as to the claims asserted under the Federal Securities laws, that:

1.      Plaintiff has reviewed the complaint against OCA, Inc., and certain other defendants, and authorizes its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of a class, including acting as a Lead Plaintiff and providing testimony at deposition and trial, if necessary.

4.      Plaintiff represents and warrants that he is fully authorized to enter into and execute this certification.

5.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.

6.      In addition, Plaintiff has made no transaction(s) during the Class Period in the common stock of OCA, Inc., except those set forth below (attach additional sheets if necessary):

| Purchases | | | | Sales | | |
|---|---|---|---|---|---|---|
| Date(s) | Number of Shares | Price | | Date(s) | Number of Shares | Price |
| 4-15-05 | 5000 | 4.59 | | 6-03-05 | 7,645 | 3.91 |
| 4-20-05 | 660 | 4.42 | | | | |
| 4-22-05 | 1,340 | 4.52 | | | | |
| 4-26-05 | 500 | 4.36 | | | | |
| 5-6-05 | 145 | 4.25 | | | | |
| | | | | | | |

7.      During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except if detailed as follows: _____

I declare under penalty of perjury, under the laws of the United States, this __7__ day of June, 2005 that the information above is accurate.

_Robert Santopietro_
Robert Santopietro

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

**05-2165**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
Robert Santopietro

**DEFENDANTS**

SECT. R MAG. 3

**(b)** County of Residence of First Listed Plaintiff  Orleans
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Jefferson
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Lemmon Law Firm
650 Poydras St, Ste 2305, 581-5644

Attorneys (If Known)

**II. BASIS OF JURISDICTION**  (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
|  | ☐ 350 Motor Vehicle / **PERSONAL PROPERTY** | ☐ 690 Other |  | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability / ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury / ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract |  ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 385 Property Damage Product Liability | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise |  | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment / **Habeas Corpus:** |  | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations / ☐ 530 General |  | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare / ☐ 535 Death Penalty |  |  | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 540 Mandamus & Other |  |  | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / ☐ 550 Civil Rights |  |  |  |
|  | ☐ 440 Other Civil Rights / ☐ 555 Prison Condition |  |  |  |

**V. ORIGIN** (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
10b(5) of The Exchange Act ; 20A of The Exchange Act
Brief description of cause:

**VII. REQUESTED IN COMPLAINT:**
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

**VIII. RELATED CASE(S) IF ANY**
(See instructions):
JUDGE
DOCKET NUMBER

DATE  6/7/05
SIGNATURE OF ATTORNEY OF RECORD  William Lemmon

FOR OFFICE USE ONLY

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____