UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

No. 05-2165

IN RE OCA, INC. SECURITIES
AND DERIVATIVE LITIGATION                    SECTION: R(3)

JUDGE VANCE

**THIS DOCUMENT RELATES TO:**

**SECURITIES CASES ONLY**

<u>**ORDER AND REASONS**</u>

Before the Court are motions to dismiss lead plaintiff Samuel Boodman's Consolidated Class Action Complaint filed by defendants Bartholomew F. Palmisano, Sr., David E. Verret, and Bartholomew F. Palmisano, Jr.  For the following reasons, the Court GRANTS the motion to dismiss as to Palmisano, Jr. and DENIES the motion to dismiss as to Palmisano, Sr. and Verret.

**I.    FACTUAL BACKGROUND**

Lead plaintiff Samuel Boodman brings this action against defendants OCA, Inc., Bartholomew F. Palmisano, Sr., David E.

Verret and Bartholomew F. Palmisano, Jr. as a putative class action on behalf of all persons who purchased OCA stock or sold OCA put options from May 18, 2004 through June 6, 2005. Plaintiff asserts claims against the defendants under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.  Plaintiff also asserts a claim for control person liability against the individual defendants under section 20(a) of the Exchange Act.  *Id.* § 78t(a).

OCA is a Delaware corporation with its principal place of business in Louisiana.  Consolidated Class Action Complaint ("CAC") ¶ 10.  OCA provides a range of financial, operational, marketing, practice management and other business services to orthodontic and pediatric dental practices throughout the United States and in several foreign countries.  *Id.*  By September 30, 2004, OCA provided business services to approximately 260 practices in the United States and approximately 40 practices abroad.  *Id.*  Plaintiff alleges that OCA essentially handles the "business operations" of affiliated practices in exchange for a percentage of the fees earned by the practices.  *Id.* ¶ 2.

Palmisano, Sr. was OCA's chairman, president and chief executive officer throughout the putative class period.  *Id.* ¶ 11.  He is both an attorney and a certified public accountant.

2

*Id.*  Verret was the company's senior vice president of finance and chief financial officer from March 20, 2004 until he resigned in May 2005.  *Id.* ¶ 13.  He is also a certified public accountant.  *Id.*  Palmisano, Jr., son of OCA's chairman, was OCA's chief operating officer until June 7, 2005, when OCA's board of directors placed him on administrative leave.  *Id.* ¶ 12. Before that, he was OCA's chief financial officer and chief information officer.  *Id.*  Both father and son were involved in developing OCA's accounting systems.  *Id.* ¶ 11.  Palmisano, Jr. reported directly to his father.  *Id.* ¶ 12.

Plaintiff alleges that, throughout the class period, the defendants deceived investors by overstating the company's reported patient receivables and concealing material shortcomings in the company's internal controls over financial reporting.  The following factual recitation is taken from the CAC and certain of OCA's public filings with the United States Securities and Exchange Commission, which this Court can consider on these motions to dismiss.  *See Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996) ("When deciding a motion to dismiss a claim for securities fraud on the pleadings, a court may consider the contents of relevant public disclosure documents which (1) are required to be filed with the SEC, and (2) are actually filed with the SEC.").

3

### A.   The E&Y Letter

Beginning in at least 2003, OCA suffered from material weaknesses in its internal financial reporting controls.  CAC ¶ 20.  In early 2004, Ernst & Young, then OCA's independent auditor, reported to OCA's audit committee that it had identified a number of material weaknesses in OCA's internal controls in the course of conducting its audit of OCA's financial statements for the year ended December 31, 2003.  *Id.*  E&Y identified the following material weaknesses in OCA's internal controls: (i) a lack of segregation of duties between personnel determining fee revenue and service fees receivable and other financial processes; (ii) a lack of review and approval of the calculations, estimates and judgments required to determine certain account balances; (iii) incomplete analyses to explain variances or unusual relationships between certain financial statement accounts; (iv) a lack of documentation of accounting treatment for certain significant balances; (v) inadequate staffing in the accounting department; and (vi) poor communications between operations and financial personnel.  CAC ¶ 32.

On April 27, 2004, OCA filed a current report on Form 8-K with the SEC.  *See* OCA, Inc., Current Report (Form 8-K) (April 27, 2004); CAC ¶ 21.  In the 8-K, OCA stated that it had

dismissed E&Y as its independent auditor and appointed
PricewaterhouseCoopers LLP as OCA's new independent auditor.  CAC
¶ 21.  OCA disclosed in this report that E&Y had submitted a
letter to OCA's audit committee concerning potential material
weakness in OCA's internal controls.  *Id.*  The company stated
that it was taking steps to address the issues raised by E&Y.
*Id.*  OCA did not, however, specifically identify at that time the
numerous material internal control weaknesses that E&Y had
identified in its letter to OCA's audit committee.  *Id.*  Rather,
in its April 27, 2004 Form 8-K, OCA stated only that E&Y had
provided OCA's Audit Committee with a letter discussing "a
material weakness" in OCA's internal controls.  *Id.*

### B.   Defendants' Alleged False or Misleading Statements During the Class Period

1.   *OCA's Adoption of FIN 46R*

On May 18, 2004, the first day of the putative class period,
OCA announced that, effective January 1, 2004, it would adopt
Financial Accounting Standards Board Interpretation No. 46R ("FIN
46R"), which requires a company to consolidate the financial
results of variable interest entities under certain circumstances
when the company has an interest in the entities.  *Id.* ¶ 23.  OCA
stated that its adoption of FIN 46R would require it to make a

number of changes to its accounting and financial statement presentation.  As is relevant here, OCA stated that FIN 46R would require the company to change the manner in which it recognized patient revenue and the manner in which it recorded patient receivables.  *Id.*  Specifically, under FIN 46R, OCA would "record patient revenue under patient contracts between affiliated practices and their patients, rather than the fee revenue portion that represented the Company's service fees."  *Id.*  With respect to receivables, OCA stated that it would "record patient receivables owed to affiliated practices under their patient contracts" and would "no longer record service fees receivable."  *Id.*

OCA's May 18, 2004 press release quoted defendant Palmisano, Sr. as stating that FIN 46R would "simplify [OCA's] accounting and make it more transparent for our shareholders and other stakeholders to measure our progress."  *Id.*  The May 18, 2004 press release also noted that, because of the accounting changes required by FIN 46R and OCA's recent change of independent auditors, the company would delay the filing of its quarterly report on Form 10-Q for the quarter ended March 31, 2004.  *Id.*

6

    2.   *OCA's First Quarter 2004 Form 10-Q*

OCA filed its quarterly report and announced its financial results for the first quarter of 2004 on May 20, 2004.  *Id.* ¶ 25. The company reported patient revenue for the quarter of $110.9 million. *Id.*  It also reported patient receivables of $122.9 million, making patient receivables the single largest of the company's $200.9 million of current assets.  *Id.*

The May 20, 2004 quarterly report included a number of statements concerning OCA's internal controls over financial reporting.  *Id.* ¶ 27.  The report disclosed that E&Y had identified a number of material weaknesses in OCA's internal controls and that OCA was developing a plan to address each of the items raised in the E&Y letter.  *Id.*  The report also stated that certain of the weaknesses identified in the E&Y letter might no longer be applicable in light of OCA's adoption of FIN 46R. *Id.*  Specifically, the report stated that the accounting changes required by FIN 46R made it unnecessary for OCA to make the complex, data-intensive calculations required to determine fee revenue and service fees receivable, as those accounts would no longer be recorded or reported in the company's financial statements.  *Id.*

The May 20, 2004 quarterly report also identified a number of steps that the company had taken to improve controls on its

7

internal financial reporting, including (i) increased automation
in determining patient revenue and patient receivables; and (ii)
steps to improve communication between operations and financial
accounting, such as appointing a CFO with operations experience
and forming a committee with representatives from the operations,
financial accounting, and legal departments to discuss and assess
pending litigation. *Id.* The company also stated that it
intended to hire additional financial accounting staff and to
engage outside consultants to advise management on additional
improvements to internal controls.

Palmisano, Sr. and Verret each signed the May 20, 2004
quarterly report, and they each also executed a certification
required by section 302 of the Sarbanes-Oxley Act of 2002, 15
U.S.C. § 7241. CAC ¶ 28. Palmisano, Sr. and Verret certified
that, based on their knowledge, OCA's May 20, 2004 quarterly
report did not contain any material false statements or omissions
and fairly presented the company's financial condition and
results. *Id*. The certifications also stated, *inter alia*, that
Palmisano, Sr. and Verret (i) had designed or caused to be
designed "disclosure controls and procedures"[1] to ensure that

---

[1]SEC regulations promulgated pursuant to section 302 of the
Sarbanes-Oxley Act define "disclosure controls and procedures" as
follows:

they were made aware of material information relating to the

company; (ii) had evaluated the effectiveness of OCA's disclosure

controls and presented in the quarterly report their conclusions

about the effectiveness of those disclosure controls; (iii) had

disclosed any material change in the company's internal controls

over financial reporting that occurred during the most recent

fiscal quarter; and (iv) had disclosed to OCA's auditors and its

---

> "[D]isclosure controls and procedures" means
> controls and other procedures of an issuer
> that are designed to ensure that information
> required to be disclosed by the issuer in the
> reports that it files or submits under the
> [Securities Exchange Act] is recorded,
> processed, summarized and reported, within
> the time periods specified in the
> Commission's rule and forms.  Disclosure
> controls and procedures include, without
> limitation, controls and procedures designed
> to ensure that information required to be
> disclosed by an issuer in the reports that it
> files or submits under the Act is accumulated
> and communicated to the issuer's management,
> including its principal executive officer or
> officers and principal financial officer or
> officers, or persons performing similar
> functions, as appropriate to allow timely
> decisions regarding required disclosure.

