`UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE OCA, INC. SECURITIES                    CIVIL ACTION
AND DERIVATIVE LITIGATION

                                              NO: 05-2165

                                              SECTION R(3)

**ORDER AND REASONS**

Before the Court is Lead Plaintiff Samuel Boodman's Motion for Preliminary Approval of Settlement and Certification of Settlement Class. For the following reasons, the Court GRANTS the motion.

**I.    Background**

**A.    Factual Background**

This action is a securities fraud action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5, promulgated by the Securities and Exchange Commission under the statute. Defendant OCA, Inc. is a Louisiana-based company that provides business services to orthodontic and pediatric dental practices throughout the United States. Plaintiffs brought suit on behalf of all people who purchased publicly traded common stock or sold put options of OCA between May 18, 2004 through June 6, 2005 (the "Class Period.")

Specifically, OCA provides affiliated orthodontic practices with information systems and a range of operational, purchasing,

1

financial, marketing, administrative and other business services. It generally provides its services to affiliated practices under long-term service, consulting, or management service agreements with terms that typically range from 20 to 25 years. As of December 31, 2004, OCA had approximately 565 affiliated centers in the United States and abroad, and the company had customers in 46 states and in international locations.

On May 18, 2004, OCA announced that it would adopt Financial Accounting Standards Board Interpretation No. 46R ("FIN 46R"), which requires a company to consolidate the financial results of variable interest entities under certain circumstances when the company has an interest in the entities. OCA stated that its adoption of FIN 46R would require it to make a number of changes to its financial statements. Those changes included changes to the way OCA recorded patient revenue and patient receivables. OCA's chief executive officer, Bart F. Palmisano, Sr., stated in OCA's May 18, 2004 press release that the accounting changes would make OCA's accounting simpler and more transparent and would lead to financial reporting that was more consistent with the way OCA managed its business.

Plaintiffs allege that over the remainder of 2004 and the early part of 2005, defendants made a series of false statements concerning OCA's quarterly financial results and its future prospects. According to plaintiffs, those statements were materially false or misleading and had the effect of artificially

inflating OCA's stock price.

On March 17, 2005, OCA announced that it would delay the filing of its Form 10-K for the fiscal year ending December 31, 2004, because it had identified certain accounting errors relating to 2004 and earlier years.  OCA stated that it would continue to review its accounting and that it had not made a decision about whether the errors were material or would require it to restate earlier financial results.  On June 7, 2005, OCA announced a further delay in the filing of its 2004 Form 10-K and reported that it had identified material errors in its calculation of patient receivables reported during the first three quarters of 2004.  It revealed that its audit committee required it to restate its financial results for those periods.  OCA also announced that it had organized a special committee of the board of directors to review the origins of certain journal entries in the company's general ledger and their impact on OCA's financial statements.  OCA's chief operating officer, Bart. F. Palmisano, Jr., went on administrative leave pending the outcome of the company's internal investigation.  After OCA's June 7 announcement, shares of OCA stock fell $1.55, or 38%, to close at $2.48 per share.  The New York Stock Exchange de-listed OCA's stock on November 8, 2005, after which the stock traded on the pink sheets.  On March 14, 2006, OCA filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.

**B.   Procedural Background**

Shortly after OCA's June 7, 2005 announcement, a number of plaintiffs filed securities class actions in this district against OCA and certain of its officers and directors.  The Court consolidated twenty of the class actions into the present case against OCA; insurers National Union Fire Insurance Company of Louisiana and XL Specialty Insurance Company; and OCA officers Bart Palmisano, Sr., David Verret, and Bart Palmisano, Jr. (R. Docs. 3, 27, 113).  On November 18, 2005, the Court appointed Samuel Boodman as Lead Plaintiff pursuant to the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C.A. § 78u-4(a)(3)(B)(v), and approved Kaplan Fox & Kilsheimer as Lead Counsel and Neblett Beard & Arsenault as liaison counsel. (R. Docs. 157, 159).  Plaintiffs filed a consolidated class action complaint on February 1, 2006 against OCA, Palmisano, Sr., Palmisano, Jr., and Verret. (R. Doc. 167).  The complaint alleged that defendants engaged in securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and SEC Rule 10b-5, 17 CFR § 240.10b-5, promulgated thereunder.  The complaint further alleged that the individual defendants, the Palmisanos and Verret, were controlling persons under Section 20(a) of the Act, 15 U.S.C. § 78t(a), and therefore derivatively liable for the company's fraudulent acts.  On December 14, 2006, the Court denied the Motion to Dismiss of

4

Palmisano, Sr. and Verret, but granted the Motion to Dismiss of
Palmisano, Jr. (R. Doc. 208).  After extensive discovery, the
parties opted to mediate this action before the Honorable Daniel
Weinstein.  The first mediation session was held on September 25-
26, 2007, and the parties reached a tentative agreement,
memorialized in a Memorandum of Understanding, on February 28,
2008.

    Lead plaintiff Samuel Boodman filed the present Motion for
Preliminary Approval of Settlement and Certification of
Settlement Class on August 25, 2008. (R. Doc. 344).  Plaintiff
requests that the Court: (1) approve the form of Class notice
described in the Notice of Pendency and Proposed Settlement of
Class Action; (2) approve the form of Summary Notice, and (3)
schedule a hearing to determine whether the Settlement should be
given final approval and establish dates for submission of proofs
of claim, dissemination of the class notice, and other relevant
deadlines. (R. Doc. 344).  On August 26, 2008, the Court set the
motion for hearing and ordered the parties to provide the Court
with the following information: (1) a discussion of the propriety
of certifying the settlement class under the certification
standards of Federal Rule of Civil Procedure 23(a) and (b); (2) a
discussion of the suitability of proposed class counsel; (3) an
explanation of the apportionment plan; (4) disclosure of the
substance of any side agreements; (5) a statement of the amount
of attorneys' fees sought and an estimate of the amount of

5

expenses sought; (6) an identification of the proposed Claims Administrator; (7) an explanation of the agreed procedure if the settlement fund is inadequate to pay the allowed claims, and (8) an explanation of paragraph (gg) of the settlement agreement and its enforceability. (R. Doc. 346).