17 C.F.R. § 240.13a-14(c).  The SEC coined the term "disclosure
controls" in order to differentiate such controls from the
preexisting term "internal controls," which generally refers to
an issuer's internal controls over assets and financial
reporting.  *See* Certification of Disclosure in Companies'
Quarterly and Annual Reports, Securities Act Release No. 8124,
Exchange Act Release No. 46427, 78 SEC Docket 875, at *7 (Aug.
28, 2002).

audit committee any significant deficiencies or material
weaknesses in the company's internal financial reporting controls
and any fraud, whether or not material, involving management or
other employees who have a significant role in the company's
internal financial reporting controls.  *Id.*

The May 20, 2004 quarterly report also discussed in some
detail the changes to revenue recognition that OCA had made as a
result of FIN 46R, including the company's "belie[f] that the
changes required under FIN 46R will enhance the transparency and
clarity of our financial reporting."  *Id.* ¶ 29.  In a press
release accompanying OCA's May 20, 2004 quarterly report,
Palmisano, Sr. similarly stated, "We continue to make progress on
a number of fronts that are important to the long range future of
the Company, including improved transparency of our accounting .
. . ."  *Id.* ¶ 24.


    3.   *OCA's July 26, 2004 Form 8-K/A*

On July 26, 2004, OCA amended its April 27, 2004 Form 8-K to
disclose additional details concerning the E&Y letter.  *See* OCA,
Inc., Amendment No. 2 to Current Report (Form 8-K/A) (July 26,
2004); CAC ¶ 32.  In its July 26, 2004 Form 8-K/A, OCA for the
first time specifically described the internal control
deficiencies that E&Y had identified in its letter to OCA's audit

10

committee.  CAC ¶ 32.  In addition, the July 26, 2004 Form 8-K/A
also described the steps that OCA had taken to address E&Y's
concerns.  *Id.*  It stated, much like the May 20, 2004 quarterly
report, that OCA's adoption of FIN 46R may have obviated certain
of E&Y's concerns and that the company had taken, or planned to
take, a number of actions to improve its internal financial
reporting controls, including (i) increasing automation in
determining OCA's patient revenue and patient receivables; (ii)
hiring additional accounting staff; (iii) improving
communications between operations and financial accounting; and
(iv) engaging outside consultants to advise management on OCA's
internal controls.  *Id.*

       4.   *OCA's Second Quarter 2004 Form 10-Q*

      OCA filed its quarterly report for the quarter ended June
30, 2004 on August 9, 2004.  *Id.* ¶ 35.  In its August 9, 2004
quarterly report, which was again signed and certified by
Palmisano, Sr. and Verret, OCA reported patient revenue of $104.3
million for the quarter and patient receivables of $128.7
million.  *Id.* ¶¶ 35, 37.  The August 9, 2004 quarterly report
also included a discussion of OCA's internal controls that was
substantially similar to the disclosures made in the May 20, 2004
quarterly report and the July 26, 2004 Form 8-K/A.  *Id.* ¶ 36.  In

addition, OCA disclosed that it had begun the process of
evaluating its internal controls in anticipation of disclosures
that it would be required to make in its 2004 annual report:

> [W]e are in the process of evaluating,
> documenting and testing our internal control
> over financial reporting in anticipation of
> disclosure that will be required to be
> included in our Annual Reports on Form 10-K
> (beginning with our Annual Report on Form 10-
> K for 2004) under rules adopted by the SEC
> under Section 404 of the Sarbanes-Oxley Act
> of 2002.  These SEC rules require that we
> include a report by OCA's management
> regarding its assessment of the effectiveness
> of our internal control over financial
> reporting as of the end of the fiscal year,
> including a statement as to whether or not
> our internal control over financial reporting
> is effective, as well as an attestation
> report by our independent auditors on
> management's assessment.  Management is not
> permitted to conclude that our internal
> control over financial reporting is effective
> if there are one or more material weaknesses
> in our internal control over financial
> reporting, and we must disclose any material
> weaknesses identified by management.
>
> During this evaluation, documentation and
> testing process, we may identify one or more
> material weaknesses in our internal control
> over financial reporting, and we may be
> unable to remediate those weaknesses before
> management's assessment.  We cannot assure
> you that our management will conclude that
> our internal control over financial reporting
> is effective.  In addition, our independent
> auditors may not be satisfied with our
> internal control over financial reporting or
> the level at which these controls are
> documented, designed, operated or reviewed,
> and they may decline to attest to

> management's assessment or may issue a
> qualified attestation report. . . .

*Id.*

In a press release the following day, August 10, 2004,
Palmisano, Sr. stated that OCA was pleased with its second
quarter financial results and that its base businesses continued
to improve over the prior year.  *Id.* ¶ 39.


5.   *OCA's Third Quarter 2004 Form 10-Q*

On November 15, 2004, OCA issued a press release containing
preliminary estimates of the company's financial results for the
quarter ended September 30, 2004.  *Id.* ¶ 40.  OCA estimated,
among other things, that it would report patient revenue for the
quarter in the amount of $104.0 million.  *Id.*

OCA confirmed these preliminary numbers when it filed its
quarterly report for the third quarter of 2004 on December 23,
2004.  The company reported patient revenue of $104.0 million and
patient receivables of $124.3 million.  *Id.* ¶ 42.  As with the
preceding two quarterly reports, the December 23, 2004 quarterly
report discussed E&Y's letter to OCA's audit committee concerning
material weaknesses in OCA's internal controls and reiterated the
steps that OCA was taking to address the issues raised by E&Y.
*Id.* ¶ 43.

OCA also stated that it was continuing to assess the
effectiveness of its internal controls in anticipation of
management's required year-end assessment of the company's
internal controls, but that it could not ensure that it would be
in a position to file its assessment within the time permitted by
the SEC.  *See* OCA, Inc., Quarterly Report (Form 10-Q), at 43
(Dec. 23, 2004).  The company also stated that its testing and
assessment of its internal controls might indicate material
internal control deficiencies.  *Id.*

      6.   *OCA Delays the Filing of Its 2004 Form 10-K*

After the market closed on March 17, 2005, OCA issued a
press release stating that the company would not be in a position
to file its 2004 annual report on Form 10-K in a timely manner.
CAC ¶ 45.  The company stated that it had identified certain
accounting errors and potential errors, which it was in the
process of investigating, but that it had made no determination
concerning the impact of those errors or whether they were
material.  *Id.*  The company also indicated that it had not
completed its year-end assessment of its internal controls over
financial reporting.  *Id.*  The press release quoted Palmisano,
Sr. as stating, "While we are disappointed to delay issuance of
our 2004 financial statements it does not impact the underlying

14

strength of our business or how we continue to provide quality business services to our client practices." *Id.*

OCA's stock price fell by 6.5 percent on the heels of the March 17, 2005 announcement. *Id.* ¶ 46.

### C.    OCA's June 7, 2005 Disclosure

On June 7, 2005, OCA announced that it would further delay the filing of its 2004 annual report and that the company had determined that it had materially overstated its reported patient receivables for each of the first three quarters of 2004, which would require the company to restate its financial results for each of those three quarters. *Id.* ¶ 50. The company further stated that its board of directors had appointed a special committee to investigate a number of journal entries entered in the company's general ledger and allegations that altered data had been provided to the company's independent auditor. *Id.* ¶ 49. OCA also announced that Palmisano, Jr., the company's chief operating officer, had been placed on administrative leave pending the completion of the committee's review. *Id.* ¶ 53.

OCA's June 7, 2005 Form 8-K also revealed that OCA had identified a number of material weaknesses in its internal controls over financial reporting:

The Company has identified the material

weaknesses listed below, as well as certain
significant deficiencies, in its internal
control over financial reporting at December
31, 2004.  The Company and its independent
registered public accounting firm may
identify other material weaknesses and
significant deficiencies as well.  Because of
these material weaknesses, the Company
believes that management will conclude that
the Company's internal control over financial
reporting was not effective at December 31,
2004. . . .

The Company believes that, at December 31,
2004, it did not maintain effective controls
over the period-end financial reporting
process.  The Company believes that its
period-end review procedures were ineffective
as they related to at least the following:
independent and timely review of the
Company's consolidation, analyses and
financial reporting processes; revenue
recognition reviews; reviews of allowances
for bad debt for patient and affiliated
practitioner accounts; review and approval of
journal entries to the general ledger; and
account reconciliations.  The Company
believes that it also lacked adequate
controls over capitalization, disposition and
evaluation of useful lives of long-lived
assets.  These control deficiencies resulted
in audit adjustments and may result in
restatement of previously issued financial
statements.  The Company also believes that,
at December 31, 2004, it did not maintain
adequate segregation of duties, which
impacted the Company's financial reporting
controls, revenue controls, expenditure
controls and information technology controls.
In addition, the Company believes that, at
December 31, 2004, it did not maintain
effective controls over access to financial
applications and data. Certain of the
Company's executive officers, information
technology staff and users with financial,

16

> accounting and reporting responsibilities had
> access to financial application programs and
> data.  The Company believes that management
> did not maintain adequate oversight of these
> employees or effectively monitor access to
> this information.  Because of these material
> weaknesses, certain controls within the
> Company's control environment may not have
> prevented the ability to override other
> controls, and information critical to an
> effective review of certain transactions,
> accounting entries and related entities were
> not disclosed to the appropriate Company
> personnel and the Company's independent
> registered public accounting firm.