### C.    The Proposed Settlement Class

The Stipulation and Agreement of Settlement defines the settlement class as:

> [A]ll persons who purchased the publicly traded common stock or sold put options of OCA during the period from May 18, 2004 through June 6, 2005, inclusive.  Excluded from the Class are the Defendants, former defendant Palmisano, Jr., any members of Defendants' or Palmisano, Jr.'s immediate families, any entity in which any Defendant or former defendant has a controlling interest, and the affiliates, legal representatives, heirs, predecessors, successors, and assigns of any such excluded party.

(R. Doc. 344-2 at 7). It further defines "person" to include:

> [A]ny individual, corporation, partnership, association, affiliate, joint stock company, estate, trust, unincorporated association, entity, government and any political subdivision thereof, or any other type of business or legal entity, and their spouses, heirs, predecessors, successors, representatives, agents, or assignees.

(R. Doc. 344-2 at 10).

### D.    The Settlement Agreement

Under the terms of the proposed Stipulation and Agreement of
Settlement, defendants would cause National Union and XL, their
insurers, to pay $6.5 million in cash into the Escrow Account
established for the Settlement Fund by Lead Counsel for the
benefit of the class members. (R. Doc. 344-2 at ¶4).  The payment
would be made on or within 30 days after the Court entered the
Preliminary Order approving the settlement. (R. Doc. 344-2 at
¶4).  Neither National Union nor XL would be required to make
payment, however, until such company received a release
satisfactory to it from each defendant and any other person or
entity that is a defendant in either the Derivative Case[1] or the
OCAI Litigation,[2] regardless of whether 30 days has elapsed. (R.
Doc. 344-2 at ¶4).

The Agreement provides that the Settlement Fund shall be
used to pay: (1) the notice and administration costs; (2) the
attorneys' fees and expense award; and (3) the remaining
administrative expenses. (R. Doc. 344-2 at ¶5).  The Agreement
provides that after these payments, the balance of the Settlement

---

[1]A group of plaintiffs also filed shareholder derivative
actions against the OCA Board of Directors, the Palmisanos,
Verret, and their insurers, and the cases were consolidated with
this securities action. (R. Doc. 3, 170).

[2]The OCAI litigation is a separate proceeding in the
Bankruptcy Court.  OCA filed a complaint in the United States
Bankruptcy Court for the Eastern District of Louisiana against
OCA International, LLC, Gimili Enterprises, LLC, and Palmisano,
Sr. with regard to a transaction transferring ownership of OCA's
foreign subsidiaries from OCA to OCA International. *See In re
OCA, Inc., et al.*, No. 06-1289 (Bankr. E.D. La.).

Fund shall be distributed to Authorized Claimants, defined as those "whose claim for recovery has been allowed pursuant to the terms of this Settlement Stipulation." (R. Doc. 344-2 at ¶¶1 & 5).  The Agreement further provides that all costs and expenses incurred by the Lead Plaintiff and the Class in connection with the Settlement shall be paid from the Settlement Fund. (R. Doc. 344-2 at ¶5).

The Agreement requires that within 10 business days after counsel for National Union receives a copy of the Court's Preliminary Approval Order, defendants shall cause National Union to deposit $175,000 of the Settlement Amount into another Escrow Account ("the Notice and Administration Fund") to be used for reasonable out-of-pocket costs in connection with providing notice of the Settlement to the class members and other administrative expenses. (R. Doc. 344-2 at ¶6).  The Agreement provides that upon written agreement of the parties or order of the Court, additional amounts may be transferred from the Settlement Fund to the Notice and Administration Fund. (R. Doc. 344-2 at ¶6).  The Agreement prohibits the Escrow Agent from disbursing funds from the Notice and Administration Fund except as provided in the Agreement, as ordered by the Court, or with the written agreement of counsel for all parties. (R. Doc. 344-2 at ¶7).

The Agreement provides that Lead Counsel or the Claims Administrator shall administer and calculate the claims submitted

8

by class members, oversee distribution of the Settlement Fund, and perform all claims administration procedures. (R. Doc. 344-2 at ¶16).  The Agreement identifies Analytics, Inc. as the claims administration firm. (R. Doc. 344-2).

The Agreement provides that the following conditions apply to those seeking to be treated as Authorized Claimants: (1) each class member seeking to participate in distributions from the Net Settlement Fund shall be required to timely submit to the Claims Administrator a separate, signed Proof of Claim, supported by certain documents showing proof of the claimant's loss; (2) all class members must submit Proofs of Claim by the date specified in the Settlement Notice (proposed to be 120 days from the date of this Order) unless the Court extends the time period, and if a class member does not meet the deadline, the class member shall be forever barred from receiving payment; (3) the Claims Administrator shall determine, in accordance with the Settlement Stipulation, which claims shall be allowed, subject to the Court's review; (4) Proofs of Claim that do not meet the submission requirements may be rejected, but before rejection, the Claims Administrator shall notify the claimant of his reasons for proposing to reject the claims; (5) the claimant may contest the rejection within 20 days by serving the Claims Administrator with a notice and statement of reasons and requesting review by the Court; and (6) the administrative determinations of the Claims Administrator shall be presented to the Court for

9

approval. (R. Doc. 344-2 at ¶18).

The Agreement further provides that all class members shall be bound by the judgment of the Court concerning the Settlement unless the person requests exclusion from the Class by mail. (R. Doc. 344-2 at ¶25). The Agreement requires that the request for exclusion be timely, but it does not specify the opt-out date. (R. Doc. 344-2 at ¶25). The class Notice establishes the opt-out date as 21 days before the settlement fairness hearing. (R. Doc. 344-4 at §9).

The Agreement also explains that Lead Counsel and the defendants have executed a Supplemental Agreement, setting forth conditions under which the Settlement Agreement may be withdrawn or terminated at the discretion of the defendants if potential class members who purchased in excess of a certain number of shares exclude themselves from the class. (R. Doc. 344-2 at ¶28).