*Id.* ¶ 52.

In the wake of this announcement, OCA's stock price fell by more than 38 percent, from its June 6, 2005 closing price of $4.03 per share to a June 7 closing price of $2.48 per share. *Id.* ¶ 54.

### D.  Additional Post-Class Period Events

On or about November 7, 2005, PWC resigned as OCA's independent auditor.  CAC ¶ 53.[2]  In a Form 8-K filed shortly after PWC's resignation, OCA disclosed that PWC did not believe that OCA had taken

> timely and appropriate remedial actions in
> response to the discovery of potential

---

[2]This paragraph of the CAC is incorrectly numbered as paragraph 53.  It actually appears at page 42 of the CAC, between paragraphs 55 and 56.

> illegal acts at OCA related to alleged
> alterations of records provided to OCA's
> contract internal auditors, current
> independent registered public accountants and
> prior independent accountants from January
> 2000 through May 2005, which alleged
> alterations were disclosed in a Form 8-K
> filed with the Securities and Exchange
> Commission on June 7, 2005.

*Id.* PWC believed that this failure compromised PWC's ability to conduct a thorough and complete investigation into the alleged illegal acts. *Id.*

The New York Stock Exchange de-listed OCA's stock on November 8, 2005, after which the stock traded on the pink sheets. *Id.* ¶ 56.

On March 14, 2006, OCA filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.

**E.   Defendants' Alleged Wrongdoing**

Plaintiff alleges that the public statements made by OCA and the individual defendants during the putative class period concerning OCA's patient receivables and its internal controls were materially false or misleading when made.  Plaintiff alleges that, after OCA received the E&Y letter in early 2004, the defendants recognized that a complete disclosure of the depth and extent of OCA's internal control weaknesses would significantly undermine the company's standing with orthodontic and pediatric

18

dental practices, thus making them less likely to contract with OCA for business services as these practices relied on OCA to handle their own accounting processes. *Id.* ¶¶ 4, 67-68. Defendants also allegedly knew that disclosing the true extent of OCA's internal control problems would negatively affect the company's stock price. *Id.* To avoid these potential problems, the defendants allegedly attempted to cover up OCA's internal control problems by downplaying the significance of the problems identified in the E&Y letter and falsely assuring both the market and potential affiliate orthodontic practices that the company was diligently addressing the problems identified in the E&Y letter. Specifically, plaintiff alleges that the defendants' statements that OCA was taking steps to improve its internal controls were materially false. Plaintiff further alleges that, notwithstanding these public statements, OCA was not taking steps to improve its internal controls, and the company's internal control problems were actually deteriorating further.

Plaintiff points to a number of facts to support his allegations that the individual defendants' class period statements about OCA's patient receivables and internal controls were false or misleading when made. First, plaintiff states that OCA's June 7, 2005 disclosure that it had materially overstated its patient receivables for each of the first three quarters of

19

2004 establishes that the amounts of patient receivables that the company reported in its 2004 quarterly reports were false at the time they were made.  Second, plaintiff asserts that OCA's disclosure that it had material internal control weaknesses as of December 31, 2004 establishes both that defendants' statements that OCA was working to address its internal control problems were false and that defendants failed to disclose that the company had additional, undisclosed internal control problems during the class period.  Third, plaintiff argues that OCA's November 15, 2005 Form 8-K, which announced PWC's November 7, 2005 resignation, shows that defendants failed to disclose the full extent of OCA's internal control problems to the company's auditor during the class period.  At paragraph 69 of the CAC, plaintiff provides a chart that purports to compare the internal control problems identified in the E&Y letter in early 2004 with the internal control problems OCA disclosed in its June 7, 2005 Form 8-K.  *See id.*  Plaintiff alleges that the primary difference between the two is that the problems that OCA disclosed on June 7, 2005 were actually more numerous and more severe than the problems identified in the E&Y letter.  *Id.*

Finally, plaintiff also makes allegations based on interviews with three confidential witnesses who were employed in OCA's accounting department during the class period.  *See id.* ¶¶

20

31(a), 34(a), 34(b).

Confidential Witness No. 1 worked at OCA's Louisiana headquarters throughout the class period and was responsible for handling patient collections for approximately eight of OCA's affiliated practices. *Id.* ¶ 31(a).  Plaintiff alleges that CW1 was one of about ten cash management and collections representatives working for OCA during the class period, and one of less than 20 employees in OCA's accounting department.  CW1 reported to the "Supervisor and/or Director of Corporate Collections," who is not identified by name in the CAC.  *Id.* Throughout the class period, CW1 frequently received calls from affiliates and patients complaining that OCA had failed to credit payments against some patients' outstanding receivable balances. *Id.*  CW1, who had access to the company's general ledger, investigated such complaints and often found that OCA had incorrectly recorded payments from patients in "miscellaneous" accounts, rather than as a reduction of the patients' receivable balances.  *Id.*  CW1 allegedly mentioned these problems to her "superiors," but was never given an explanation as to why the problem occurred.  *Id.*  CW1 also stated that other cash management and collections representatives reported similar experiences.  *Id.*  Finally, plaintiff alleges that CW1 did not observe any steps by OCA management to improve internal controls,

21

specifically concerning increased automation for determining patient receivables, during the class period. *Id.*

Confidential Witness No. 2 also worked in the accounting department at OCA's Louisiana headquarters for most of the class period, from June 2004 through May 2005. *Id.* ¶ 34(a). Plaintiff does not specifically identify CW2's job title, but he alleges that CW2 had "responsibilities for various aspects of the Company's financial reporting" and reported to CFO Verret. *Id.* CW2 stated that OCA's management took a "lackadaisical" approach to its financial reporting obligations. *Id.* With respect to internal controls, CW2 stated that during 2004, OCA's entire accounting department, including Verret, and other non-accounting employees, such as Palmisano, Jr., had access to the company's accounting records, journals, and general ledger and had the ability to make changes to those records without supervision. *Id.* Like CW1, CW2 did not observe any enhancements to OCA's internal controls during the class period. *Id.*

Confidential Witness No. 3 was a cash management and collections representative for OCA during part of the class period, from June 2004 through January 2005. *Id.* ¶ 34(b). CW3 handled cash management and collections for approximately 20 of OCA's affiliated practices. Like CW1, CW3 frequently received calls from affiliates and patients complaining that OCA had

22

failed to credit payments against some patients' outstanding balances. *Id.* CW3 asked her supervisors about this problem, but was not given a satisfactory explanation. *Id.* CW3 also stated that Jeffrey Adams, another member of OCA's accounting department, prepared Daily Accounts Receivable Aging Reports, which "provided management with daily updates on the status of outstanding patient receivables and would have shown increasing outstanding balances which purportedly were not being paid." *Id.* According to CW3, Palmisano, Jr. was among the members of OCA management who received the daily reports. *Id.* Finally, like CW1 and CW2, CW3 did not observe any internal control improvements at OCA during the class period. *Id.*

## II.  PROCEDURAL HISTORY

Shortly after OCA's June 7, 2005 announcement, a number of plaintiffs filed securities class actions and shareholder derivative actions in this district against OCA and certain of its officers and directors.  Those actions were consolidated before this Court and, by order and reasons dated November 18, 2005, the Court appointed Samuel Boodman as the lead plaintiff in the securities cases.  Plaintiff filed the CAC on February 1, 2006.  Plaintiff asserts a claim against OCA, Palmisano, Sr., Verret and Palmisano, Jr. under section 10(b) of the Exchange Act

and Rule 10b-5 thereunder, as well as a claim for control person liability against each of the individual defendants under section 20(a) of the Exchange Act.

Defendants filed motions to dismiss the CAC on March 8, 2006.  During the briefing of defendants' motions, however, OCA filed its petition for voluntary bankruptcy protection, thus staying plaintiff's claims against it in this case.[3] Accordingly, this order addresses only the individual defendants' motions to dismiss.

## III. APPLICABLE LAW

### A.    Rule 12(b)(6) Standard

Motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are traditionally viewed with disfavor and are infrequently granted.  *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005) (citing *Shipp v. McMahon*, 199 F.3d 256, 260 (5th Cir. 2000)).  On a motion to dismiss, the court must accept all well-pleaded facts in the complaint as true and view those facts in the light most favorable to the plaintiff.  *See Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996); *Am. Waste & Pollution Control Co. v. Browning-Ferris*,

---

[3]The companion derivative cases have been stayed in their entirety as a result of the automatic bankruptcy stay.