Finally, the Agreement provides that it is intended to be a final and complete resolution of all disputes asserted or which could be asserted by the class members against any of the released parties with respect to the released claims. (R. Doc. 344-2 at ¶41).

### E.   Plan of Allocation

The proposed Notice to class members sets forth the plan of allocation ("Plan"). (R. Doc. 344-4 at § 7). The Plan provides that the Net Settlement Fund will be distributed to class members

10

who submit valid, timely Proof of Claim forms. (R. Doc. 344-4 at § 7).  The Plan provides that class members may participate only if they suffered a net loss on all transactions in OCA during the Class Period.

Specifically the Plan provides that, for shares of OCA common stock purchased between May 18, 2004 and March 17, 2005, inclusive: (1) if the share was held as of the close of trading on June 6, 2005, the Authorized Claimant's Recognized Claim shall be the lesser of $1.85 per share; or (b) the difference between the purchase price per share and $1.64 per share; (2) if the share was sold at a loss between March 18, 2005 and June 6, 2005, the Recognized Claim shall be the lesser of $0.31 per share; or (b) the difference between the purchase price per share and the sales price per share; (3) if the share was sold at a loss between June 7, 2005 and September 2, 2005, inclusive, the Recognized Claim shall be the lesser of (a) $1.85 per share or (b) the difference between the purchase price per share and the sales price per share; or (4) if the share was sold prior to the close of trading on March 17, 2005, the Recognized Claim is $0. (R. Doc. 344-4 at § 7).

For shares of OCA common stock purchased between March 18, 2005 and June 6, 2005, inclusive, the plan provides that: (1) if the share was held as of the close of trading on June 6, 2005, the Authorized Claimant's Recognized Claim shall be the lesser of (a) $1.54 per share or (b) the difference between the purchase

11

price per share and $1.64 per share; (2) if the share was sold at a loss between June 7, 2005 and September 2, 2005, inclusive, the Recognized Claim shall be the lesser of (a) $1.54 per share or (b) the difference between the purchase price per share and the sales price per share; or (3) if the share was sold prior to the close of trading on June 6, 2005, the Recognized Claim is $0. (R. Doc. 344-4 at § 7).

As for put options, the Plan provides that for put options sold between May 18, 2004 and March 17, 2005: (1) no claim will be recognized for OCA put options sold between May 18, 2004 and March 17, 2005 that were not the obligation of the Authorized Claimant as of the close of trading on March 17, 2005; (2) for put options that were the obligation of the Authorized Claimant at the close of trading on March 17, 2005, the Recognized Claim shall be the lesser of (a) the difference, if a loss, between the amount received for writing the put option and the sum for which the put options were repurchased at a loss, (b) $0.31 per share covered by such put options if repurchased at a loss between March 18, 2005 and June 6, 2005, or (c) $1.85 per share covered by such put options if repurchased at a loss after the close of trading on June 6, 2005; (3) for OCA put options that were "put" to the Authorized Claimant, the Authorized Claimant's Recognized Claim shall be calculated as a purchase of common stock as shown above, and as if the sale of the put option were instead a purchase of OCA common stock on the date of the sale of the put

12

option and the "purchase price paid" shall be the strike prices less the proceeds received on the sale of the put option. (R. Doc. 344-4 at § 7).

As for put options sold between March 18, 2005 and June 6, 2005, the Plan provides that: (1) no claim shall be recognized for OCA put options sold that were not the obligation of the Authorized Claimant as of the close of trading on June 6, 2005; (2) for put options sold that were the obligation of the Authorized Claimant at the close of trading on June 6, 2005, the Authorized Claimant's Recognized Claim shall be the lesser of (a) the difference, if a loss, between the amount received for writing the put option and the sum for which the put options were repurchased at a loss after the close of trading on June 6, 2005 or (b) $1.54 per share covered by such put options; or (3) for put options that were "put" to the Authorized Claimant, the Authorized Claimant's Recognized Claim shall be calculated as a purchase of common stock as shown above, and the "purchase price paid" shall be the strike price less the proceeds received on the sale of the put option. (R. Doc. 344-4 at § 7).

The Plan further provides that for put options sold that expired unexercised, an Authorized Claimant's Recognized Claim shall be $0.  The Plan provides that no loss shall be recognized for put options sold during the Class Period to offset a long position in the same option that was purchased at any time prior to the sale. (R. Doc. 344-4 at § 7).

13

The Notice explains that Lead Counsel will request the Court to award attorneys' fees of up to 30% of the settlement proceeds, plus reimbursement of expenses, which are not expected to exceed $180,000. (R. Doc. 344-4 at § 12).

## II.  Class Certification

### A.    Legal Standard

The certification requirements of Federal Rule of Civil Procedure 23 generally apply when certification is for settlement purposes. *See Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, (1997).  A district court need not consider "whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." *Id.* at 620 (citing Fed. R. Civ. P. 23(b)(3)(D)).  But the Court's consideration of the other factors in Rule 23 is of "vital importance" since the court will lack a later opportunity to make adjustments to the class. *Id.* The existence of a settlement class may even "warrant more, not less, caution on the question of certification." *Id.*

To be certified under Rule 23, the class must first satisfy four threshold requirements.  A court may certify a class only if:

> (1)  the class is so numerous that joinder of all members is impracticable;

14

> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). The party seeking certification bears the burden of establishing these requirements. *Unger*, 401 F.3d at 320 (citing *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479-80 (5th Cir. 2001)). If the prerequisites of Rule 23(a) are met, the proposed class must additionally satisfy one of the three provisions for certification under Rule 23(b). For certification of a 23(b)(3) damages class, the district court must make a finding that questions of law or fact common to class members predominate over questions affecting only individual members and that a class action is the best way to adjudicate the controversy. Fed. R. Civ. P. 23(b)(3); *Unger*, 401 F.3d at 320.