24

*Inc.*, 949 F.2d 1384, 1386 (5th Cir. 1991).  The court must resolve doubts as to the sufficiency of the claim in the plaintiff's favor.  *Vulcan Materials Co. v. City of Tehuacana*, 238 F.3d 382, 387 (5th Cir. 2001).  The court need not, however, "'strain to find inferences favorable to the plaintiffs.'" *Southland Sec. Corp. v. Inspire Ins. Solutions Inc.*, 365 F.3d 353, 361 (5th Cir. 2004) (quoting *Westfall v. Miller*, 77 F.3d 868, 870 (5th Cir. 1996)).  Nor will it accept "conclusory allegations, unwarranted deductions, or legal conclusions." *Id.; see also Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006) ("[T]he plaintiff must plead specific facts, *not conclusory allegations*, to avoid dismissal.").

**B.   Pleading Standards for Securities Fraud Cases**

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must adequately allege, in connection with the purchase or sale of securities, "'(1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately caused [the plaintiff's] injury.'" *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406-07 (5th Cir. 2001) (quoting *Tuchman v. DSC Commc'ns*, 14 F.3d 1061, 1067 (5th Cir. 1994)).

A plaintiff asserting a claim for securities fraud must also

25

plead his claim in accordance with the particularity requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4.  The relevant provision of the PSLRA provides:

> Misleading statements and omissions.  In any private action arising under this title in which the plaintiff alleges that the defendant
>
> (A) made an untrue statement of a material fact; or
>
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).  The Fifth Circuit has held that the PSLRA's pleading requirement "incorporates, at a minimum, the pleading standard for fraud actions under Federal Rule of Civil Procedure 9(b)."  *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005) (citing *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 865 (5th Cir. 2003)); *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002) ("[W]e have observed that '[t]he effect of the PSLRA in this respect is to *at a minimum,*

incorporate the standard for pleading fraud under Fed. R. Civ. P. 9(b).'") (quoting *Nathenson*, 267 F.3d at 412).   To satisfy Rule 9(b), a plaintiff must specify each allegedly fraudulent statement, the speaker, when and where the statement was made and why the statement was false or misleading.  *Fin. Acquisition Partners*, 440 F.3d at 287; *Plotkin*, 407 F.3d at 696.

The PSLRA also requires that a plaintiff "state with particularity facts giving rise to a strong inference" of scienter with respect to each allegedly false or misleading statement.  15 U.S.C. § 78u-4(b)(2).  The scienter element of a section 10(b) claim can be satisfied by establishing either intent to defraud or severe recklessness.  *Fin. Acquisition Partners*, 440 F.3d at 287; *Nathenson*, 267 F.3d at 408.  Severe recklessness, for purposes of section 10(b)'s scienter element, is "'limited to those highly unreasonable omissions or representations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or so obvious that the defendant must have been aware of it.'"  *Nathenson*, 267 F.3d at 408 (quoting *Broad v. Rockwell*, 642 F.2d 929, 961-62 (5th Cir. 1981)).

## IV.  DISCUSSION

Defendants Palmisano, Sr., Verret and Palmisano, Jr. each move to dismiss the CAC on two grounds.  First, they argue that plaintiff has failed to allege any actionable false statements or omissions of material fact.  Second, they assert that plaintiff has not alleged facts sufficient to establish a strong inference of scienter.  In connection with each of these challenges, the individual defendants also argue that plaintiff has engaged in impermissible "group pleading" and has failed to specify each defendant's role in the alleged fraud.

### A.  Group Pleading

Defendants first argue that plaintiff improperly relies on the "group pleading" doctrine.  Under the group pleading doctrine, which has been accepted by some courts, a plaintiff is permitted to rely on a presumption that certain public statements issued by a company are the collective work of a group of company insiders.  The Fifth Circuit has described the group pleading doctrine as follows:

> Instead of being required to plead that a
> defendant actually made, authored or approved
> an offending statement in a corporate
> communication, the "group pleading" doctrine
> in its broadest form allows unattributed
> corporate statements to be charged to one or
> more individual defendants based solely on

28

their corporate titles.  Under this doctrine,
the plaintiff need not allege any facts
demonstrating an individual defendant's
participation in the particular communication
containing the misstatement or omission where
the defendants are "insiders or affiliates"
of the company. . . .  Therefore, the "group
pleading" doctrine would allow the plaintiff
to plead the first element of a section 10(b)
case against an individual defendant without
citing particular facts connecting the
defendant to the alleged fraud.

*Southland Sec. Corp.*, 365 F.3d at 363 (internal citation
omitted).

In *Southland Securities Corp.*, the Fifth Circuit rejected
the group pleading doctrine as inconsistent with the PSLRA's
pleading and scienter requirements.  *See id.* at 364.  The
*Southland Securities Corp.* court concluded that, under the PSLRA,
an unattributed corporate statement can be charged to an
individual corporate officer only if "specific factual
allegations link the individual to the statement at issue," such
as "a signature on the document or particular factual allegations
explaining the individual's involvement in the formulation of
either the entire document, or that specific portion of the
document, containing the statement."  *Id.* at 365.

In his opposition brief, plaintiff disclaims any reliance on
the group pleading doctrine.  Plaintiff asserts that the CAC
sufficiently attributes statements to the individual defendants

because it identifies the authors or signatories of many of the allegedly false or misleading statements and alleges that the individual defendants were involved in creating OCA's false or misleading press releases during the class period.

The Court finds that plaintiff has adequately attributed many of the allegedly false or misleading statements identified in the complaint to one or more of the individual defendants. For example, plaintiff alleges that Palmisano, Sr. and Verret each signed and certified OCA's quarterly reports for the first three quarters of 2004. *See* CAC ¶ 25 (May 20, 2004 Form 10-Q); *id.* ¶ 35 (August 9, 2004 Form 10-Q); *id.* ¶ 42 (December 23, 2004 Form 10-Q); *Southland Sec. Corp.*, 365 F.3d at 365 (defendant's signature on corporate document sufficient to attribute statements within the document to that defendant). Moreover, a number of statements in OCA's press releases during the class period are expressly attributed to Palmisano, Sr. *See* CAC ¶ 23 (May 18, 2004 press release); *id.* ¶ 24 (May 20, 2004 press release); *id.* ¶ 39 (August 10, 2004 press release); *id.* ¶ 45 (March 17, 2005 press release).

Plaintiff has failed, however, to specifically link a number of the alleged false statements to any individual. The individual defendants are correct that they cannot be held liable for any statements that plaintiff has not specifically tied to

them, including any unattributed statements in OCA press releases during the class period.  Although the CAC alleges generally that the individual defendants were involved in creating and/or approving all of OCA's press releases and other public statements during the putative class period,[4] this boilerplate allegation, which amounts to little more than an assertion that the individual defendants are responsible for all of OCA's public statements because of their positions with the company, is facially insufficient to attribute any particular statement to any of the individual defendants.  *See Fener v. Belo Corp.*, 425 F. Supp. 2d 788, 797-98, 2006 WL 832514, at *5-6 (N.D. Tex. Mar. 30, 2006).  Indeed, the *Southland Securities Corp.* court

---

[4]Paragraph 14 of the CAC alleges, in pertinent part:

The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of OCA's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

CAC ¶ 14.

expressly held that this type of general attribution allegation is insufficient because it "fails to specify which of the[] documents is attributable to each individual defendant, let alone which portions or statements within the[] documents are assignable to each individual defendant." *Southland Sec. Corp.*, 365 F.3d at 365; *see also Fin. Acquisition Partners*, 440 F.3d at 287 ("Corporate officers are *not* liable for acts solely because they are officers, even where their day-to-day involvement in the corporation is pleaded.").

Plaintiff's failure to specifically attribute statements to the individual defendants is fatal to the section 10(b) claim against Palmisano, Jr. As plaintiff even concedes, the CAC contains no allegation that Palmisano, Jr. signed any of OCA's public filings during the class period. *See* Pl. Opp. Mem. at 33 (noting that "Palmisano, Jr. was not a signatory to the false SEC filings issued during the Class Period"). Moreover, plaintiff has not alleged sufficient facts to connect Palmisano, Jr. to any of the other allegedly false statements identified in the CAC. Accordingly, because plaintiff has failed to identify any false or misleading statement attributable to Palmisano, Jr., the Court will dismiss plaintiff's section 10(b) claim against him.

In addition, the Court will evaluate the sufficiency of plaintiff's claims against Palmisano, Sr. and Verret only with

respect to those allegedly false or misleading statements that
plaintiff has properly attributed to them.

**B.   Falsity**

Palmisano, Sr. and Verret next argue that plaintiff has
failed to adequately allege the falsity of any of their
statements concerning either OCA's reported patient receivables
or OCA's internal controls.

1.   *Patient Receivables*

The Court easily concludes that plaintiff has adequately
alleged that OCA's reported patient receivables for the first
three quarters of 2004 were materially false at the time they
were reported.  First, as noted above, plaintiff has alleged that
Palmisano, Sr. and Verret each signed OCA's quarterly reports for
the first three quarters of 2004, so the statements contained in
those reports are attributable to them.  *See* CAC ¶¶ 25, 35, 42;
*Southland Sec. Corp.*, 365 F.3d at 365.  In its June 7, 2005 press
release, OCA specifically admitted that "the amount of patient
receivables reported at each of March 31, June 30 and September
30, 2004 was overstated by material amounts," and that "due to
these overstatements, these previously issued quarterly financial
statements will need to be restated and should no longer be

33

relied upon." CAC ¶ 49. These allegations are plainly sufficient to establish the falsity of OCA's reported patient receivables for the purposes of these motions. *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004) ("Although a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made.").