Additionally, a court that certifies a class must also appoint class counsel. Fed. R. Civ. P. 23(g). In appointing class counsel, the Court must consider:

> (I) the work counsel has done in identifying or investigating potential claims in the action;
>
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>
> (iii) counsel's knowledge of the applicable law; and

15

(iv) the resources that counsel will commit to
representing the class

Fed. R. Civ. P. 23(g)(1)(A).  Under the PSLRA, the most adequate
plaintiff shall select and retain counsel to represent the
class, subject to the approval of the court. 15 U.S.C.A. § 78u-
4(a)(3)(B)(v).

**B.   Discussion**

For the following reasons, the Court finds that the class
may be certified for settlement purposes under Rule 23.

**1.   Rule 23(a) requirements**

*Numerosity*

Rule 23(a)(1) requires that the class be so large that
joinder of all members is impracticable.  To satisfy the
numerosity requirement, "a plaintiff must ordinarily demonstrate
some evidence or reasonable estimate of the number of purported
class members." *Pederson v. Louisiana State University*, 213 F.3d
858, 868 (5th Cir. 2000) (quoting *Zeidman v. J. Ray McDermott &
Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir. 1981)).  A mere
allegation that the class is too numerous to make joinder
practicable is insufficient. *Pederson*, 213 F.3d at 868 (citing
*Fleming v. Travenol Laboratories, Inc.*, 707 F.2d 829, 833 (5th
Cir. 1983)).

Plaintiff argues that the numerosity requirement has been
met since OCA had over 50 million shares of common stock

16

outstanding that were actively traded on the New York Stock Exchange.  The Fifth Circuit has presumed satisfaction of the numerosity requirement in class actions involving nationally-traded securities. *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir. 1981); *see also* 7 Newberg on Class Actions § 22:16 ("In cases involving securities traded on the national stock exchanges, class members are usually so geographically dispersed and numerous that the joinder requirement is easily satisfied").  Here, plaintiffs have provided evidence that OCA had 50 million shares of stock that were actively traded during the Class Period, and this figure supports an inference that there is a sufficiently large plaintiff class to satisfy the numerosity requirement. *See In re College Bound Consol. Litigation*, 1994 WL 236163 at *2 (S.D.N.Y. 1994) (finding that plaintiffs complied with the numerosity requirement by providing evidence that 20 million shares of defendant's stock publicly traded during the class period).

### *Commonality*

The commonality test of Rule 23(a)(2) is met when there is at least one issue whose resolution will affect all or a significant number of the putative class. *Mullen*, 186 F.3d at 625 (quoting *Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir.1997)). Because of this minimal requirement, "[t]he threshold of commonality is not high." *Jenkins v. Raymark Inds., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986).

Here, a number of issues could affect all plaintiffs, including: whether or not defendants issued false and misleading statements, whether defendants acted with scienter, and whether defendants' conduct caused the market price of OCA common stock to be artificially inflated.  Accordingly, plaintiffs have satisfied the commonality requirement.

### *Typicality*

Rule 23(a)(3) requires that "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." The test for typicality is not demanding, *Shipes v. Trinity Inds.,* 987 F.2d 311, 316 (5th Cir.1993)), and it focuses on the general similarity of the legal and remedial theories behind plaintiffs' claims. *Lightbourn,* 118 F.3d at 426; *Jenkins,* 782 F.2d at 472.  A typicality inquiry may be used to "screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law and fact are present." 7A Wright & Miller, *Federal Practice and Procedure* § 1764 (2008).

Lead Plaintiff Boodman's claim arises out of the same conduct of defendants as the claims of the other class members. Boodman and the class of plaintiffs both claim that the market price for OCA securities was artificially inflated during the class period as a result of defendants' false or misleading public statements, that they purchased OCA securities during the

18

class period without knowledge of defendants' alleged fraud and
in reliance upon the integrity of the market price for OCA
securities, and that they suffered damages as a result.
Further, it does not appear that Boodman would be subject to any
unique defenses that would render him an atypical class
representative.  Boodman purchased OCA shares between January 3,
2005 and February 3, 2005, while the market for OCA shares was
allegedly inflated and before the March 17, 2005 "partial
disclosure." Boodman retained those shares through the end of
the class period and the disclosure of the alleged fraud.  The
Court therefore finds that Boodman's claims are typical of the
claims of the putative class members.

### *Adequacy*

Rule 23(a) also requires that the representative parties
must "fairly and adequately protect the interests of the class."
This requirement is "essential to due process, because a final
judgment in a class action is binding on all class members. *In
re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1083 (6th Cir.1996)
(citing *Hansberry v. Lee,* 311 U.S. 32, 42-43 (1940)).  To meet
the adequacy requirement, the "class representatives, their
counsel, and the relationship between the two [must be] adequate
to protect the interests of absent class members." *Unger v.
Amedisys Inc.,* 401 F.3d 316, 321 (5th Cir.2005) (citing *Stirman
v. Exxon Corp.,* 280 F.3d 554, 562 (5th Cir.2002)). The Court
must be satisfied that class representatives, and not their

19

counsel, are directing the litigation. *Unger,* 401 F.3d at 316. Thus they "must show themselves sufficiently informed about the litigation to manage the litigation effort." *Id.*

In its earlier order, the Court made findings that Boodman would satisfy Rule 23's adequacy requirement since his interests were fully aligned with the class. (R. Doc. 157).  Additionally, as discussed, *infra*, Boodman's retained counsel, Kaplan Fox & Kilsheimer, is experienced and has prosecuted this action vigorously.  The Court therefore finds that the adequacy requirement is met.

### 2.   Rule 23(b) requirement

For class actions seeking money damages, Rule 23(b)(3) imposes two prerequisites, predominance and superiority: "[Q]uestions of law or fact common to the members of the class [must] predominate over any questions affecting only individual members, and ... a class action [must be] superior to the other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).  To predominate, "common issues must constitute a significant part of the individual cases." *Mullen,* 186 F.3d at 626.  "This requirement, although reminiscent of the commonality requirement of Rule 23(a), is 'far more demanding' because it 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Unger,* 401 F.3d at 320 (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623-24 (1997)).