### 2.   *Internal Controls*

Palmisano, Sr. and Verret also argue that plaintiff has not alleged the falsity of their statements concerning OCA's internal controls with the requisite particularity. To adequately plead the falsity of a statement under Rule 9(b) and the PSLRA, a plaintiff must allege facts sufficient to provide an adequate basis for believing that the defendants' statements were false when made. *See ABC Arbitrage*, 291 F.3d at 351-54; *Ray v. Palmisano*, No. Civ.A. 01-0949, 2002 WL 3141573, at *3 (E.D. La. Oct. 24, 2002). For purposes of the instant motion, the Court focuses on two types of allegedly false statements about OCA's internal financial reporting controls that plaintiff has set forth in the CAC. First, plaintiff alleges that defendants' statements in OCA's SEC filings that the company was working to

34

address its internal control problems, including by increasing automation in calculating patient revenue and receivables, improving communication between operations and accounting, and improving documentation of controls and procedures, were materially false or misleading because internal control problems were not being properly addressed and were in fact getting worse. Second, plaintiff alleges that the Sarbanes-Oxley certifications signed by Palmisano, Sr. and Verret falsely stated that they had disclosed all material weaknesses and significant deficiencies in OCA's internal financial reporting controls to the company's auditor and to its audit committee.  The Court now considers each type of allegedly false statement.

### a.    Statements to the SEC about OCA's Internal Controls

Plaintiff alleges that defendants falsely stated that OCA was taking steps to address its internal control problems in the following SEC filings: March 31, 2004 Form 10-Q; June 30, 2004 Form 10-Q; July 26, 2004 Form 8-K; and Sept. 30, 2004 Form 10-Q. While Palmisano, Sr. and Verret were telling investors throughout the putative class period in these SEC filings that OCA was fixing its internal control problems, plaintiff alleges that the reality of what was taking place inside the company materially

35

contradicted defendants' public assertions.  Plaintiff argues
that the CAC's allegations based on interviews with three
confidential witnesses, all former employees in OCA's accounting
department, establish that OCA was not, in fact, working to
enhance or improve its internal controls during the class period.
Specifically, plaintiff notes that each of the three confidential
witnesses stated that he or she did not observe any steps by OCA
management to improve internal controls, even though OCA's
accounting department consisted of fewer than 20 people.  CAC ¶
31(a)(i) ("CW1 noted that CW1 did not observe steps by OCA
management to improve internal controls and specifically did not
observe increased automation in determining patient
receivables."); *id.* ¶ 34(a) ("CW2 did not observe enhancements to
internal controls such as automating systems, documenting
internal control procedures and/or improvements relating to
segregation of duties."); *id.* (CW2 stated that "no readily
apparent steps were taken by OCA during the Class Period to truly
improve internal controls"); *id.* ¶ 34(b) ("CW3 . . . did not
observe enhancements to internal control procedures and/or
increased meetings between Operations and Accounting to improve
communications.").  Plaintiff also argues that OCA's post-class
period admissions that the company did not have effective
internal financial reporting controls in place at December 31,

36

2004 establishes that defendants' class period statements about improving internal controls were false at the time they were made.  In connection with this allegation, plaintiff asserts that many of the internal control problems that OCA acknowledged after the putative class period were nearly identical to problems identified in the E&Y letter in early 2004.  *See id.* ¶ 69.

Palmisano, Sr. and Verret attack both of these sets of allegations.  They argue that plaintiff's allegations based on confidential witnesses are insufficient to show that OCA was not making enhancements to its internal controls during the class period because the confidential witnesses were all low-level employees who would not necessarily have knowledge of changes to the company's internal controls.  They also argue that plaintiff's allegations show that two of the three confidential witnesses were not hired until June 2004 and would have no basis for knowing about any steps taken to improve internal controls before they were hired.  In addition, Palmisano, Sr. and Verret argue that plaintiff's attempt to establish the falsity of defendants' class period statements based on OCA's later disclosures that its internal controls were inadequate is nothing more than an impermissible attempt to plead "fraud by hindsight."

As an initial matter, although Palmisano, Sr. and Verret frame their argument about plaintiff's confidential witnesses as

one about whether plaintiff has pleaded his allegations based on confidential sources sufficient particularity, the Court finds that their arguments actually address the somewhat distinct issue of whether plaintiff's confidential witness allegations even support a belief that any of defendants' statements were false.

In *ABC Arbitrage*, the Fifth Circuit held that the PSLRA's pleading requirements do not require plaintiffs to name their confidential sources, "provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *ABC Arbitrage*, 291 F.3d at 352.  Plaintiff has provided general descriptions of the employment duties of each of the confidential witnesses, the department in which they worked, and the dates that they were employed by OCA.  In this case, the background information that plaintiff has provided is sufficient to support the conclusion that a person in the position of the confidential witnesses would possess the information that they allege, which is based primarily on personal observation.

The more substantial issue is whether the allegations of the confidential witnesses support a reasonable belief that defendants' public statements that OCA was taking steps to address its internal control deficiencies were false or

38

misleading.  The Court finds that they do.  OCA's accounting
department consisted of fewer than 20 employees during the class
period.  CAC ¶¶ 31(a)(i), 34(a)-34(b).  Plaintiff has presented
testimony, which must be taken as true for purposes of this
motion, from three of these employees – more than *fifteen* percent
of the company's accounting employees during the class period –
that they did not observe any ongoing enhancements to OCA's
internal controls during the class period.[5]  By contrast, CW2
witnessed a "lackadaisical" approach by management to financial
reporting.  *Id.* ¶ 34(a).  Furthermore, each confidential witness
observed that internal control problems initially identified in
the 2004 E&Y letter persisted throughout the class period.  *Id.* ¶
31(a)(i) ("CW1 routinely found that although payments were
received from the complaining payments, such payments were being

---

[5]Defendants contend that, because two of plaintiff's
confidential witnesses were not hired by OCA until after the
beginning of the class period, they could not have knowledge of
improvements made before they were hired.  This is not
necessarily true, but in any case, those witnesses could, by the
same token, have knowledge of whether improvements were made
after they were hired, which would be relevant to showing whether
defendants' public statements that OCA continued to improve its
internal controls throughout the putative class period were
false.  *See, e.g.*, CAC ¶ 43 (December 20, 2004 quarterly report)
("We continue to further document and enhance our controls and
procedures . . . .").  Thus, allegations based on these witnesses
(who were hired only one month into the class period) are not *per
se* insufficient simply because they were hired after the
beginning of the class period.

recorded in 'miscellaneous' accounts and not being recorded as a reduction of the respective patients' outstanding receivables."); *id.* ¶ 34(a) ("CW2 did not observe enhancements to internal controls such as automating systems, documenting internal control procedures and/or improvements relating to segregation of duties."); *id.* ¶ 34(b) ("CW3 noted that OCA took monies paid directly to OCA by patients for outstanding balances and routinely failed to reduce outstanding patient receivables by such amounts."). For example, defendants stated in their SEC filings that the company was taking steps to improve segregation of duties with respect to financial accounting. *See id.* ¶¶ 32, 36, 43. In reality, plaintiff alleges, OCA did little, if anything, to abate the problem of uncontrolled access to financial data identified in the 2004 E&Y letter. Plaintiff asserts that CW2

> observed that during at least 2004 all members of the accounting department, including CFO Verret, and even non-accounting department employees such as Chief Operating Officer, Palmisano, Jr., not only had access to accounting records and journals, including the Company's General Ledger, but also had the ability to make entries in such vital Company documents without supervision or controls.

*Id.* ¶ 34(a). Although CW2 only began working at OCA in June 2004, this allegation supports an inference that OCA had

40

inadequate internal controls over access to financial data
beginning in at least June 2004, before OCA issued its second and
third quarter Form 10-Qs.  Moreover, OCA's November 15, 2005 Form
8-K, which announced PWC's resignation, also supports an
inference that OCA did not adequately control access to financial
data during the class period.  In the Form 8-K, OCA referred to
alleged alterations of records provided to independent
accountants "from January 2000 through May 2005."  CAC ¶ 53.