20

To determine whether the class claims meet the predominance requirement, the court must examine the underlying cause of action. *Luskin v. Intervoice-Brite, Inc.*, 261 Fed. Appx. 697, 701 (5th Cir. 2008) (citing *Unger*, 401 F.3d at 321).  To establish a claim of securities fraud, a plaintiff must prove: (1) a material misrepresentation or omission by the defendant, (2) scienter on the part of the defendant, (3) a connection with the purchase or sale of security, (4) reliance, often referred to as transaction causation, (5) economic loss, and (6) loss causation. *Luskin*, 261 Fed. Appx. at 701 (citing *Dura Pharm. Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).  In a securities fraud action, the decision of whether to certify a class often turns on whether common issues of reliance predominate. *Luskin*, 261 Fed. Appx. at 701.

In *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, the Fifth Circuit held that a district court in this circuit cannot merely rely upon the fraud-on-the-market theory to presume that common issues of reliance predominate. 487 F.3d 261, 264-65 (5th Cir. 2007).  The Court requires that plaintiff first establish loss causation in order to trigger the fraud-on-the market presumption. *Id.* at 265.  Plaintiffs must prove that a misstatement "*actually moved* the market." *Id.*  Thus the plaintiffs "must demonstrate that . . . the cause of the decline in price is due to the revelation of the truth and not the release of unrelated negative information." *Id.* (citing

21

*Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 661 (5th Cir. 2004)). The court was primarily concerned with the "simultaneous disclosure of multiple negatives, not all of which are alleged culpable." *Id.* at 265 n.22. Thus plaintiffs must prove that the negative, truthful information, and not other unrelated negative information, caused the decline in market price. *Id.* at 266. Plaintiffs must prove this at the class certification stage, by a preponderance of all admissible evidence, in order to establish predominance. *Oscar Private Equity*, 487 F.3d at 269.

Here, plaintiffs have provided evidence that the declines in stock prices on March 18, 2005 and June 7, 2005 were due to OCA's disclosure that it would delay filing its Form 10-K because it had discovered past accounting errors. Defendants have provided no evidence to the contrary, and the Court has no evidence of any other unrelated negative information that could have caused the decline in stock price. In particular, plaintiffs provided an affidavit from Cynthia Jones, a Managing Director of Financial Markets Analysis (FMA), LLC, a firm that provides both securities analysis and consulting. (R. Doc. 351-3). In the affidavit, Jones attests that FMA performed a regression analysis which quantified the relationship of OCA's daily common stock changes to those of the S&P 500 Index and the S&P Small Cap Health Care Services Index. (R. Doc. 351-3 at ¶9). FMA used those results to calculate abnormal OCA common stock

price changes (*i.e.*, the price changes based on general market
and/or industry performance minus the actual price change). (R.
Doc. 351-3 at ¶9).  FMA then determined, with at least 95%
confidence, that the price changes of OCA stock on March 18,
2005 and June 7, 2005 did not occur by chance, but rather were
caused by OCA's disclosures that cured its previous
misstatements. (R. Doc. 351-3 at ¶9).  Based on the assumption
that these disclosures corrected prior information allegedly
misrepresented or omitted by defendants, FMA determined that
these stock price declines were indicative of previously-
existing artificial stock price inflation. (R. Doc. 351-3 at
¶10).  The Court finds that plaintiffs have made a sufficient
showing of loss causation to trigger the presumption of reliance
based on the preponderance of the admissible evidence.  As such,
common issues of reliance predominate.  Additionally, the other
issues common to the class — whether defendants issued false and
misleading statements and whether the defendants had the
requisite scienter — predominate over any individual issues
involving damage calculations.

The Court also finds that a class action is superior to
other methods of adjudicating this case.  The stockholders were
harmed by a common set of facts, and certifying the case as a
class action allows the claims of many stockholders to be
efficiently resolved at one time.

23

For the foregoing reasons the Court GRANTS plaintiffs' Motion to Certify a Settlement Class.

### 3.   Rule 23(g)

In connection with the PSLRA's procedures for the selection of a Lead Plaintiff and Lead Counsel, the Court appointed Kaplan Fox & Kilsheimer LLP as Lead Counsel and Neblett Beard & Arsenault as Liaison Counsel. (R. Doc. 157).  The Court reviewed the resumes of both firms and was satisfied that both were competent and experienced in complex securities litigation.  The Court also finds that both firms are qualified to serve as class counsel under Rule 23(g).  The Court finds that both firms have ample experience in litigating securities class actions and knowledge of the applicable law.  Kaplan Fox has litigated numerous complex class actions throughout the country in the past three decades and has been substantially involved in over 25 securities class actions with recoveries of over $10 million. (R. Doc. 351-1).  Mr. Arsenault of Neblett, Beard & Arsenault also has extensive experience in complex litigation and has previously served as liaison counsel in complex actions before this Court. (R. Doc. 135-2).  The experience of both firms attests to their knowledge of the applicable law concerning securities class actions.  Further, the Court finds that both firms have committed substantial resources to litigating this case over the past three years, and both firms have yet to

receive payment for their services.  Finally, the Court finds that counsel has vigorously investigated and litigated this matter.  Accordingly, the Court finds that Kaplax Fox & Kilsheimer, LLP and Neblett, Beard and Arsenault have satisfied the requirements of Rule 23(g) and ORDERS that both firms be appointed class counsel.

## III. Preliminary Fairness Determination

### A.  Legal Standard

Federal Rule of Civil Procedure 23 governs the settlement of class actions. *See Henderson v. Eaton,* 2002 WL 3145728, *2 (E.D. La. 2002) (citing *Pearson v. Ecological Science Corp.*, 522 F.2d 171, 176-77 (5th Cir. 1975)).  A class action may not be dismissed or compromised without the district court's approval. *See* Fed. R. Civ. P. 23(e); *see also Cope v. Duggins*, 203 F. Supp. 2d 650, 652-53 (E.D. La. 2002) (citing *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)).