Given the size of OCA's accounting department, as well as
the positions of plaintiff's witnesses within it, their testimony
can establish that, despite Verret's and Palmisano, Sr.'s public
statements to the contrary, meaningful efforts were not being
made, or at the very least being implemented, during the class
period to improve OCA's internal controls.  At the motion to
dismiss stage, these alleged facts, in light of their specificity
and source, are sufficient to show that OCA's control problems
clearly existed and defendants' statements about improving OCA's
internal controls were clearly false.[6]

---

[6] *See, e.g.*, CAC ¶ 32 ("Since December 31, 2003, OCA also
has made certain changes to enhance its internal control over
financial reporting. . . .  OCA is working to further document
and enhance its controls and procedures."); *id.* ¶ 36 ("Since
March 31, 2004, we have taken certain steps to enhance our
internal control over financial reporting. . . .  We continue to
further document and enhance our controls and procedures."); *id.*
¶ 43 ("Since June 30, 2004, we have taken certain steps to

Further, OCA's June 7, 2005 disclosure that the company's internal controls were ineffective at December 31, 2004 also supports the falsity of defendants' earlier statements. Plaintiff argues essentially that OCA's public statements during the class period that it was working to improve its internal controls in certain areas must have been false because the June 7, 2005 disclosure identified a number of internal control deficiencies in those same areas that had persisted for five years.  Plaintiff provides a chart in his complaint that compares the internal control failures found by E&Y in early 2004 with the internal control failures conceded in the June 7, 2005 Form 8-K. *Id*. ¶ 69.  The degree to which the problems identified in early 2004, before the class period, mirror those that still existed in June 2005, at the end of the class period, is undoubtedly evidence that defendants' repeated assurances of improving OCA's internal control processes were misleading when made.  For example, in both April 2004 and June 2005, OCA was found to have not maintained effective controls over revenue and receivables, to have problems with its review and approval process of its accounting entries, to have not maintained adequate segregation

---

enhance our internal control over financial reporting. . . .  We continue to further document and enhance our controls and procedures, but we have not yet completed the testing of their operating effectiveness.").

of duties in its reporting processes.  *Id.*  In fact, plaintiff alleges that the depth and magnitude of OCA's internal control problems were worse in June 2005 than in April 2004.  *Id.*  To this end, defendants' contention that because they never told investors during the class period that OCA's internal controls were effective, defendants' interim public statements that OCA was working to address those weaknesses were not false rings hollow.  Plaintiff has alleged sufficient facts to raise the strong inference that defendants' were not working to meaningfully enhance their internal control processes during the class period.  In fact, the control problems were of such a nature that they could logically lead to a misstatement of assets by defendants.

The Fifth Circuit recently held that when a securities fraud defendant's statements would lead a reasonable investor to form an impression that was in contradiction to the reality, those statements can be considered false under the PSLRA's heightened pleading standard.  *See Plotkin v. IP Axess Inc.*, 407 F.3d 690, 697-98 (5th Cir. 2005).  Here, defendants' repeated assertions throughout the class period that OCA was taking steps to enhance its internal controls, and in fact *was* enhancing its internal controls, can be characterized as misleading investors into believing that the shortcomings OCA disclosed at the start of the

43

class period were being fixed, when in actuality the opposite was true.  At the very least, plaintiff's allegations raise a sufficient inference that defendants' statements were misleading in that they caused reasonable investors to believe that OCA's internal control problems were less severe than they actually were.

        b.   *Sarbanes-Oxley Certifications*

     Plaintiff has also sufficiently alleged that the Sarbanes-Oxley certifications that Palmisano, Sr. and Verret signed in connection with OCA's quarterly reports for the first three quarters of 2004 were false or misleading.  The certifications that Palmisano, Sr. and Verret signed included a representation that they had designed OCA's disclosure controls to ensure that they were made aware of material information and that they had evaluated the effectiveness of these disclosure controls.  In all three Form 10-Qs the company issued during the class period, defendants represented that these disclosure controls were "effective."  *See* CAC ¶ 28 (May 20, 2004 Form 10-Q); *see also id.* ¶ 37 (August 9, 2004 Form 10-Q); *id.* ¶ 44 (December 23, 2004 Form 10-Q).  For the same reasons that the Court finds defendants' statements about OCA's internal controls false or misleading, discussed *supra*, the Court finds their

44

representations as to the effectiveness of the company's disclosure controls false or misleading.  While defendants may have qualified their representations as to OCA's disclosure controls in their May and December Form 10-Qs, those qualifications were based on false or misleading statements about OCA's internal controls, discussed *supra*.

Additionally, the certifications that Palmisano, Sr. and Verret signed included a representation that they had disclosed to OCA's independent auditors and its audit committee "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information." *Id.* ¶ 28 (May 20, 2004 Form 10-Q); *see also id.* ¶ 37 (August 9, 2004 Form 10-Q); *id.* ¶ 44 (December 23, 2004 Form 10-Q).  As discussed *supra*, plaintiff has adequately alleged that OCA failed to disclose material weaknesses in its internal controls over access to financial data during the class period.  Further, the November 15, 2005 Form 8-K supports the inference that, contrary to what they stated in their Sarbanes-Oxley certifications, Palmisano, Sr. and Verret did not, in fact, inform PWC of these material weaknesses during the class period.  Rather, PWC stated that it could not and did not rely on any financial records it

45

was provided by OCA during the class period.  The Court therefore
finds that plaintiff has adequately alleged that statement in
defendants' Sarbanes-Oxley certifications were false or
misleading when made.


C.   Scienter

Palmisano, Sr. and Verret also argue that the CAC does not
allege facts sufficient to support a strong inference of scienter
with respect to any of their allegedly false statements.

As discussed *supra*, the PSLRA requires a securities fraud
plaintiff to plead with particularity specific facts giving rise
to a strong inference of scienter, *i.e.*, that the defendant
either knew that his public statements were false or was severely
reckless as to their falsity.  15 U.S.C. § 78u-4(b)(2);
*Nathenson*, 267 F.3d at 408.  A plaintiff can establish the
required strong inference of scienter through either direct or
circumstantial evidence.  *See Goldstein v. MCI WorldCom*, 340 F.3d
238, 246 (5th Cir. 2003).  But general or conclusory allegations
that a defendant "must have known" that his statements were false
based on his position within a company cannot support an
inference of scienter.  *See Goldstein*, 340 F.3d at 251 ("[T]he
plaintiffs' general allegation that Ebbers was a 'hands-on' CEO
and therefore must have been aware of the accounts receivable

46

situation simply lacks the requisite specificity."); *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002) ("A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions with the company."). Courts should consider a plaintiff's scienter allegations collectively, rather than individually, to determine whether they establish a strong inference of scienter. *See Goldstein*, 340 F.3d at 246 ("[W]e consider all the facts and circumstances alleged to determine whether they, in toto, raise a requisite strong inference of scienter."); *Abrams*, 292 F.3d at 431 ("The appropriate analysis . . . is to consider whether all facts and circumstances 'taken together' are sufficient to support the necessary strong inference of scienter . . . .").[7]

---

[7]Although the Court must consider plaintiff's scienter allegations together to determine whether they support a strong inference of scienter, the Court is also mindful that the plaintiff must plead facts to support a strong inference of scienter as to *each* defendant for *each* false or misleading statement. *See* 15 U.S.C. § 78u-4(b)(2) ("[T]he complaint shall, with respect to *each act or omission* alleged to violate this title, state with particularity facts giving rise to a strong inference that *the defendant* acted with the required state of mind.") (emphasis added); *see also In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 886 (W.D.N.C. 2001) ("For *each alleged misstatement* or omission, plaintiffs must plead specific facts concerning, for example, when *each defendant* or other corporate officer learned that a statement was false . . . .") (emphasis added).

Thus, a plaintiff cannot simply lump together all of the scienter allegations in his complaint and assert that, taken together, they establish a strong inference of scienter in some

Plaintiff alleges few facts that would show directly that either Palmisano, Sr. or Verret knew about the falsity of any of their statements during the putative class period.  However, the Court finds that allegations of the following circumstances, when considered together, are sufficient to raise a strong inference of scienter as to Palmisano, Sr. and Verret:  (1) the importance of OCA's patient receivables asset; (2) the severity of OCA's internal control problems; (3) the relationship of the internal control problems to the overstatements of the patient receivables asset; and (4) the Sarbanes-Oxley certifications executed by Palmisano, Sr. and Verret.

1.   *Importance of OCA's patient receivables asset*

Plaintiff alleges that, because OCA materially overstated its patient receivables, the company's single largest asset, the company's reported financial statements during 2004 were knowingly false or were made with severe recklessness.  Plaintiff further alleges that these overstatements support an inference of scienter as to Palmisano, Sr. and Verret, who signed the

---

general sense.  This limitation accords with common sense.  In multiple-misstatement cases such as this one, a factual allegation that suggests that a defendant knew that one particular statement was false or misleading might be irrelevant to the question of whether that defendant knew that a different statement was false or misleading.

Company's financial results during the class period.  The Court finds scienter adequately pleaded.

As plaintiff alleges, throughout the class period, patient receivables represented OCA's single largest asset.  CAC ¶¶ 25, 35, 42.  Specifically, for the first quarter of 2004, patient receivables constituted $122.9 million of OCA's total reported assets of $200.9 million; for the second quarter of 2004, patient receivables constituted $128.7 million of total reported assets of $204.7 million; and for the third quarter of 2004, patient receivables constituted $124.3 million of total reported assets of $198.9 million.  *Id.*  Obviously, patient receivables was OCA's most significant asset in 2004, as at any given time during that period it alone represented roughly 60 percent of the company's entire asset pool.  The Fifth Circuit has held that material misstatements as to a company's most significant asset can give rise to a strong inference that those misstatements were made with knowledge of their falsity or severe recklessness in not knowing that they were false.  *See Plotkin*, 407 F.3d at 699-700 ("It is reasonable to assume, given the importance of these deals to the company, that Ipaxess would have familiarized itself with the financial condition of Lynxus/AGNI . . ."); *see also In re Netsolve, Inc. Sec. Litig.*, 185 F. Supp. 2d 684, 697 (N.D. Tex. 2001) ("The plaintiffs have alleged AT&T was NetSolve's primary

customer – indeed, was the lifeblood of the company – and that sales to AT&T were declining during the class period.  If true, this information would have been 'so obvious that the defendant[s] must have been aware of it.'") (internal citation omitted).