The Court must "ensure that the settlement is in the interests of the class, does not fairly impinge on the rights and interests of dissenters, and does not merely mantle oppression." *Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983) (quoting *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1214 (5th Cir. 1978)).  Because the parties'

interests are aligned in favor of a settlement, the Court must take independent steps to ensure fairness in the absence of adversarial proceedings. *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279-80 (7th Cir. 2002) (noting that the class action context "requires district judges to exercise the highest degree of vigilance in scrutinizing proposed settlements."); *see also* Manuel for Complex Litigation (Fourth) § 21.61 (2004).   The Court's duty of vigilance does not, however, authorize it to try the case in the settlement hearings. *Cotton*, 559 F.2d at 1330.

As this motion is for *preliminary* approval of a class action settlement, the standards are not as stringent as those applied to a motion for final approval. *Karvaly v. eBay, Inc.*, 245 F.R.D. 71, 86 (E.D.N.Y. 2007); Manuel for Complex Litigation § 21.63 ("At the stage of preliminary approval, the questions are simpler, and the court is not expected to, and probably should not, engage in analysis as rigorous as is appropriate for final approval."). If the proposed settlement discloses no reason to doubt its fairness, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, does not grant excessive compensation to attorneys, and appears to fall within the range of possible approval, the court should grant preliminary approval. *See In re Stock Exchanges Options Trading Antitrust Litigation*, 2005 WL 1635158 at *5 (S.D.N.Y. 2005);

26

*McNamara v. Bre-X Minerals Ltd,* 214 F.R.D. 424, 430 (E.D. Tex. 2002).

**B.   Discussion**

For the following reasons, the Court finds that the proposed settlement merits preliminary approval.

The Court finds no obvious deficiency that would preclude a finding that the settlement is fair.  Plaintiffs and defendants arrived at the agreement after three sessions of arm's length mediation with the Honorable Daniel Weinstein.  The settlement was reached after over three years of litigation and extensive discovery, and thus counsel for all parties were experienced and familiar with the factual and legal issues in the case.

Further, the economic terms of the settlement appear fair. The parties agreed to settle the case for $6.5 million in cash. (R. Doc. 344-2 at ¶4).  Because OCA filed for bankruptcy, plaintiffs' possible recovery would be limited.  The money available for recovery primarily comes from two of OCA's insurance policies for director and officer liability, and these policies are worth around $20 million total. (Trans. of Certification Hearing at 4).  The insurance proceeds available have been reduced by attorneys' fees and costs from this litigation and a SEC investigation.  Thus although plaintiffs estimate that they incurred $32 million in damages from defendants' allegedly false and misleading statements,  (Trans.

27

of Certification Hearing at 2), the most optimistic estimate of possible recovery is much lower because of the financial condition of OCA.  Additionally, the range of recovery is in dispute.  If the case went to trial, defendants would argue that the allegedly false and misleading statements were not material, that the individual defendants acted in good faith, that plaintiffs failed to mitigate damages, as well as a host of other affirmative defenses outlined in their Answer to the Amended Class Action Complaint. (R. Doc. 210 at ¶¶85-114). Thus in light of OCA's financial condition and the numerous defenses to plaintiffs' claims, the $6.5 million settlement, although less than 20% of plaintiffs' damage estimate of $32 million, appears to be within a reasonable range for approval.

Additionally, the settlement does not appear to give any preferential treatment to the lead plaintiff or any segment of the class.  The allocation plan was developed by Lead Counsel and its damage consultant FMA.  It appears to have a fair and reasonable basis for apportionment of recovery.  The plan was developed after FMA reviewed the complaint, the historic trading data for OCA common stock and options, the historic price data for the S&P 500 index, OCA's filings with the SEC during the relevant time period, and data obtained from Thomson Financial on quarterly holdings of OCA common stock by large institutional investors, as well as news articles, press releases, analyst

research reports, and conference call transcripts published during the Class Period. (R. Doc. 351-3 at ¶6).

The proposed allocation plan compensates class members in relation to the timing of their actual purchases and sales as well as the amount of their actual losses. (R. Doc. 351-3 at ¶13). The funds will be distributed based on two purchase periods. For class members who purchased shares (or sold put options) between May 18, 2004 and March 17, 2005, the agreement essentially recognizes a loss upon purchase of $1.85 per share. (R. Doc. 351-3 at ¶13). For class members who purchased shares (or sold put options) between March 18, 2005 and June 6, 2005, the agreement essentially recognizes a loss upon purchase of $1.54 per share. (R. Doc. 351-3 at ¶13). The different levels of compensation are due to OCA's March 17, 2005 announcement that it would delay the filing of its Form 10-K because it had identified accounting errors relating to 2004 and earlier years. FMA's analysis shows that this partially curative disclosure caused $0.31 in artificial inflation per share to be removed from the price of OCA stock. (R. Doc. 351-3 at ¶13). Accordingly, the Court finds that the differential treatment of these two groups is appropriate.

To the extent that class members' claims exceed the Net Settlement Fund, each claimant will be compensated on a pro rata basis according to the claimant's calculated loss under the

allocation plan. (R. Doc. 351-8 at ¶15).  Thus for the reasons
discussed, *supra*, the Court has no reason to doubt the fairness
of this allocation plan.

The Court preliminarily approves the proposed claims
handling process and documentation requirements that are
provided for in the settlement agreement.  The Court also
approves the claims bar date of 120 days after the issuance of
this order, unless extended by this Court. (R. Doc. 344-2 at
¶18).  Since the Court has discretion to allow later claims, the
Court sees no obvious problem with the claims bar date.
Further, the Court approves the Proof of Claims forms, attached
to plaintiffs' motion as Exhibit A-2, as they contain no clear
deficiencies.

The Court finds no other obvious deficiencies in the
Settlement Agreement.  The Court has studied the "Released
Claims" provision in the Settlement and finds it reasonable.
The release extends to:

> [A]ny and all claims, demands, rights, liabilities and
> causes of action, known or unknown asserted in the
> Securities Cases by Lead Plaintiff or any Class Member
> against any of the Released Parties, arising out of,
> based upon or related to their purchase of OCA stock or
> sale of put options during the Class Period and the
> facts alleged in the Securities Complaint.