Plaintiff has alleged additional facts that bolster the inference that defendants knew that their reported patient receivables figures were false when made.  Plaintiff presents testimony from both CW1 and CW3 that throughout the class period each received phone calls from OCA-affiliated practices and/or patients complaining that patient payments were not being credited against their balances, and therefore the amounts due remained outstanding.  CAC ¶¶ 31(a), 34(b).  CW1 learned that these patient payments were being recorded in "miscellaneous accounts" and not as a reduction of the patients' outstanding receivables.  *Id.* ¶ 31(a).  Both CW1 and CW3 subsequently disclosed the problem to their supervisors, but were never provided an explanation for the problem even as the problem persisted throughout the class period.  *Id.* ¶¶ 31(a), 34(b).  Additionally, CW1 stated that, based on discussions with colleagues, other accounting department employees were similarly finding that patient payments were not being credited against their outstanding patient receivable balance.  *Id.* ¶¶ 31(a).  As

50

discussed above, OCA was a small company.  During the class
period, the entire accounting department consisted of fewer than
twenty employees.  Furthermore, Palmisano, Sr. and Verret were
the top officers at OCA and were directly responsible for
disclosing the company's financial performance to the public
throughout the class period.  Palmisano, Sr., who is a certified
public accountant, helped develop the company's accounting
systems.  *Id.* ¶ 11.  Given this evidence, the Court finds that it
would have been virtually impossible for defendants to not have
known of the ongoing problems with, and, ultimately, the falsity
of, the company's patient receivables figures.  In *Netsolve*, the
district court found that scienter had been adequately alleged
against the individual defendants who were the top
officers/directors at a small company and had made material
misstatements regarding the company's largest asset because the
truth "would have been 'so obvious that the defendant[s] must
have been aware of it.'"  185 F. Supp. 2d at 697 (internal
citation omitted).  Here, the Court finds that plaintiff has
alleged enough facts to give rise to a strong inference that
Palmisano, Sr. and Verret must have been aware that their
misstatements of OCA's patient receivables figures were false or
misleading when made.

51

2. *Severity of OCA's Internal Control Problems*

Plaintiff next asserts that the very severity of OCA's internal controls problems creates an inference that Palmisano, Sr. and Verret acted with scienter. *See In re Elec. Data Sys. Corp. Sec. & ERISA Litig.*, 298 F. Supp. 2d 544, 557 (E.D. Tex. 2004) (stating that the "sheer magnitude and importance" of particular project supported an inference that CEO and CFO knew of its true status); *In re Triton Energy Ltd. Sec. Litig.*, No. 5:98-CV-256, 2001 U.S. Dist. LEXIS 5920, at *31-32 (E.D. Tex. Mar. 30, 2001) (finding that the importance of properly accounting for small number of assets to the company's success supported an inference of scienter). The *Electronic Data Systems* and *Triton Energy* courts did not, however, find a strong inference of scienter based solely on the relative magnitude of the problems at the company; in each of those cases, the plaintiffs also alleged specific facts to link the defendants to the undisclosed problems at issue to create an inference that they were aware that the problems existed. For example, in *Electronic Data Systems*, the court considered scienter allegations based on the importance of the project in question, but the court took pains to emphasize that it was not simply imputing knowledge to the defendants based on their positions with the company: "[T]his is not a case where Plaintiffs try to

impute knowledge of problems . . . to [defendants] simply because
of their corporate positions.  First, and perhaps most
importantly, Plaintiffs have pointed to *specific meetings,
reports, and practices* whereby [the defendants] were made
actually aware of the NMCI Contract's status." *Elec. Data Sys.*,
298 F. Supp. 2d at 557 (emphasis added).  Similarly, in *Triton
Energy*, the court emphasized that the plaintiffs had alleged that
the company had a small number of assets, that the individual
defendants knew that accurate disclosure about those assets was
essential to investors, and that they had previous experience
with the very type of disclosures that were at issue in the case.
*Triton Energy*, 2001 U.S. Dist. LEXIS 5920, at *31-32.  The court
found that these allegations together could support the requisite
inference that the defendants knew about misrepresentations in
the disclosures.  *Id.*

In this case, plaintiff has alleged specific facts that,
when viewed together, raise an inference of fraudulent intent by
Palmisano, Sr. and Verret when making their false or misleading
statements about the company's internal control problems
discussed in the previous section.  Put a slightly different way,
the facts alleged in the complaint, if true, indicate a depth of
involvement in the company's accounting processes on the part of
both Palmisano, Sr. and Verret that makes it appear implausible

that they would not have been aware of the real state of OCA's internal control mechanisms.  As mentioned above, Palmisano, Sr., who is a certified public accountant, helped develop the company's accounting systems.  *Id.* ¶ 11.  He was aided in that endeavor by his son, Palmisano, Jr., who served in various capacities during his tenure at OCA, including as CFO prior to the class period.  *Id.* ¶¶ 11, 12.  While it is unclear from the complaint when or why Palmisano, Jr. was no longer serving as CFO at the start of the class period, it appears from OCA's July 26, 2004 Form 8-K, in which it detailed some of the problems raised in E&Y's early 2004 letter, that the company's previous CFO had contributed to the material weaknesses in OCA's internal controls identified before the start of the class period by E&Y.  *Id.* ¶ 32 ("OCA has also hired additional accounting staff and taken steps to improve communication between its operations and financial accounting areas, including appointment of a chief financial officer with experience in OCA's operations area.").  According to CW2, however, Palmisano, Jr. did not cease his involvement in the company's accounting affairs after his tenure as CFO.  CW2 alleges that, during the class period, Palmisano, Jr. had access to accounting records and journals and had the ability to make entries in vital company documents without supervision or controls.  *Id.* ¶ 34(a).  Palmisano, Jr. also allegedly sent daily

54

financial reports to CW2 for review during the class period, which is evidence that he was aware of the company's problematic financial reporting processes. *Id.* ¶ 34(b). Palmisano, Jr. reported directly to his father throughout the class period. *Id.* ¶ 12. In sum, the Palmisanos' fingerprints were all over OCA's accounting systems since at least 2000, creating a strong inference that Palmisano, Sr. knew that the company was not meaningfully enhancing its internal control processes during the class period. As to Verret, who is also a certified public accountant, CW2 observed that, during the class period, like Palmisano, Jr., he had access to accounting records and journals and had the ability to make entries in vital company documents without supervision or controls. *Id.* ¶ 34(a). The Court credits the testimony of CW2, who reported directly to Verret, as yielding a reasonable inference that Verret possessed material facts regarding the true state of OCA's failing internal control processes. The Court, therefore, finds that plaintiff has adequately pleaded scienter as to Verret as well. *See Plotkin*, 407 F.3d at 700 (holding that a reasonable inference that a defendant knew that or was severely reckless in not knowing that his statements were false or misleading is sufficient to allege scienter at the motion to dismiss stage). Accordingly, the Court does not dismiss plaintiff's section 10(b) claim against

55

Palmisano, Sr. and Verret on this ground.


     3.   *Relationship of the Internal Control Problems to the*
          *Overstatements of the Patient Receivables Asset*

     While the Court addresses the statements about the patient
receivables and internal control problems in separate sections
above, it also finds that the statements go hand in hand and,
when viewed together, support a further inference of scienter as
to Palmisano, Sr. and Verret.  The patient receivables asset and
the internal control problems were essentially intertwined, as
OCA could not have inflated its patient receivables asset during
the class period without a failure of its internal controls.  As
discussed earlier, CW1 and CW3 both stated that their supervisors
in the accounting department knew of the problems being reported
by client practices and/or patients as to outstanding balances.
Yet throughout the class period, this problem was never fixed.
The effect of this type of accounting irregularity was to inflate
OCA's patient receivables, its most important asset.  Similarly,
while defendants repeatedly stated during the class period that
the company was improving its segregation of duties with respect
to financial accounting, the company made no material
improvements in this regard.  Rather, officers such as Verret and
Palmisano, Jr. as well as members of the accounting department

                                56

retained the ability to make entries in vital company documents
without supervision or controls during the class period,
according to CW2.  Plaintiff alleges lack of internal controls
such as these also enabled OCA to inflate its patient receivables
asset.

     In sum, the major internal control problems alleged in
plaintiff's complaint consistently involved revenues and
receivables, which is the asset that OCA inflated in its SEC
filings.  Given the small size of OCA's accounting department and
the depth to which the Palmisanos and Verret were allegedly
involved in the company's accounting practices, the Court finds
that the interrelated nature of the internal control problems and
the overstatements of the patient receivables asset contributes
to an inference of scienter as to the false statements made by
Palmisano, Sr. and Verret during the class period.  It is
virtually impossible to believe that either defendant did not
know that his statements were false when made in light of the
connection between internal control problems and the
overstatements of the patient receivables asset, combined with
the overall importance of OCA's patient receivables asset to its
stock price.