(R. Doc. 344-2 at § 1(x)).  The Settlement further explains
"unknown claims" as follows:

Any and all Released Claims that Lead Plaintiff or any
Class Member does not know or suspect to exist in his,
her or its favor at the time of the release of the
Released Parties. With respect to any and all Released
Claims, the parties stipulate and agree that upon the
Effective Date, Lead Plaintiff shall expressly, and
each Class Member shall be deemed to have, and by
operation of the Order and Final Judgment shall have,
expressly waived any and all provisions, rights and
benefits conferred by any law of any state or territory
of the United States, or principle of common law, which
is similar, comparable or equivalent to Cal. Civ. Code
§ 1542, which provides:

> A general release does not extend to claims
> which the creditor does not know or suspect
> to exist in his or her favor at the time of
> executing the release, which if known by him
> or her must have materially affected his or
> her settlement with the debtor.

(R. Doc. 344-2 at § 1(gg)). Courts have consistently approved releases in class action settlements that discharge unknown claims relating to the factual issues in the complaint. *See DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 311-12 (W.D. Tex. 2007) (finding that release of unknown claims was not impermissibly broad); *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. 1981) ("a court may release not only those claims alleged in the complaint and before the court, but also claims which could have been alleged by reason of or in connection with any matter or fact set forth or referred to in the complaint") (internal citations omitted); *Zandford v. Prudential-Bache Sec., Inc.*, 112 F.3d 723, 727 (4th Cir. 1997) (noting that general releases are intended to "settle

31

all matters forever" including "claims of every kind or character, known or unknown") (internal citations omitted). Since this release applies only to unknown claims arising from the same facts and circumstances, the Court does not see any obvious deficiency with the release.

The Court has also reviewed the Supplemental Agreement between Lead Counsel and defendants.  The agreement provides that defendants may withdraw from the Settlement Agreement if potential class members who purchased in excess of a certain number of OCA shares exclude themselves from the Class. (R. Doc. 344-4 § 7).  The proposed Notice discloses the essence of the Supplemental Agreement, but purposefully omits the number of shares that triggers defendants' right to withdraw. (R. Doc. 344-4 § 7, Trans. of Certification Hearing at 10).  The Court has reviewed the entire Supplemental Agreement *in camera* and does not find that the agreement is unreasonable or unfair.

Lastly, the Court finds that the agreement does not appear to grant excessive compensation to the attorneys.  Lead Counsel has yet to receive payment for its services or reimbursement for out-of-pocket expenditures.  Lead Counsel requests an attorneys' fee award of no more than 30% of the settlement, as well as reimbursement for expenditures, not expected to exceed $180,000. The Notice estimates that the average cost per share of attorneys' fees would be $0.09. (R. Doc. 344-4 at 2).

32

The Court must independently analyze the reasonableness of attorneys' fees proposed in a settlement agreement. *See Strong v. BellSouth Telecomm., Inc.*, 137 F.3d 844, 849-50 (5th Cir. 1998); *see also* Fed. R. Civ. P. 23(e).  At the final approval stage, the Court will apply the federal standards applicable to approval of attorneys' fees to determine the fee award. *See In re Educational Testing Service Praxis Principles of Learning and Teaching: Grades 7-12 Litigation*, 447 F. Supp. 2d 612, 628 (E.D. La. 2006).  Counsel intends to submit a detailed accounting of the time spent on the action before the Final Approval Hearing. As the settlement agreement stands, no specific fee amount is agreed to, although a 30% ceiling is established. *See Shaw v. Toshiba America Information Systems, Inc.*, 91 F. Supp. 2d 942 (E.D. Tex. 2000) (finding that attorneys' fees in the range of 25% to 33.34% have routinely been awarded in class actions). Thus the Court does not find that the settlement provides for the payment of excessive attorneys' fees as the Court will be the final arbiter of the fee amount.

For the following reasons, the Court GRANTS PRELIMINARY APPROVAL of the proposed settlement.


**IV.  Notice**

**A.    Content of the Notice**

Federal Rule of Civil Procedure 23(c)(3) governs the notice requirements for class certification.  Specifically, the notice must state:

(i) the nature of the action;

(ii) the definition of the class certified;

(iii) the class claims, issues, or defenses;

(iv) that a class member may enter an appearance through an attorney if the member so desires;

(v) that the court will exclude from the class any member who requests exclusion;

(vi) the time and manner for requesting exclusion; and

(vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(3)(B).  Additionally, in securities class actions, the notice must satisfy the disclosure requirements of the Private Securities Litigation Reform Act (PSLRA).  The PSLRA requires a proposed settlement agreement published and disseminated to the class to include: (1) the amount of settlement proposed to be distributed to the parties to the action, determined in the aggregate and on an average per share basis; (2) if the parties do not agree on the average amount of damages per share that would be recoverable if plaintiffs prevailed, a statement from the settlement party concerning the average amount of such potential damages per share; (3) a statement indicating which parties or counsel intend to make

34

application for attorneys' fees and costs, including the amount
of fees and costs sought; (4) the name, telephone number, and
address of one or more representatives of counsel for the
plaintiff class who will be reasonably available to answer
questions from class members; (5) a brief statement of the
reasons the parties propose to settle; and (6) such other
information as the Court requires. 15 U.S.C.A. § 78u-4(a)(7)(A)-
(F).

    After reviewing the notice, the Court finds that it meets
the requirements of Rule 23(c)(3) and the PSLRA.  The plain
language of the Notice apprises all class members of the nature
of the action (R. Doc. 344-4 at § 3), the definition of the
class (R. Doc. 344-4 at § 2), the class claims and the defenses
(R. Doc. 344-4 at §§ 4-5), the class members' right to be heard
(R. Doc. 344-4 at § 14), the class members' right to exclusion
(R. Doc. 344-4 at § 10), the time and manner for requesting
exclusion (R. Doc. 344-4 at § 10), and the binding effect of a
class judgment (R. Doc. 344-4 at § 11).  The Notice also
discloses the amount of settlement (R. Doc. 344-4 at § 6), the
amount of damages per share (R. Doc. 344-4 at § 7), a statement
of attorneys' fees sought (R. Doc. 344-4 at 2), the name and
contact information of counsel (R. Doc. 344-4 at § 16), and the
reasons for settlement (R. Doc. 344-4 at § 4).

    **B.   Method of Notice**

Under Rule 23(e)(1), when approving a class action settlement, the district court "must direct notice in a reasonable manner to all class members who would be bound by the proposal."  Additionally, for classes certified under Rule 23(b)(3), courts must ensure that class members receive "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified by reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).  The Due Process Clause also gives unnamed class members the right to notice of the settlement of a class action. *Fidel v. Farley*, 534 F.3d 508, 513-14 (6th Cir. 2008) (citing *DeJulius v. New England Health Care Employees Pension Fund*, 429 F.3d 935, 943-44 (10th Cir. 2005)).  The notice must be "reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *DeJulius*, 429 F.3d at 944 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)).  Still, "the type of notice to which a member of a class is entitled depends upon the information available to the parties about that person." *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1098 (5th Cir. 1977).  Thus due process does not require *actual* notice to all class members who may be bound by the litigation. *See Fidel*, 534 F.3d at 514.

36

In securities class actions, the vast majority of shareholder class members own securities in "street name," which means the securities are registered to the brokerage house or financial institution rather than directly to the investor. (R. Doc. 351-8 at ¶9).  Courts have typically found notice to class members who hold stock in street names to satisfy due process even if some brokerage houses fail to forward the notice to class members on a timely basis. *See Fidel*, 534 F.3d at 514 (holding that notice comported with due process when it was mailed to brokerage houses 46 days before the opt-out deadline and claims administrator published summary notice in print and on the internet); *DeJulius*, 429 F.3d at 940 (approving a notice scheme in which notice was mailed to brokerage houses and they were asked to, within 10 days, either provide a list of owners or forward the notice to the owners themselves); *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993) (finding that notice was adequate even though one-third of shareholders received untimely notice and could not object to the settlement).

Here, since most of the shareholders owned securities in street names, Analytics proposes to provide brokerage houses and other nominees with a Notice Package. (R. Doc. 351-8 at ¶10). Analytics will send the Notice by first class mail on or within 21 days of this Court's entry of a Preliminary Approval Order.

The brokers and nominees will then be required to: (1) either provide Analytics with the name and last known address of each person or entity who purchased a relevant security or (2) mail the Notice Package directly to the beneficial owners of relevant securities. (R. Doc. 351-8 at ¶11).  To provide notice to class members whose mailing addresses are unavailable, Analytics plans to initiate a published notice campaign designed to distribute the Summary Notice as widely as possible. (R. Doc. 351-8 at ¶11).  In the campaign, Analytics will: (1) publish the Summary Notice in the national edition of the Wall Street Journal; (2) distribute the Summary Notice internationally via PR Newswire; and (3) distribute the Summary Notice electronically via the Depository Trust Company's Legal Electronic Notice System. (R. Doc. 351-8 at ¶11).

The Court finds that the proposed notice satisfies the requirements of Rule 23(c)(2)(B) and due process.  The Court finds that the direct mailing of notice, along with publication of Summary Notice in print and on the web, is reasonably calculated to apprise class members of the settlement.  Further, the mailing of the notice to brokerage houses is the "best notice practicable under the circumstances."  Although most shareholders hold the stock in street names, Analytics' plan is a reasonable effort to identify class members for individual notice.  Analytics plans to conduct a nominee outreach campaign

to ensure that the nominees receive the notice package and then either provide Analytics with the contact information for the shareholder or mail the notice package directly to them. Analytics will mail the notice within 21 days of the Court's entry of the Preliminary Approval Order.  As class members have until 21 days before the settlement fairness hearing to opt out or object to the settlement, the notice will be mailed, at most, 39 days before the opt-out deadline.  Courts have approved similar periods between the mailing of notice and the deadline to object in cases involving securities held in street name. *DeJulius*, 429 F.3d at 940, 946-47 (32 days); *Torrisi,* 8 F.3d at 1373, 1375 (31 days); *Fidel*, 534 F.3d at 514 (46 days). Accordingly, the Court APPROVES the proposed Notice and Summary Notice.


**V.    Claims Administrator**

Counsel requests the Court to approve Analytics, Inc. as the Claims Administrator in this case.  Analytics is the oldest class action consulting and settlement administration firm in the country. (R. Doc. 351-8 at ¶3).  Analytics has extensive experience in administering settlements and in particular has administered securities litigation settlements with an aggregate value of about $2 billion.  (R. Doc. 351-8 at ¶¶6-7).

39

In this case, Analytics would be responsible for: (1) disseminating the Notice of Pendency of Class Action and Settlement of Class Action and the Proof of Claim and Release to potential Class Members in this action; (2) assisting Class Members with questions regarding the proposed settlement and the submission of claims; (3) receiving and processing claims submitted regarding the settlement fund; (4) corresponding with Class Members submitting deficient claims; (5) reporting to Counsel and the Court; and (6) distributing settlement funds to approved claimants. (R. Doc. 351-8 at ¶8).  Analytics anticipates that its total estimated fees and expenses will be between $160,000 and $175,000. (R. Doc. 351-8 at ¶25). Plaintiffs anticipate that the Notice and Administration Fund of $175,000 will be sufficient to cover these costs.

After reviewing the experience of Analytics and its proposed plan to administer the settlement, the Court is satisfied that Analytics will competently administer the settlement.  Accordingly, the Court APPROVES Analytics, Inc. as the Claims Administrator.

## VI.  Conclusion

For the foregoing reasons, the Court GRANTS Lead Plaintiff's Motion for Preliminary Approval of Settlement and

Certification of Class.  A detailed procedural order will be
issued in conjunction with this opinion.


New Orleans, Louisiana, this <u>17th</u> day of October 2008.


_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

41