4.    *Sarbanes-Oxley Certifications*

Plaintiff argues that the certifications that Palmisano, Sr. and Verret each executed in connection with OCA's quarterly reports for the first three quarters of 2004 pursuant to section 302 of the Sarbanes-Oxley Act support an inference of scienter because, by signing the certifications, Palmisano, Sr. and Verret certified that (i) they designed or oversaw the design of OCA's disclosure controls, *i.e.*, controls designed to ensure that material information about the company is made known to them; (ii) they had evaluated the effectiveness of those disclosure controls; (iii) those disclosure controls were effective; (iv) they had disclosed all material changes in OCA's internal financial reporting controls during the prior quarter; and (v) they had disclosed all material weaknesses and significant deficiencies in OCA's internal financial reporting controls to OCA's auditor.

There is very little case law considering whether a corporate officer's Sarbanes-Oxley certification supports an inference that the officer knew or was severely reckless about false statements contained in a company's financial statements. Plaintiff points the Court to one case in which a court has expressly found that a certification executed by a corporate officer pursuant to section 302 of the Sarbanes-Oxley Act

supports an inference of scienter against the certifying
defendant.  *See In re Lattice Semiconductor Corp. Sec. Litig.*,
No. CV04-1233-AA, 2006 U.S. Dist. LEXIS 262, at *46-51 (D. Or.
Jan. 3, 2006).[8]  In *Lattice Semiconductor*, the court concluded
that a corporate officer's Sarbanes-Oxley certification can
support at least some inference of scienter because it
necessarily supports one of the alternative inferences that (a)
the defendant was aware of the misconduct alleged (because, as
the defendant certified, the company had effective disclosure
controls), or (b) that the defendant knowingly misrepresented
that the company's disclosure controls were adequate and
effective.  *See id.* at *50.  Several commentators have similarly
suggested that a corporate officer's Sarbanes-Oxley certification
could be used as circumstantial evidence to show that a defendant
acted with scienter.  *See* Harold S. Bloomenthal, Sarbanes-Oxley
Act in Perspective § 10.1 (stating that Sarbanes-Oxley
certification requirements "should aid plaintiffs in meeting the
enhanced pleading requirements by alleging knowledge (or reckless
disregard) of the alleged misrepresentations by the individual

---

[8]*Cf. In re Elec. Data Sys. Corp. Sec. & ERISA Litig.*, 298 F.
Supp. 2d 544, 557 (E.D. Tex. 2004) (noting plaintiff's
allegations that defendants "represented to the SEC that they
personally designed EDS' internal control procedures to ensure
that they were aware of all material financial information").

defendants"); Steven J. Choi, The Evidence on Securities Class Actions, 57 Vand. L. Rev. 1465, 1471 n.23 (2004) (noting that Sarbanes-Oxley certifications may help securities plaintiffs satisfy PSLRA's pleading standard for scienter); Kourtney T. Cowart, Comment, The Sarbanes-Oxley Act:  How a Current Model in the Law of Unintended Consequences May Affect Securities Litigation, 42 Duq. L. Rev. 293, 311 (2004) (stating that certifications "could be used as evidence from which defendant's knowledge of the misrepresentations or reckless disregard of them could be inferred").

Under SEC regulations, an officer certifying a company's quarterly or annual report must state not only that, to his knowledge, the statements contained in the report are accurate (a representation that is already implicit when an officer signs the report itself), but also that (i) the company has disclosure controls to ensure that the certifying officer is made aware of material information about the company; and (ii) the certifying officer has publicly disclosed his evaluation of the effectiveness of those disclosure controls.  *See* 17 C.F.R. § 240.13a-14(b)(4).  Thus, commentators argue that when a corporate officer certifies a company's financial reports, the company's later revelation that the reports contained material false statements can support an inference that the officer either knew

or was reckless about the false statements, by virtue of the company's disclosure controls, or that he knew or was reckless in not knowing that the company's disclosure controls were inadequate.  Either of these inferences can help a plaintiff establish scienter.  *See*, *e.g.,* Bloomenthal, *supra*, at § 10.1 (requirements that officers certify the company's disclosure controls "will make it much more difficult for the certifying officers as defendants in private actions to claim they did not know the representations were false").

The Court does not hold that a Sarbanes-Oxley certification, without more, would support a strong inference of scienter under the PSLRA.[9]  However, under the particular facts of this case, the Court does find that the Sarbanes-Oxley certifications executed by Palmisano, Sr. and Verret, when combined with the allegations of scienter contained in the previous sections, support an inference of scienter as to the defendants' statements about OCA's disclosure controls because the certifications show that both defendants stated that they designed and evaluated

---

[9]*See, e.g., In re Watchguard Sec. Litig.*, No. C05-678JLR, 2006 U.S. Dist. LEXIS 27217, at *34 (W.D. Wash. Apr. 21, 2006) ("Although the passage of Sarbanes-Oxley may make it somewhat more reasonable to infer that a certifying Defendant whose head is in the sand is being deliberately reckless, it does not transform the PSLRA's requirement of falsity-plus-scienter into a requirement of falsity-plus-a-Sarbanes-Oxley-certification.").

OCA's control procedures to ensure that they worked to provide them with material information about the company and then certified that the controls were effective, while at the same time failing to disclose serious, unremedied internal control problems.  The Court does not find persuasive defendants' contention that, in two of the three quarters, they expressly qualified their endorsement of OCA's disclosure controls by stating that they were effective, *subject to OCA's internal control weaknesses*.  *See* OCA, Inc., Quarterly Report (Form 10-Q), at 43 (Dec. 23, 2004) (stating that OCA's disclosure controls were effective, "subject to the matters discussed in the following subsections," which included disclosures concerning internal control weaknesses); OCA, Inc., Quarterly Report (Form 10-Q), at 33 (May 20, 2004) (stating that OCA's disclosure controls were effective, "subject to certain enhancements to our internal controls, as described below").  Doubletalk stating that controls were "effective" subject to a discussion of internal weaknesses that was itself knowingly or recklessly false or misleading bespeaks more of conscious evasion of the truth than candor.  Moreover, defendants' evaluation of OCA's disclosure controls for the second quarter of 2004 did not contain such express qualifying language.  *See* OCA, Inc., Quarterly Report (Form 10-Q), at 37 (Aug. 9, 2004).  The certifications about the

effectiveness of OCA's disclosure controls therefore support an inference of scienter on the part of Palmisano, Sr. and Verret, when combined with the other allegations against defendants, as to the company's internal control failures.

For the same reasons, plaintiff has adequately pleaded scienter as to the defendants' statements in their 2004 Sarbanes-Oxley certifications that they had disclosed to OCA's independent auditors and its audit committee "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information." CAC ¶ 28 (May 20, 2004 Form 10-Q); *see also id.* ¶ 37 (August 9, 2004 Form 10-Q); *id.* ¶ 44 (December 23, 2004 Form 10-Q).  In addition to the reasons stated earlier, the Court notes that, albeit after the class period, PWC determined in its November 1, 2005 letter to OCA that the company had not timely and appropriately responded to serious accounting irregularities that had risen to the level of potential illegal acts, which suggests a prior lack of cooperation with OCA's auditors, including a pattern of intentional inaction in the face of such problems.  In fact, just before the start of the class period, OCA fired its previous auditor E&Y after it had identified several material weaknesses

63

in the company's internal controls.  Subsequently, the auditor during the class period, PWC, resigned after it was unable to investigate potential illegalities because OCA failed to take appropriate remedial actions in response to serious accounting irregularities.  Significantly, PWC stated that OCA had potentially provided altered records to company auditors beginning back in 2000.  Therefore, OCA's history of dealing with its auditors contributes to the inference that defendants knew that their statements in the certifications that they had disclosed "[a]ll significant deficiencies and material weaknesses" in the company's internal controls to its auditors were false or misleading when made.

### C.    Plaintiff's Section 20(a) Claim

Control person liability under section 20(a) requires an underlying violation of the Exchange Act.  *See R2 Inv. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005).  As discussed above, plaintiff has adequately stated a claim against Palmisano, Sr. and Verret under section 10(b) of the Exchange Act and Rule 10b-5.  Section 20(a) also requires that the defendants had actual control or influence over OCA's allegedly fraudulent accounting and reporting policies.  *See, e.g., In re Netsolve, Inc. Sec. Litig.*, 185 F. Supp. 2d at 699.  The Court concludes that

64

plaintiff has alleged sufficient facts to this end, for many of the same reasons discussed earlier in this opinion.  Palmisano, Sr. and Verret were the top officers at OCA during the class period, serving as CEO and CFO, respectively.  These defendants put their names on the company's SEC filings and the Sarbanes-Oxley certifications.  Palmisano, Sr., along with his son, helped develop the company's accounting systems, and Verret, as CFO, had actual control or influence over its accounting and reporting policies, a fact that defendants seemingly concede in their papers.  Def's Mem. in Support of Mot. to Dismiss, at 30. Furthermore, plaintiff has alleged that these defendants "had direct and supervisory involvement in the day-to-day operations of the Company . . . ."  CAC ¶ 83.  Thus, the Court has no difficulty finding that plaintiff has adequately alleged that Palmisano, Sr. and Verret were "controlling persons" under section 20(a) of the Exchange Act.

## VI.  CONCLUSION

For the reasons stated above, the Court GRANTS the motion to dismiss as to Palmisano, Jr. and DENIES the motion to dismiss as to Palmisano, Sr. and Verret.

New Orleans, Louisiana, this __14th__ day of December, 2006.

_Sarah Vance_
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE