UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE OCA, INC. SECURITIES                          CIVIL ACTION
AND DERIVATIVE LITIGATION

                                                    NO: 05-2165

                                                    SECTION R(3)


**ORDER AND REASONS**

Before the Court are Lead Plaintiff's motion for final approval of the class action settlement and Lead Counsel's motion for an award of attorneys' fees and costs. The Court has considered all of the evidence submitted at the fairness hearing held on February 10, 2009, as well as the objection and legal memoranda submitted by the parties. For the reasons stated more fully below, the Court finds the settlement of this class action to be fair, reasonable, and adequate, and the Court awards attorneys' fees and costs as provided in this order.

**I.    Background**

**A.    Factual Background**

This action is a securities fraud action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5, promulgated by the Securities and Exchange Commission under the statute. Defendant OCA, Inc. is a Louisiana-based company that provided business services to orthodontic and pediatric dental practices throughout the United

1

States.  Plaintiffs sued on behalf of purchasers of OCA's publicly traded common stock and sellers of OCA put options who engaged in their transactions between May 18, 2004 through June 6, 2005 (the "Class Period").

Specifically, OCA provided affiliated orthodontic practices with information systems and a range of operational, purchasing, financial, marketing, administrative and other business services. It generally provided its services to affiliated practices under long-term contracts with terms that typically range from 20 to 25 years.  As of December 31, 2004, OCA had approximately 565 affiliated centers in the United States and abroad.

On May 18, 2004, OCA announced that it would adopt Financial Accounting Standards Board Interpretation No. 46R ("FIN 46R"), which requires a company to consolidate the financial results of variable interest entities under certain circumstances when the company has an interest in the entities.  OCA stated that its adoption of FIN 46R would require it to make a number of changes to its financial statements.  Those changes included changes to the way OCA recorded patient revenue and patient receivables. OCA's chief executive officer, Bart F. Palmisano, Sr., stated in OCA's May 18, 2004 press release that the accounting changes would make OCA's accounting simpler and more transparent and would lead to financial reporting that was more consistent with the way OCA managed its business.

Plaintiffs allege that over the remainder of 2004 and the early part of 2005, defendants made a series of false statements concerning OCA's quarterly financial results and its future prospects. According to plaintiffs, those statements were materially false or misleading and had the effect of artificially inflating OCA's stock price.

On March 17, 2005, OCA announced that it would delay the filing of its Form 10-K for the fiscal year ending December 31, 2004, because it had identified certain accounting errors relating to 2004 and earlier years. OCA stated that it would continue to review its accounting and that it had not made a decision about whether the errors were material or would require it to restate earlier financial results. On June 7, 2005, OCA announced a further delay in the filing of its 2004 Form 10-K and reported that it had identified material errors in its calculation of patient receivables reported during the first three quarters of 2004. It revealed that its audit committee required it to restate its financial results for those periods. OCA also announced that it had organized a special committee of the board of directors to review the origins of certain journal entries in the company's general ledger and their impact on OCA's financial statements. OCA's chief operating officer, Bart. F. Palmisano, Jr., went on administrative leave pending the outcome of the company's internal investigation. After OCA's June 7

announcement, shares of OCA stock fell $1.55, or 38%, to close at $2.48 per share. The New York Stock Exchange de-listed OCA's stock on November 8, 2005, after which the stock traded on the pink sheets. On March 14, 2006, OCA filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.

**B.    Procedural Background**

Shortly after OCA's June 7, 2005 announcement, a number of plaintiffs filed securities class actions in this district against OCA and certain of its officers and directors. The Court consolidated twenty of the class actions into the present case against OCA, OCA's insurers National Union Fire Insurance Company of Louisiana and XL Specialty Insurance Company, and OCA officers Bart Palmisano, Sr., David Verret, and Bart Palmisano, Jr. (R. Docs. 3, 27, 113). A group of plaintiffs also filed shareholder derivative actions (collectively referred to as the "Derivative Case") against the OCA Board of Directors, the Palmisanos, Verret, and their insurers, and the cases were consolidated with this securities action. (R. Doc. 3, 170). Another related case, the OCAI litigation, was proceeding in the United States Bankruptcy Court for the Eastern District of Louisiana. In that case, OCA sued OCA International, LLC, Gimili Enterprises, LLC, and Palmisano, Sr. over a transaction that transferred ownership of OCA's foreign subsidiaries from OCA to OCA International. *See In re OCA, Inc., et al.*, No. 06-1289 (Bankr. E.D. La.).

On November 18, 2005, the Court appointed Samuel Boodman as Lead Plaintiff pursuant to the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C.A. § 78u-4(a)(3)(B)(v), and approved Kaplan Fox & Kilsheimer as Lead Counsel and Neblett Beard & Arsenault as liaison counsel. (R. Docs. 157, 159). Plaintiffs filed a consolidated class action complaint on February 1, 2006 against OCA, Palmisano, Sr., Palmisano, Jr., and Verret. (R. Doc. 167). The complaint alleged that defendants engaged in securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and SEC Rule 10b-5, 17 CFR § 240.10b-5, promulgated thereunder. The complaint further alleged that the individual defendants, the Palmisanos and Verret, were controlling persons under Section 20(a) of the Act, 15 U.S.C. § 78t(a), and therefore were derivatively liable for the company's fraudulent acts. On December 14, 2006, the Court denied the Motion to Dismiss of Palmisano, Sr. and Verret, but granted the Motion to Dismiss of Palmisano, Jr. (R. Doc. 208). After discovery, the parties opted to mediate this action, as well as the Derivative Case and the OCAI Litigation, before the Honorable Daniel Weinstein. (Strauss Decl., Exhibit G, Weinstein Decl.). The first mediation session was held on September 25-26, 2007. The session was unsuccessful and the parties remained quite far apart. (Weinstein Decl., ¶6). The parties continued to engage in settlement discussions and held a second mediation session on November 26, 2007. (Weinstein Decl., ¶7). No

settlement resulted from the mediation, but the parties continued
to negotiate, often with the assistance of Weinstein. (Weinstein
Decl., ¶7).  The parties eventually reached a global resolution
of the Securities Case, the Derivative Case, and the OCAI
litigation, memorialized in a Memorandum of Understanding on
February 28, 2008. (Weinstein Decl., ¶7).

Lead Plaintiff Samuel Boodman filed a motion for preliminary
approval of the settlement in the Securities Case and
certification of the settlement class on August 25, 2008. (R.
Doc. 344).  Plaintiff requested that the Court: (1) approve the
form of class notice described in the Notice of Pendency and
Proposed Settlement of Class Action; (2) approve the form of
summary notice,(3) schedule a hearing to determine whether the
settlement should be given final approval, and (4) establish
dates for submission of proofs of claim, dissemination of the
class notice, and other relevant deadlines. (R. Doc. 344).  After
a status conference, the Court ordered the parties to brief the
following issues before the preliminary approval hearing: (1) the
propriety of certifying the class under Federal Rule of Civil
Procedure 23; (2) the suitability of the proposed class counsel
under the requirements of Rule 23(g); (3) the reasonableness of
the apportionment plan contained in the settlement agreement; (4)
the substance of any side agreements; (5) the amount of
attorneys' fees sought; (6) the identity of the proposed Claims
Administrator and his qualifications; (7) the procedure to be

followed if the settlement fund is inadequate to pay the claims; and (8) the meaning of paragraph (gg) of the settlement agreement, dealing with the release of unknown claims. (R. Doc. 346).

On October 7, 2008, the Court held a hearing on the motion for preliminary approval of the settlement. (R. Doc. 352). After considering the parties' memoranda, exhibits, and live arguments, the Court issued an order preliminarily approving the settlement and certifying the settlement class on October 17, 2008. (R. Doc. 353). In the Order, the Court certified the settlement class and approved Samuel Boodman as Lead Plaintiff and Kaplan Fox & Kilsheimer as Lead Counsel for purposes of Rule 23. The Court approved Analytics, Inc. as the Claims Administrator. The Court also approved the proposed notice and claim forms, as well as deadlines for submitting claims forms, opting out, and filing objections. The Court scheduled a fairness hearing on February 9, 2009, to determine whether the settlement is fair, whether the securities complaint should be dismissed, whether the proposed allocation plan is fair, and to determine an award of attorneys' fees and expenses.

**C.  The Settlement Class**

On October 17, 2008, the Court certified a class for purposes of settlement. The class is defined as:

[A]ll persons who purchased the publicly traded common
stock or sold put options of OCA during the period from
May 18, 2004 through June 6, 2005, inclusive.  Excluded
from the Class are the Defendants, former defendant
Palmisano, Jr., any members of Defendants' or
Palmisano, Jr.'s immediate families, any entity in
which any Defendant or former defendant has a
controlling interest, and the affiliates, legal
representatives, heirs, predecessors, successors, and
assigns of any such excluded party.

(R. Doc. 344-2 at 7).  A "person" includes:


[A]ny individual, corporation, partnership,
association, affiliate, joint stock company, estate,
trust, unincorporated association, entity, government
and any political subdivision thereof, or any other
type of business or legal entity, and their spouses,
heirs, predecessors, successors, representatives,
agents, or assignees.

(R. Doc. 344-2 at 10).  In its October 17, 2008 Order, the Court

found that the class met the numerosity, commonality, typicality,

adequacy, and predominance requirements of Rule 23. (R. Doc.

353).

**D.   The Settlement Agreement**

Under the Stipulation and Agreement of Settlement,

defendants agreed to have National Union and XL, their insurers,

pay $6.5 million in cash into the escrow account established for

the settlement fund by Lead Counsel for the benefit of the class

members. (R. Doc. 344-2 at ¶4).  The payment was to be made on or

within 30 days after the Court entered the preliminary order

approving the settlement. (R. Doc. 344-2 at ¶4).  Neither

8

National Union nor XL were required to make payment, however, until the insurers received a release from each defendant and any other person or entity that is a defendant in either the Derivative Case or the OCAI litigation, regardless of whether 30 days has elapsed. (R. Doc. 344-2 at ¶4).

Under the Agreement, the settlement fund will be used to pay: (1) the notice and administration costs; (2) the attorneys' fees and expense award; and (3) the remaining administrative expenses. (R. Doc. 344-2 at ¶5). After these payments, the balance of the settlement fund will be distributed to Authorized Claimants, defined as those "whose claim for recovery has been allowed pursuant to the terms of this Settlement Stipulation." (R. Doc. 344-2 at ¶¶1 & 5). In addition, all costs and expenses incurred by the Lead Plaintiff and the class in connection with the settlement are to be paid from the settlement fund. (R. Doc. 344-2 at ¶5).

The Agreement required that, within 10 business days after counsel for National Union receives a copy of the Court's preliminary approval order, National Union will deposit $175,000 of the settlement amount into another escrow account ("the Notice and Administration Fund") to be used for reasonable out-of-pocket costs in connection with providing notice of the settlement to the class members and other administrative expenses. (R. Doc. 344-2 at ¶6). The Agreement provides that upon written agreement of the parties or order of the Court,

additional amounts may be transferred from the settlement fund to the Notice and Administration Fund. (R. Doc. 344-2 at ¶6). The Agreement prohibits the escrow agent from disbursing funds from the Notice and Administration Fund, except as provided in the Agreement, as ordered by the Court or with the written agreement of counsel for all of the parties. (R. Doc. 344-2 at ¶7).

Under the Agreement, Lead Counsel or the Claims Administrator, Analytics, Inc., will administer and calculate the claims submitted by class members, oversee distribution of the Settlement Fund, and perform all claims administration procedures. (R. Doc. 344-2 at ¶16). In order to be an "Authorized Claimant" under the Agreement: (1) a class member must timely submit a proof of claim to the Claims Administrator, supported by certain documents showing proof of the claimant's loss; (2) the proof of claim must be submitted by the claims bar date of February 14, 2009, unless the Court extends the time period; and (3) the Claims Administrator must determine that the claim should be allowed in accordance with the Settlement Stipulation, subject to the Court's review. The Administrator may reject proofs of claim that do not meet the submission requirements, but before rejection, the Claims Administrator must notify the claimant of his reasons for proposing to reject the claim, and the claimant may contest the rejection within 20 days by serving the Claims Administrator with a notice and statement of reasons and requesting review by the Court. The Agreement

requires the administrative determinations of the Claims
Administrator to be presented to the Court for approval. (R. Doc.
344-2 at ¶18).

The Agreement further provides that all class members will
be bound by the judgment of the Court concerning the Settlement,
unless the person requests exclusion from the class by mail. (R.
Doc. 344-2 at ¶25). The class notice establishes the opt-out
date as January 20, 2009 — 21 days before the settlement fairness
hearing. (R. Doc. 344-4 at §9).

The Agreement discloses that Lead Counsel and the defendants
have executed a Supplemental Agreement, setting forth conditions
under which the Settlement Agreement may be withdrawn or
terminated at the discretion of the defendants if potential class
members who purchased in excess of a certain number of shares
exclude themselves from the class. (R. Doc. 344-2 at ¶28).
Finally, the Agreement provides that it is intended to be a final
and complete resolution of all disputes asserted or that could be
asserted by the class members against any of the released parties
with respect to the released claims. (R. Doc. 344-2 at ¶41).

**E.    Plan of Allocation**

The notice to class members sets forth the plan of
allocation ("Plan"). (R. Doc. 344-4 at § 7). The Plan provides
that the Net Settlement Fund will be distributed to class members
who submit valid, timely proof of claim forms. (R. Doc. 344-4 at

§ 7). The Plan provides that class members may participate only if they suffered a net loss on all transactions in OCA during the Class Period.

Specifically the Plan provides that, for shares of OCA common stock purchased between May 18, 2004 and March 17, 2005, inclusive: (1) if the share was held as of the close of trading on June 6, 2005, the Authorized Claimant's Recognized Claim shall be the lesser of $1.85 per share; or (b) the difference between the purchase price per share and $1.64 per share; (2) if the share was sold at a loss between March 18, 2005 and June 6, 2005, the Recognized Claim shall be the lesser of $0.31 per share; or (b) the difference between the purchase price per share and the sales price per share; (3) if the share was sold at a loss between June 7, 2005 and September 2, 2005, inclusive, the Recognized Claim shall be the lesser of (a) $1.85 per share or (b) the difference between the purchase price per share and the sales price per share; or (4) if the share was sold prior to the close of trading on March 17, 2005, the Recognized Claim is $0. (R. Doc. 344-4 at § 7).

For shares of OCA common stock purchased between March 18, 2005 and June 6, 2005, inclusive, the Plan provides that: (1) if the share was held as of the close of trading on June 6, 2005, the Authorized Claimant's Recognized Claim shall be the lesser of (a) $1.54 per share or (b) the difference between the purchase price per share and $1.64 per share; (2) if the share was sold at

a loss between June 7, 2005 and September 2, 2005, inclusive, the Recognized Claim shall be the lesser of (a) $1.54 per share or (b) the difference between the purchase price per share and the sales price per share; or (3) if the share was sold prior to the close of trading on June 6, 2005, the Recognized Claim is $0. (R. Doc. 344-4 at § 7).

As for put options, the Plan provides that for put options sold between May 18, 2004 and March 17, 2005: (1) no claim will be recognized for OCA put options sold between May 18, 2004 and March 17, 2005 that were not the obligation of the Authorized Claimant as of the close of trading on March 17, 2005; (2) for put options that were the obligation of the Authorized Claimant at the close of trading on March 17, 2005, the Recognized Claim shall be the lesser of (a) the difference, if a loss, between the amount received for writing the put option and the sum for which the put options were repurchased at a loss, (b) $0.31 per share covered by such put options if repurchased at a loss between March 18, 2005 and June 6, 2005, or (c) $1.85 per share covered by such put options if repurchased at a loss after the close of trading on June 6, 2005; (3) for OCA put options that were "put" to the Authorized Claimant, the Authorized Claimant's Recognized Claim shall be calculated as a purchase of common stock as shown above, and as if the sale of the put option were instead a purchase of OCA common stock on the date of the sale of the put option and the "purchase price paid" shall be the strike prices

less the proceeds received on the sale of the put option. (R. Doc. 344-4 at § 7).

As for put options sold between March 18, 2005 and June 6, 2005, the Plan provides that: (1) no claim shall be recognized for OCA put options sold that were not the obligation of the Authorized Claimant as of the close of trading on June 6, 2005; (2) for put options sold that were the obligation of the Authorized Claimant at the close of trading on June 6, 2005, the Authorized Claimant's Recognized Claim shall be the lesser of (a) the difference, if a loss, between the amount received for writing the put option and the sum for which the put options were repurchased at a loss after the close of trading on June 6, 2005 or (b) $1.54 per share covered by such put options; or (3) for put options that were "put" to the Authorized Claimant, the Authorized Claimant's Recognized Claim shall be calculated as a purchase of common stock as shown above, and the "purchase price paid" shall be the strike price less the proceeds received on the sale of the put option. (R. Doc. 344-4 at § 7).

The Plan further provides that for put options sold that expired unexercised, an Authorized Claimant's Recognized Claim shall be $0. The Plan provides that no loss shall be recognized for put options sold during the Class Period to offset a long position in the same option that was purchased at any time prior to the sale. (R. Doc. 344-4 at § 7).

To the extent that class members' claims exceed the Net

Settlement Fund, each claimant will be compensated on a pro rata basis according to the claimant's calculated loss under the allocation plan. (R. Doc. 351-8 at ¶15).

**F.   Notice**

Federal Rule of Civil Procedure 23(c)(3) governs the notice requirements for class certification.  Specifically, the notice must state:

(i) the nature of the action;

(ii) the definition of the class certified;

(iii) the class claims, issues, or defenses;

(iv) that a class member may enter an appearance through an attorney if the member so desires;

(v) that the court will exclude from the class any member who requests exclusion;

(vi) the time and manner for requesting exclusion; and

(vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(3)(B).  Additionally, in securities class actions, the notice must satisfy the disclosure requirements of the Private Securities Litigation Reform Act (PSLRA).  The PSLRA requires a proposed settlement agreement published and disseminated to the class to include: (1) the amount of settlement proposed to be distributed to the parties to the action, determined in the aggregate and on an average per share basis; (2) if the parties do not agree on the average amount of damages per share that would be recoverable if plaintiffs

15

prevailed, a statement from the settling party concerning the average amount of such potential damages per share; (3) a statement indicating which parties or counsel intend to make application for attorneys' fees and costs, including the amount of fees and costs sought; (4) the name, telephone number, and address of one or more representatives of counsel for the plaintiff class who will be reasonably available to answer questions from class members; (5) a brief statement of the reasons the parties propose to settle; and (6) such other information as the Court requires. 15 U.S.C.A. § 78u-4(a)(7)(A)-(F). After reviewing the notice here, the Court found in its preliminary approval order that it met the requirements of Rule 23(c)(3) and the PSLRA. The Court also found that the proposed dissemination of the notice was the best notice practicable in accordance with Rule 23(c)(2)(B) and that it met the requirements of Due Process.

Lead Counsel has provided evidence that the notice was disseminated as planned. (Strauss Decl., Exhibit I, Affidavit of Richard Simmons). Analytics received from Lead Counsel two reports identifying Security Intermediaries identified by the Depository Trust Company and Registered Holders of Equity Interests as evidenced by the Equity Holder List prepared by Computershare. (Simmons Affidavit, ¶4). From those reports, Analytics assembled a list of 410 unique names and addresses of potential class members. (Simmons Affidavit, ¶4). To provide

notice to those shareholders that owned OCA stock in "street name," Analytics looked to its list of 577 brokers and other nominees who regularly purchase and/or hold securities as nominees for beneficial purchasers and to a list of 5,439 brokers registered with the SEC. (Simmons Affidavit, ¶5). Analytics then put together the notice package, the mailing envelope of which stated, conspicuously: "Notice to those who purchased common stock or sold put options of OCA, Inc." [or] "Notice to those who purchased common stock or sold put options of OCA, Inc. You could receive a payment from a class action settlement." (Simmons Affidavit, ¶6). Analytics then sent the notice package to: (1) security intermediaries; (2) registered holders, and (3) Analytics' focused lists of financial institutions known to hold the securities on behalf of investors. (Simmons Affidavit, ¶8). In total, Analytics sent out 6,426 copies of the notice package. (Simmons Affidavit, ¶8).

Analytics also arranged for the publication of summary notice. On November 19, 2008, summary notice was published in the national edition of *The Wall Street Journal*. (Simmons Affidavit, ¶10 and Exhibit D). Summary notice was also distributed by PR Newswire, both internationally and domestically. (Simmons Affidavit, ¶11 and Exhibit E). Analytics confirmed that the summary notice was redistributed by online news organizations and financial web sites such as Bloomberg, CBS

Marketwatch, Fox Business, The Wall Street Journal, Google Finance, and Yahoo Finance. (Simmons Affidavit, ¶12). Analytics also requested that the securities clearing agency, the Depository Trust Company ("DTC"), post the summary notice on its Electronic Legal Notice System. (Simmons Affidavit, ¶13).

In addition, Analytics conducted a nominee outreach campaign. Analytics obtained security position reports regarding relevant securities on May 22, 2004, the earliest date available, and June 3, 2005, the end of the class period. (Simmons Affidavit, ¶15). The reports identified 191 nominees holding positions in the relevant securities. (Simmons Affidavit, ¶15). Analytics then attempted to contact those nominees multiple times, through mail and email. (Simmons Affidavit, ¶16). Based on the additional information received from the nominees, Analytics sent an additional 20,751 copies of the notice package by the date of its affidavit. (Simmons Affidavit, ¶17). In total, Analytics mailed or caused to be mailed 27,177 copies of the settlement notice and claim form as of the date of the affidavit. (Simmons Affidavit, ¶18). Although some of the notice packages were returned, Analytics re-mailed those with forwarding addresses and conducted searches for updated address information for those without forwarding addresses. (Simmons Affidavit, ¶19).

To further disseminate notice of the settlement and answer questions about the claims process, Analytics maintained a

settlement administration website and a settlement administration
call center. (Simmons Affidavit, ¶¶20-25). The website,
www.ocasecuritieslitigation.com, contained a frequently asked
questions section, a case status section, and a case documents
section containing links to the notice, proof of claim,
consolidated class action complaint, and the Court's Order
preliminarily approving the settlement. (Simmons Affidavit, ¶21).
As of the date of the affidavit, the website had received 1,489
unique visits and 859 downloads of various case documents.
(Simmons Affidavit, ¶22). The call center was fully operational
as of November 6, 2008. When a caller connected with the call
center, she heard an Interactive Voice Response system, which
provided detailed information regarding the claims filing process
and filing objections, and allowed the caller to request a Notice
Package by mail. (Simmons Affidavit, ¶24). The call center also
contained an option to speak to a live operator who was trained
on the specifics of the settlement. (Simmons Affidavit, ¶25).

In sum, after reviewing evidence of the actual dissemination
of the notice by the Claims Administrator, the Court confirms
that the notice complies with the requirements of Rule 23, the
PSLRA, and Due Process.

**G.   Opt-outs and objections**

Analytics received only one request to be excluded from the
settlement before the opt-out deadline of January 20, 2009.

(Simmons Affidavit, ¶27, Trans. of Settlement Fairness Hearing).
While the request was timely, it was invalid because it failed to
include any transaction information. (Simmons Affidavit, ¶27).

The Court also received one objection to the settlement.  On
January 5, 2009, the Court received a letter of objection from
Richard & Betsy Jasinski.  The Jasinski's objected to the
proposed award of attorneys' fees in the settlement, asserting
that the proposed fee award was a "windfall" and a "skimming
operation."  The Jasinski's also objected to the certification of
the class because plaintiffs were required to "opt out" rather
than "opt in."  The Jasinski's further alleged that counsel
presented the information to the class in a manner that made it
difficult for the class to understand what was going on in the
case.  They contended that the class notice was used in an effort
to quickly resolve the case before class members could object to
the settlement and attorneys' fees.  The Jasinski's aver that the
limited objection to the settlement simply means that the class
has not taken the time to respond, rather than that most of the
class favors the proposed settlement.

II.  **Class Action Settlement**

   A.   **Legal Standard- Fair, Reasonable, and Adequate**

A class action may not be dismissed or compromised without the approval of the Court and notification to all class members. Fed. R. Civ. P. 23(e). Before the Court approves a settlement, the Court must find that the proposed settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1)(c); *Newby v. Enron Corp.*, 394 F.3d 296, 301 (5th Cir. 2004); *Ayers v. Thompson*, 358 F.3d 356, 368 (5th Cir. 2004); *In re Educ. Testing Serv. Praxis Principles of Learning and Teaching: Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 619 (E.D. La. 2006).

The Court must "ensure that the settlement is in the interest of the class, does not unfairly impinge on the rights and interests of dissenters, and does not merely mantle oppression." *Ayers*, 358 F.3d at 368-69 (quoting *Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983)); *see also Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1214 (5th Cir. 1978). Because the parties' interests are aligned in favor of a settlement, the Court must take independent steps to ensure fairness in the absence of adversarial proceedings. *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279-80 (7th Cir. 2002) (noting that the class action context "requires district judges to exercise the highest degree of vigilance in scrutinizing proposed settlements."); *see also* Manual for Complex Litigation (Fourth) § 21.61 (2004). The Court's duty of vigilance does not,

however, authorize it to try the case in the settlement hearings. *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977).

The Fifth Circuit has identified six factors that the Court should consider in assessing whether a settlement is fair, adequate, and reasonable: (1) evidence that the settlement was obtained by fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the factual and legal obstacles to plaintiffs prevailing on the merits; (5) the range of possible recovery and certainty of damages; and (6) the opinions of class counsel, class representatives, and absent class members. *See Newby*, 394 F.3d at 301; *Ayers*, 358 F.3d at 369; *Reed*, 703 F.2d at 172; *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982).

**B.   Discussion**

The Court will now consider the factors for final approval of the settlement.

**1.   Fraud or collusion**

There is no evidence that the settlement involves fraud or collusion.  The parties have presented evidence that the settlement was the result of arm's length negotiations after two mediation sessions before the Honorable Daniel Weinstein, an experienced mediator. (R. Doc. 357-3, Strauss Decl., ¶¶32-34). The parties submitted a declaration from Judge Weinstein

detailing the mediation and negotiation process. (R. Doc. 357, Exhibit G, Weinstein Decl.). Judge Weinstein explained that, because of the bankruptcy of OCA and the limited financial resources of the individual defendants, the bulk of the potential settlement was to come from the two insurance carriers, National Union and XL. (Weinstein Decl., ¶6). He explained that the settlement was further complicated by the insurance companies' push for a global resolution of the Securities Case, the Derivative Case and the OCAI Litigation. (Weinstein Decl., ¶6). He noted that it was a "long and difficult" mediation in which counsel for all parties worked hard to represent the interests of their clients. Judge Weinstein stated that there was no evidence of fraud or collusion at any point in the settlement process. (Weinstein Decl., ¶9).

The Court has required justification from the parties for certain provisions of the settlement. Specifically, the Court required the parties to demonstrate the reasonableness of the "Released Claims" provision in the settlement agreement, which extended to any claims, known or unknown, arising out of the purchase of OCA stock or sale of put options during the Class Period. The parties demonstrated that the release applied only to class members and that this type of provision was common in class action litigation, citing a number of cases allowing the

release of similar provisions. *See, e.g., In re DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 311 (W.D. Tex. 2007)(finding that the release of all past, present, and future claims is not overly broad).  The Fifth Circuit has explained that courts are required to enforce such broad provisions because they "contribute significantly to the public policy of encouraging the settlement of differences and compromise of disputes in which the execution and exchange of releases is the common and legally accepted means of consummation." *Ingram Corp. v. J. Ray McDermott & Co.*, 698 F.2d 1295, 1312 (5th Cir. 1983).  Accordingly, the Court finds the provision to be reasonable.  In addition, the Court reviewed the Supplemental Agreement between Lead Counsel and defendants, which allowed defendants to withdraw from the settlement agreement if potential class members who purchased in excess of a certain number of shares opted out of the settlement.  Without such an agreement, defendants would have no protection from potentially duplicative liability if class members who purchased a large number of shares opted out of the settlement and sued defendants.  The Court finds that the number of shares that triggers defendants' ability to withdraw from the settlement to be neither unreasonable nor unfair.

As noted by the Court in its preliminary approval order, the plan of allocation does not give unfair or preferential treatment

to the lead plaintiff or any segment of the class.  The
allocation plan was developed by Lead Counsel and its damage
consultant FMA, and it has a fair and reasonable basis for
apportionment of recovery.

The allocation plan compensates class members in relation to
the timing of their actual purchases and sales as well as the
amount of their actual losses. (R. Doc. 351-3 at ¶13).  The funds
will be distributed based on two purchase periods.  For class
members who purchased shares (or sold put options) between May
18, 2004 and March 17, 2005, the agreement essentially recognizes
a loss upon purchase of $1.85 per share. (R. Doc. 351-3 at ¶13).
For class members who purchased shares (or sold put options)
between March 18, 2005 and June 6, 2005, the agreement
essentially recognizes a loss upon purchase of $1.54 per share.
(R. Doc. 351-3 at ¶13).  The different levels of compensation are
due to OCA's March 17, 2005 announcement that it would delay the
filing of its Form 10-K because it had identified accounting
errors relating to 2004 and earlier years.  FMA's analysis shows
that this partially curative disclosure caused $0.31 in
artificial inflation per share to be removed from the price of
OCA stock. (R. Doc. 351-3 at ¶13).  The differential treatment of
these two groups thus has a reasonable basis.

In sum, the Court has received no indication that the settlement is fraudulent, collusive, or that it unfairly discriminates among class members. This factor favors approval of the settlement.

### 2. Complexity, expense, and likely duration of the litigation

This case is a securities class action brought under the PSLRA. Plaintiffs have alleged that defendants committed securities fraud in violation of Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5 and that the individual defendants were controlling persons under Section 20(a) of the Act and thus derivatively liable.

Under this factor, the Court considers whether settling now avoids the risks and burdens of potentially protracted litigation. *Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004). Here, both parties would incur significant expenses if the case continued in litigation. Although the parties have engaged in some formal discovery, much more would be necessary, including consulting with expert witnesses. The parties would undoubtedly spend large amounts of time and resources filing and contesting motions before trial. The parties would also have to deal with an interlocutory appeal of any class certification order before trial. Trial itself would be lengthy and would require numerous attorneys, paralegals, and witnesses, as well as voluminous

amounts of evidence. Prosecution of the case would require extensive expert testimony on accounting rules, loss causation, and damages. After trial, the parties could still expect years of appeals. Such litigation would consume substantial judicial and attorney time and resources, and avoiding such costs weighs in favor of settlement. *See In re Delphi Corp. Sec., Derivative & ERISA Litig.*, 248 F.R.D. 483, 498 (E.D. Mich. 2008) (avoiding the unnecessary expenditure of time and resources for the complex trial of a securities actions benefits all parties and the court); *In re Ikon Office Solutions, Inc.*, *Sec. Litig.*, 194 F.R.D. 166, 178 (E.D. Pa. 2000) (the "inherently complicated nature of large class actions alleging securities fraud" weighs in favor of settlement); *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235, 257 (D.N.J. 2000) (complex legal and factual issues in securities litigation weigh in favor of settlement).

### 3. Stage of the proceedings

This factor asks whether the parties have obtained sufficient information "to evaluate the merits of the competing positions." *Ayers*, 358 F.3d at 369. The question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on

the terms proposed or continuing to litigate it. *In re Educ. Testing Serv.*, 447 F. Supp. 2d at 620-21 (citing *In re Train Derailment Near Amite, La.*, 2006 WL 1561470 at *22 (E.D. La. 2006)). The parties need not undertake extensive formal discovery or build a voluminous record before settlement. *Cotton*, 559 F.2d at 1332; *see also In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981). Rather, if the settlement proponents have taken affirmative steps to gather data on the claims at issue and the terms of the settlement are not patently unfair, the Court may rely on counsel's judgment that the information gathered was enough to support a settlement. *In re Corrugated Container*, 643 F.2d at 211.

Because the PSLRA prohibits formal discovery during the pendency of any motion to dismiss, the parties were prohibited from engaging in formal discovery until the Court ruled on defendants' motion to dismiss on December 14, 2006. *See* 15 U.S.C.A. § 78u-4(b)(3)(B). Before then, plaintiffs' counsel performed informal discovery, including identifying, locating and interviewing potential witnesses and identifying and obtaining records from court proceedings involving OCA. (Strauss Decl., ¶22). As for formal discovery, Lead Counsel drafted and served extensive document requests upon the individual defendants and served ten subpoenas to nonparties, including OCA's auditor and

former auditor and various former OCA employees and consultants. (Strauss Decl., ¶23).  Plaintiffs' counsel received and reviewed nearly 250,000 pages of documents, including depositions taken in the SEC investigation of OCA.  The protracted mediation led to further understanding of the factual and legal issues involved in the case.  Plaintiffs' counsel declared that they were in a position to fully evaluate the strengths and weaknesses of the case. (Strauss Decl., ¶¶25-27).

The Court is satisfied that the parties were sufficiently informed to assess the strengths and weaknesses of their positions and to make a reasoned evaluation of whether and on what terms to settle.  This factor favors settlement.

### 4.    The obstacles to prevailing on the merits

In order to succeed on a claim for securities fraud under Rule 10b-5, a plaintiff must prove: (1) a material misrepresentation or omission by the defendant, (2) scienter on the part of the defendant, (3) a connection with the purchase or sale of security, (4) reliance, often referred to as transaction causation, (5) economic loss, and (6) loss causation. *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 264 n.5 (5th Cir. 2007) (citing *Dura Pharm. Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).

Plaintiffs would face significant obstacles to prevailing on the merits of their claim. If the class had not been certified for settlement purposes, defendants would have vigorously contested plaintiffs' class certification motion. To attain class certification, plaintiffs would have had to meet the Fifth Circuit's stringent requirement that plaintiffs prove loss causation at the class certification stage in order to trigger the fraud-on-the-market presumption, such that the court could find that common issues of reliance predominate. *See Oscar Private Equity*, 487 F.3d at 271; *cf. In re LDK Solar Sec. Litig.*, --- F.R.D. ---, 2009 WL 196396 at *10-*11 (N.D. Cal. 2009) ("[*Oscar*] essentially injects what is fundamentally a merits inquiry into the class-certification inquiry . . . [I]t requires the *plaintiff* to *prove* loss causation in order to avail itself of the benefit of the fraud-on-the-market presumption (without which certification is virtually impossible)."); *Oscar Private Equity*, 487 F.3d at 277 (Dennis, J., dissenting) ("the majority's decision dramatically expands the scope of class certification review in this circuit to effectively require a mini-trial on the merits of plaintiffs' claims at the certification stage."). To prove loss causation, plaintiffs would have had to show that the corrective disclosure — not other negative information released on the same day — caused the stock price movement. *See Oscar*

*Private Equity*, 487 F.3d at 271. Plaintiffs would have had to
show this for both dates at issue – March 18, 2005 and June 7,
2005. Plaintiffs previously submitted evidence that the decline
in stock price on the relevant days was caused by OCA's
disclosures that it would delay filing its Form 10-K because it
had previously overstated patient receivables in its financial
statements and had no effective internal controls, rather than
other unrelated negative information or a general business
downturn. (*See* R. Doc. 351-3). But plaintiffs' evidence was
uncontested, as they submitted it in connection with their motion
for preliminary approval of the settlement. Had the case not
settled, defendants would have argued that other negative
information released on the dates in question actually caused the
decline in stock price. Plaintiffs would have had to prove loss
causation just to certify the class. If the class were
certified, plaintiffs would have had to defeat defendants'
interlocutory appeal of the class certification order.

Plaintiffs would also have had to survive defendants'
inevitable summary judgment motions. If plaintiffs made it to
trial, they would have had the difficult task of proving these
complex issues to a jury. Plaintiffs would have had to prove
scienter and would thus have had to show that defendants either
knew that their statements or omissions were materially false or

misleading or were severely reckless in making the statements. *See Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002) (scienter element of a section 10(b) claim is a "mental state embracing intent to deceive, manipulate, or defraud."); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408 (5th Cir. 2001) (scienter in securities fraud cases includes severe recklessness). Defendants contested whether plaintiffs sufficiently pleaded scienter at the motion to dismiss stage and would certainly have continued to vigorously contest this issue. (R. Doc. 208). Proving each defendant's state of mind would be a difficult task. *See In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 579 (S.D.N.Y. 2008) ("Proving a defendant's state of mind is hard in any circumstances."). Accordingly, proof of this element would have been a significant obstacle to plaintiffs' case. Further, even if plaintiffs succeeded on the merits at trial, they would have had to face years of appeals before they could actually recover any money from the judgment.

In sum, considering the risks plaintiffs face in attaining class certification and prevailing at trial and on appeal, the probability of success factor favors approval of the settlement.

### 5. Range of possible recovery

Even if plaintiffs established liability, plaintiffs would have had substantial obstacles in proving damages. Plaintiffs

can recover only for the amount of stock price inflation that they can prove resulted from the defendants' alleged misstatements and omissions. *See In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491, 505 (W.D. Pa. 2003). Before the mediation, plaintiffs' expert Cynthia Jones attested that OCA's damages were $32 million. (Trans. of Settlement Fairness Hearing & R. Doc. 351-3). Jones's firm, Financial Market Analysis, LLC (FMA), calculated this figure by performing a regression analysis that quantified the relationship of OCA's daily common stock changes to those of the S&P 500 Index and the S&P Small Cap Health Care Services Index. (R. Doc. 351-3 at ¶9). FMA then used those results to calculate abnormal OCA common stock price changes and measured those residual price changes for statistical significance. (R. Doc. 351-3 at ¶9). FMA determined that the residual price changes on March 18, 2005 and June 7, 2005 did not occur by chance, but were the result of investors' reactions to unexpected negative information and were indicative of previously existing artificial stock price inflation. (R. Doc. 351-3 at ¶¶9-10). FMA estimated the artificial stock price inflation per share based on the residual price declines and determined that the March 18, 2005 decline of 6.3% translated to a $0.31 loss per share and the June 7, 2005 decline of 38.3% translated to a loss of $1.54 per share. (R. Doc. 351-3 at ¶10).

Based on this analysis, FMA concluded that class members who purchased OCA stock during the Class Period and held those shares at the close of trading on March 17, 2005, suffered losses of $1.85 per share. Class members who purchased OCA stock between March 18, 2005 and June 6, 2005 who held those shares at the close of trading on June 6, 2005 lost $1.54 per share. (R. Doc. 351-3 at ¶11). FMA used a standard share trading model to reach its $32 million estimate of the aggregate class-wide damages. (R. Doc. 351-3 at ¶12). This is the amount of damages plaintiffs would have requested at trial and thus probably their maximum possible recovery.

To prove those damages, plaintiffs would have had to rely on market data and expert testimony as to the extent the price was artificially inflated. Proving the level of artificial inflation would have been complicated by the fact that plaintiffs alleged multiple misstatements over a prolonged period – over one year. *See In re Rent-Way*, 305 F. Supp. 2d at 505. Plaintiffs would also have had to establish the difference in damages between those who purchased OCA stock before and after the partially curative disclosure on March 17, 2005. Defendants would have rebutted plaintiffs' damage assessment with their own expert testimony. Because the jury would have been faced with competing expert opinions, the resulting damage

award would have been highly unpredictable. *See In re Rent-Way*, 305 F. Supp. 2d at 505; *In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004) (calculation of damages in a securities fraud case "is a complicated and uncertain process, typically involving conflicting expert opinion about the difference between the purchase price and the stock's 'true' value absent the alleged fraud"); *In re Indep. Energy Holdings PLC*, 2003 WL 22244676 at *3 ("proof of damages in a securities case is always difficult and invariably requires expert testimony which may, or may not be, accepted by a jury."). Because plaintiffs' damage award could vary widely from $0 to $32 million, settlement would grant relief to plaintiffs without subjecting them to the considerable risks of litigating their claims.

Further, OCA's bankruptcy meant there were not many "deep pockets" in the case. *See In re Quintus Sec. Litig.*, 2006 WL 3507936 at *3 (N.D. Cal. 2006 ) (the risk and cost of further litigation is enhanced by defendant's bankruptcy). The money available for recovery primarily comes from two of OCA's insurance policies for director and officer liability, and these policies are worth a total of approximately $20 million. (Trans. Of Class Certification Hearing at 4).[1] Thus even though

_____

[1] Counsel for both sides stated at the Settlement Fairness Hearing that the individual defendants remaining in the case could not

plaintiffs' damage estimate is $32 million, plaintiffs could not have realistically expected to recover over $20 million. While the $20 million in insurance proceeds is substantially more than the settlement, the $20 million is being used to fund the $5.75 million settlement in the Derivative Case and the $1.2 settlement in the OCAI litigation. Furthermore, the insurance policies are being depleted by the substantial litigation expenses and attorneys' fees incurred in this case, the Derivative Case (which has significantly more defendants), and the OCAI Litigation. Both Lead Counsel and defense counsel stated that, before the mediation, between $2 million and $3 million of the insurance proceeds available had already been spent on OCA's attorneys' fees. As the case had not yet undergone full discovery and motion practice, counsel estimated that going to trial and completing the appellate process would further deplete the proceeds available from these policies by as much as $5 million. (Trans. of Settlement Fairness Hearing). Because plaintiffs faced considerable risk in litigating the damages element of their claim and are limited in their recovery because of OCA's bankruptcy, this factor weighs in favor of settlement.

### 6. Opinions of class counsel, class representatives, and absent class members

<hr/>

significantly contribute to the settlement.

The opinions of the affected parties are generally favorable towards the settlement. Lead Counsel and Lead Plaintiff have both expressed their approval of the settlement. (Strauss Decl. and Boodman Decl.). Further, the Court and counsel have received only one objection, from Richard and Betsy Jasinski, to the settlement and proposed attorneys' fee award (R. Doc. 356), even though 26,000 copies of the Notice were sent to potential class members and summary notice was published in *The Wall Street Journal* and on *PR Newswire.* (Strauss Decl., ¶51). The Claims Administrator has also received only one request to opt out of the settlement. (Simmons Affidavit, ¶27).

Although the Court is careful not too infer too much from a paucity of objectors and opt-outs, that only one couple objected and only one person attempted to opt out suggests class-wide support for the proposed settlement. *See In re Delphi Corp.,* 248 F.R.D. at 499 (a small number of opt-outs and objections can be viewed as indicative of the adequacy of the settlement); *In re Rent-Way*, 305 F. Supp. 2d at 502 ("sole objector to the proposed Settlement comprises an infinitesimal percentage of the total number of class members and of the shares traded during the Class Period" and suggests "overwhelming class-wide support" for the settlement); *In re Excess Value Ins. Coverage Litig.*, 2004 WL

1724980 at *11 (S.D.N.Y. 2004) (small number of objectors suggests support for settlement).

In addition, Lead Counsel demonstrated additional support for the settlement at the Settlement Fairness Hearing. Pursuant to the Class Action Fairness Act, the defendants sent notice of the settlement to the Attorneys General of all 50 states and the United States Attorney General. (Trans. of Settlement Fairness Hearing). Defendants received no negative reaction to the settlement in response. (Trans. of Settlement Fairness Hearing). Additionally, 1755 claim forms had been received as of Thursday, February 5, 2009 — well over a week before the February 14 deadline. (Trans. of Settlement Fairness Hearing). Although the number of potential claimants is unascertainable because of the frequency with which some people trade stock, Lead Counsel explained that this was a substantial number of claimants. Lead Counsel also noted that a number of the claimants were sophisticated financial institutions such as state and municipal pension funds. (Trans. of Settlement Fairness Hearing). That those institutions filed claims and voiced no objections further attests to the general support for the settlement.

In sum, because all of the factors weigh in favor of settlement, the Court finds the settlement to be fair, reasonable

and adequate under Rule 23(e)(1)(C) of the Federal Rules of Civil Procedure.

### 7. Objection

The Court has considered the arguments raised in the Jasinskis' objection and for the reasons discussed below does not find that the objection raises problems sufficient to warrant rejection of the settlement.   The Jasinski's do not object to the amount of the settlement, but rather to the percentage of attorneys' fees proposed to be awarded to counsel.   The Court will separately consider the attorneys' fee award in Part III of this Order.

The Jasinski's also object that "counsel for the plaintiffs [] presents all this information in a manner which makes it difficult and time consuming for the class to decipher and act upon."   The Court interprets this to be an objection to the notice.   The Court reviewed the notice sent to potential class members in its preliminary approval order.   The Court found that it met the disclosure requirements of the PSLRA and Rule 23(c)(3) because it disclosed: (1) the nature of the action; (2) the definition of the class; (3) the class claims and defenses; (4) the class members' right to be heard; (5) the class members' right to exclusion; (6) the time and manner for requesting exclusion and the binding effect of a class judgment; (7) the

amount of settlement; (8) the amount of damages per share; (9) a statement of the attorneys' fees sought; (10) the name and contact information of counsel; and (11) the reasons for settlement. (*See* R. Doc. 344-4). After reviewing the notice again, the Court finds nothing in the eight-page document that makes it difficult or time consuming to decipher. On the first page, the notice plainly states the amount of the settlement and the average recovery per damaged share of the stock. (R. Doc. 344-4). At the top of the second page, the notice clearly states the amount of attorneys' fees sought and explains that, if the Court approves that amount, the average cost of attorneys' fees per damaged share would be $0.09. After these initial statements, the notice contains 16 sections, each set off with a heading in bold and all capital letters, that explain various aspects of the settlement and the actions potential claimants must take to make a claim, opt out, or object to the settlement. The Court finds that the notice presents the information to potential claimants as clearly as possible given the complex issues involved in securities litigation.

The Jasinskis' other objection largely concerns the class action process itself. The Jasinski's object that they must "opt out" rather than "opt in" to the class and that the Court does not require the class to respond if they favor the settlement of

this suit.  The Court notes that Rule 23(b)(3) mandates the opt-out procedure used here.  Because the objection does not concern the fairness or substance of the settlement, but rather the class action process set forth in Federal Rule of Civil Procedure 23(b)(3), the Court OVERRULES the objection.

### III. Attorneys' Fees and Costs

Class counsel requests attorneys' fees of 30% of the $6.5 million Settlement Fund, or $1,950,000, plus interest accruing thereon at the same rate as earned on the Settlement Fund, until paid.  The Court must independently analyze the reasonableness of the attorneys' fees proposed in the settlement agreement. *See Strong v. BellSouth Telecomm., Inc.*, 137 F.3d 844, 849-50 (5th Cir. 1998); *see also* Fed. R. Civ. P. 23(e).

#### A.    Common Fund Cases

In common fund cases, as here, the attorneys' fees award is taken out of the common fund, lessening the ultimate award for the plaintiffs. *See In re Enron Corp. Sec., Derivatives & "ERISA" Litig.*, 586 F. Supp. 2d 732, 745 n.10 (S.D. Tex. 2008).  The Court must carefully scrutinize the attorneys' fee award in a common fund settlement because the interests of the attorneys conflict with those of the class. *See id.* at 745.  If the attorneys get more, the class gets less.

In common fund cases, courts typically utilize one of two methods of calculating attorneys' fees. Courts use either (1) the percentage method, under which the Court awards fees as a reasonable percentage of the common fund; or (2) the lodestar method, under which the Court awards fees by multiplying the number of reasonable hours expended by a reasonable hourly rate and applying a lodestar multiplier. *See In re Enron,* 586 F. Supp. 2d at 745-46. The Fifth Circuit has established twelve factors to consider in calculating reasonable fees and costs. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). The twelve *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal service; (4) the preclusion of other employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the residuals obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of professional relationship with the client; and (12) awards in similar cases. *Von Clark v. Butler*, 916 F.2d 255, 258 n.3 (5th Cir. 1990). Using the *Johnson* factors, the court should (1) ascertain the nature and extent of the services supplied by

the attorney; (2) determine the value of the service according to the customary fee and the quality of the work; and (3) adjust the compensation on the basis of the other *Johnson* factors that may be of significance in that particular case. *Id.* at 258 (citations omitted). The first two tasks compute the "lodestar," which is essentially the reasonable number of hours expended on litigation multiplied by a reasonable hourly rate. *See Strong*, 137 F.3d at 851; *see also* Manual on Complex Litigation (4th) §§ 13.121-14.122. The Court then uses the *Johnson* factors to adjust the lodestar upward or downward using a multiplier. *Strong*, 137 F.3d at 851; *see also Longden v. Sunderman*, 979 F.2d 1095, 1099-1100 (5th Cir. 1992).

**B.  Percentage vs. Lodestar**

This Court has previously discussed the pervasive criticism of the lodestar method of calculating attorneys' fees. *See In re Educ. Testing*, 447 F. Supp. 2d at 628-69. The method has been called "difficult to apply, time-consuming to administer, inconsistent in result, and capable of manipulation." *See* Manual on Complex Litigation (4th) § 14.121. The vast majority of Courts of Appeals have approved or mandated the use of the percentage method. *See, e.g., In re Thirteen Appeals Arising out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 307 (1st Cir. 1995); *Gwozdzinnsky v. Sandler Assocs.*, 159 F.3d 1346 (2d

43

Cir. 1998); *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litig.*, 55 F.3d 768, 821-22 (3d Cir. 1995); *Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513, 515-17 (6th Cir. 1993); *Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560, 564-65 (7th Cir. 1994); *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1295 (9th Cir. 1994); *Gottlieb v. Barry*, 43 F.3d 474, 487 (10th Cir. 1994); *Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1271 (D.C. Cir. 1993). The Supreme Court has also approved the percentage method in common fund cases. *See Blum v. Stenson*, 465 U.S. 886, 900 n. 16 (1984) ("under the 'common fund doctrine,' a reasonable fee is based on a percentage of the fund bestowed on the class"); *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("[A] lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorneys' fee from the fund as a whole.").

The Fifth Circuit has never explicitly disapproved of the percentage method of calculating fees in common fund cases. For instance, in *Strong,* 137 F.3d at 852, the Fifth Circuit found that the lodestar method applied because the settlement at issue did not involve a traditional common fund. The court distinguished the Supreme Court's decision in *Boeing*, because

there, "each member of the class had an undisputed and
mathematically ascertainable claim to part of [the] lump sum
judgment." *Id.* In contrast, in *Strong*, the value of the
settlement was contingent on class members' desire to continue
inside wire maintenance service plans with BellSouth. *Id.* The
Fifth Circuit has affirmed a court's calculation of fees based on
the percentage method when the court also considered the *Johnson*
factors, noting the judge's use of the percentage method merely
demonstrated his preference "as a matter of policy." *See Longden
v. Sunderman*, 979 F.2d 1095, 1100 n.11 (5th Cir. 1992). Numerous
district courts in the Fifth Circuit have applied the percentage
fee method to common fund cases. *See In re Enron*, 586 F. Supp. 2d
at 751; *In re Educ. Testing Serv.*, 447 F. Supp. 2d at 630; *In re
Lease Oil Antitrust Litig.,* 186 F.R.D. 403, 444 (S.D. Tex. 1999);
*In re Harrah's Entm't, Inc.,* 1998 WL 832574 at *4 (E.D. La.
1998); *In re Combustion, Inc.,* 968 F. Supp. 1116, 1135 (W.D. La.
1997); *In re Catfish Antitrust Litig.,* 939 F. Supp. 493, 501
(N.D. Miss. 1996).

The percentage method of calculating fees is particularly
appropriate in the PSLRA context. The PSLRA explicitly
authorizes the percentage method in calculating attorneys' fees
in securities action. *See* 15 U.S.C.A. § 78u-4(a)(6) ("Total
attorneys' fees and expenses awarded by the court to counsel for

the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class."). A number of courts have held that, based on this statutory language, the percentage method is the preferred method for calculating attorneys' fees in securities actions. *See In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 188 n.7 (3d Cir. 2005) ("the PSLRA has made percentage-of-recovery the standard for determining whether attorneys' fees are reasonable"); *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 586 (S.D.N.Y. 2008) ("Congress plainly contemplated that percentage-of-recovery would be the primary measure of attorneys' fee awards in federal securities class actions"); *In re Xcel Energy, Inc., Sec., Derivative & ERISA Litig.*, 364 F. Supp. 2d 980, 992 n.6 (D. Minn. 2005) ("the PSLRA incorporates the common fund percentage method"). But courts often perform the lodestar analysis as a cross-check on the percentage method. *See Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir. 2000) (noting that "it is advisable to cross-check the percentage award counsel asks for against the lodestar method of awarding fees"); *see also In re Enron*, 586 F. Supp. 2d at 778; *In re Telik,* 576 F. Supp. 2d at 588; *In re Educ. Testing*, 447 F. Supp. 2d at 633; *In re Indep. Energy Holdings, PLC*, 2003 WL 22244676 at *9 (S.D.N.Y. 2003).

### C. Percentage

The Court first notes that, surprisingly, Lead Counsel and
Lead Plaintiff represented to the Court that, while counsel took
this case on a contingent basis, the plaintiff did not enter into
an *ex ante* fee agreement as to the percentage to be paid counsel
in this representation.  Such an agreement would be entitled to
deference given the lead plaintiff's role in selecting counsel
under the PSLRA. *See In re Enron*, 586 F. Supp. 2d at 749 ("The
PSLRA establishes a model of client control that extends not only
to appointment of counsel but also to monitoring of counsel and
negotiation of the fee.").  Because Lead Plaintiff and Lead
Counsel did not enter into such a fee agreement, the Court will
begin its analysis by looking at awards in comparable cases to
determine a benchmark percentage.  The Manual on Complex
Litigation states that a fee of 25% of a common fund "represents
a typical benchmark." MCL (4th) § 14.121.  The Ninth Circuit has
adopted a benchmark of 25% in common fund cases. *See Staton v.
Boeing Co.*, 327 F.3d 938, 968 (9th Cir. 2003).  In securities
suits, common fee awards generally fall within the 20 to 33 per
cent range. *See* 4 Newberg on Class Actions § 14.6 (4th ed.).  In
order to prevent windfalls to attorneys, the percentage of
attorneys' fees awarded typically decreases as the settlement
award increases in size. *See In re Ikon Office Solutions, Inc.
Sec. Litig.,* 194 F.R.D. 166, 195 (E.D. Pa. 2000); *Hicks v.*

*Stanley*, 2005 WL 2757792 at *9 (S.D.N.Y. 2005). In reported securities cases involving funds in the $5 million to $10 million range, attorneys' fee awards are generally within the 25 to 33 1/3 per cent range. *See e.g.*, *In re Telik*, 576 F. Supp. 2d at 570 (25% of $5 million fund); *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115808 at *4 (S.D.N.Y. 2007) (30% of $5.5 million fund); *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1177 (S.D. Cal. 2007) (25% of $10 million); *Hicks v. Stanley*, 2005 WL 2757792 at *9 (S.D.N.Y. 2005) (30% of $10 million); *Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*, 212 F.R.D. 400, 412 (E.D. Wis. 2002) (30% of $10.15 million); *In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 102 (D.N.J. 2001) (33 1/3% of $4.5 million); *In re Eng'g Animation Sec. Litig.*, 203 F.R.D. 417, 423 (S.D. Iowa 2001) (33 1/3 % of $7.5 million); *In re Harrah's Entm't, Inc.*, 1998 WL 832574 at *7 (E.D. La. 1998) (26% of $6.8 million).

Further, the Court has reviewed data on fee awards in class action settlements in a study involving data sets from 1993-2002. *See* Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 Journal of Empirical Legal Studies 27, 28 (2004). The data sets are (1) data based on published decisions from "all state and federal

class actions with reported fee decisions between 1993 and 2002, inclusive, in which the fee and class recovery could be determined with reasonable confidence"; and (2) information reported on more than 600 common fund cases from 1993 and 2002 in *Class Action Reports (CAR)*. *Id.* The study finds a "strong correlation between the fee amount and the client recovery." *Id.* at 52. The authors of the study suggest that the results can assist courts in determining fee awards:

> [B]ecause our study finds an overwhelming correlation between class recovery and attorney fees, the court can conduct a simple initial inquiry that looks only at these two variables in any case where the size of the class recovery can be estimated. The court need only compare the request in a given case with average awards in cases of similar magnitude. If the request is relatively close to average awards in cases with similar characteristics, the court may feel a degree of confidence in approving the award. If the request is significantly higher than amounts awarded in past cases, the court should inquire further.

*Id.* at 72. Eisenberg and Miller divided the cases into ten ranges of recovery (deciles) and then gave the mean and median fee percent, as well as the standard deviation, for each fee percent. *Id.* at 73. The Court finds the study's data on the average percentage fee awarded in the recovery range comparable to this case useful in arriving at a benchmark percentage fee.[2]

---

[2]Eisenberg and Miller suggest that a fee request within one standard deviation of the mean is presumptively reasonable, and that one falling between one and two standard deviations from the mean may require further justification. *Id.* at 74.

The $6.5 million recovery in this case falls within the 30-40% decile of client recovery, which includes recoveries between $5.2 million and $9.7 million. *Id.* at 73. Based on the *Class Action Reports (CAR)* data set, the mean fee percent for common fund cases with funds of this size range is 28.7%, with a standard deviation of 5.3%. The data set generated from published decisions shows a mean fee percent for cases in this decile of 25.6%, with a standard deviation of 7.0%. Eisenberg and Miller also found that, in general, the median fee award in securities class actions of all sizes is 25%. *Id.*

Based on the study and the Court's review of similar reported cases, the Court finds that a benchmark of 27% is appropriate. Twenty-seven percent is the average of the mean fee percents (28.7% and 25.6%) of the two data sets in the Eisenberg and Miller study involving settlements of comparable size and is also roughly the average of the fee awards in the sampling of reported securities cases collected by this Court involving similar-sized settlements. The Court will determine whether this benchmark should be adjusted upward or downward based on the particular circumstances of this case. In doing so, the Court will consider the *Johnson* factors.

**D.   *Johnson* Factors**

The *Johnson* factors are intended to ensure "a reasonable fee." *Johnson*, 488 F.2d at 720. Because not all of the *Johnson* factors are always applicable, *see In re Harrah's*, 1998 WL 832574 at *4 (citing *Uselton v. Commercial Lovelace Motor Freight, Inc.*, 9 F.3d 849, 854 (10th Cir. 1993)), the Court will only consider the relevant ones.

### 1. Time and labor required

The Court does not find that the amount of time and labor required in this case warrants an adjustment of the benchmark percentage. The case was settled before intensive formal discovery began and well before trial. Although the case was settled in its early stages, the Court is mindful not to "penalize counsel for obtaining an early settlement." *In re Harrah's*, 1998 WL 832574 at *5. The magnitude of the work required in connection with informal and formal discovery, the motion to dismiss, the monitoring of the bankruptcy, the settlement negotiations and mediation, preliminary approval of the settlement, the fairness hearing, and post-approval administration is adequately reflected in the benchmark percentage fee. This factor does not warrant an increase or decrease in the benchmark fee award.

### 2. Novelty and difficulty of the question and skill required to perform the legal service

Securities actions are generally large and complex cases involving difficult financial and accounting issues. Moreover, Fifth Circuit decisions on causation, pleading and proof at the class certification stage make PSLRA claims particularly difficult in this circuit. *See In re Enron*, 586 F. Supp. 2d at 788. This case was further complicated by OCA's bankruptcy, for which Lead Counsel had to retain separate bankruptcy counsel. *See In re Harrah's*, 1998 WL 832574 at *5 (recognizing that concurrent bankruptcy proceedings add a level of difficulty to a typical securities litigation case). Further, the Court does not doubt that handling this difficult case required considerable skill and experience. Given the inherent difficulty involved in securities class actions, the special difficulty of bringing those cases in the Fifth Circuit, and the further complication of the bankruptcy proceeding, as well as accounting for counsel's skill and expertise, the Court finds that an increase in the percentage is merited.

### 3. The customary fee

The Court has discussed, *supra*, the typical fees in securities cases involving comparable awards. Because the benchmark percentage is about average for cases of this kind the Court finds that this factor does not warrant an adjustment.

### 4. Whether the fee is fixed or contingent

Consideration of this factor is designed to "demonstrat[e] the attorney's fee expectations when he accepted the case." *Johnson*, 488 F.2d at 718. This factor considers the financial risks a contingency fee arrangement places on counsel. *See In re Enron*, 586 F. Supp. 2d at 791. Class counsel undertook this case on a contingency basis and has thus far received no payment. Although counsel faces risks in litigating any securities class action post-PSLRA, counsel faces even more challenges in the Fifth Circuit. Early on, counsel faced a significant risk that the case would be dismissed given the Fifth Circuit jurisprudence regarding the pleading of scienter under the PSLRA. *See Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 545 (5th Cir. 2008) (reversing the denial of a motion to dismiss because plaintiffs' circumstantial allegations of scienter were insufficient to support a strong inference of scienter); *Goldstein v. MCI WorldCom*, 340 F.3d 238 (5th Cir. 2003) (affirming grant of motion to dismiss because circumstantial allegations did not meet "strong inference" requirement); *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002) (affirming grant of motion to dismiss for failure to sufficiently plead scienter).

Although the case survived the motion to dismiss, counsel still faced challenges in overcoming the Fifth Circuit's loss

causation hurdle to class certification (as discussed, *supra*), surviving summary judgment, and then proving liability and damages at trial. In addition, counsel stated at the Settlement Fairness Hearing that, because of OCA's bankruptcy, there was a chance that plaintiffs' claims would be completely wiped out in the reorganization of the company. (Trans. of Settlement Fairness Hearing). That counsel pursued this case against a bankrupt corporation was a substantial risk in itself. Because there were no obvious deep pockets, plaintiffs would be at risk of little or no recovery even if they won a judgment. *See In re Enron*, 586 F. Supp. 2d at 791 (noting the risk of no recovery because of Enron's bankruptcy and the "wasting" director's and officer's liability insurance policies). In sum, the risk plaintiffs' counsel undertook in litigating this case on a contingency basis must be considered in its award of attorneys' fees, and thus an upward adjustment is warranted.

### 5. Amount involved and the results obtained

Given the limited pool of recovery for this case, counsel obtained a favorable settlement for plaintiffs. Although counsel estimated that plaintiffs' damages totaled $32 million, only $20 million in insurance proceeds was available for recovery for plaintiffs in this securities action, as well as those in the Derivative Case and OCAI Litigation. As discussed*, supra*,

defendants had expended between $2 million and $3 million of the $20 million in attorneys' fees and costs even before the mediation.  This depleting resource would likely be lessened by as much as $5 million more if the case were to go through trial and appeal. (*See* Trans. of Settlement Fairness Hearing).  Thus if the Court estimates that roughly $12 million of the policy would be available for judgments in all three cases, and that in the settlement context, the insurance companies were pushing for a global resolution of the three cases, the plaintiffs' $6.5 million recovery (notably, $750,000 more than the settlement in the Derivative Case) is not insubstantial under the circumstances.  Still, the class members' potential award was depressed because of OCA's bankruptcy, a factor that is independent of the merits of their claims.  Class counsel should share the pain and not receive an increase because their clients' settlement was limited because of the bankruptcy.  The Court thus finds that this factor does not warrant an increase or decrease in the percentage.

### 6.    The experience, reputation, and ability of the attorneys

The Court is satisfied that the experience and reputation of the attorneys involved are of the highest quality.  But as the Court has accounted for counsel's experience and skill in the

*Johnson* factor considering the skill necessary to litigate the case, a further increase in the percentage is not warranted.

### 7. Undesirability of the case

Class counsel asserts that the case was risky and undesirable, particularly, as previously noted, because of the numerous obstacles to bringing securities class actions in the Fifth Circuit and the fact that OCA was in bankruptcy proceedings. The Court agrees that these factors make the case undesirable, but it has already accounted for this in granting an increase for the risks in the litigation.

In sum, most of the *Johnson* factors do not point to an increase in the fee award. The Court finds that, after considering these factors, an increase of 1.5% is warranted. Counsel has also requested interest on their percentage of the settlement. No party has objected to an award of interest. The Court thus awards counsel 28.5% of the interest the settlement fund has accrued.

### E. Lodestar Cross-check

The Court will calculate a rough lodestar for purposes of checking the percentage fee award. Class counsel and Lead Plaintiff request that the attorneys' fees be apportioned among Lead Counsel; local counsel, Neblett Beard & Arsenault; plaintiffs' bankruptcy counsel, Lowenstein Sandler, PC; and

counsel for plaintiff Stephen Klein, Pomerantz Haudek Block Grossman & Gross, LLP.[3]

## 1. Non-class counsel

The Court first notes that Lead Counsel requests that the attorneys' fee award be apportioned among four law firms, two of which, Lowenstein Sandler and Pomerantz Haudek, were never appointed class counsel by the Court. In securities cases governed by the PSLRA, courts may give deference to lead counsel and lead plaintiff's allocation of attorneys' fees to non-lead counsel for work done after the appointment of lead counsel at the direction of lead counsel. *See In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 197-98 (3d Cir. 2005); *In re Tut Systems, Inc. Sec. Litig.*, 2007 WL 1722420 at *3 (N.D. Cal. 2007); *In re NTL, Inc. Sec. Litig.*, 2007 WL 438320 at *3 (S.D.N.Y. 2007). Such deference is warranted because of the PSLRA's structure, which allows the lead plaintiff to choose the class's counsel and direct the litigation. Under the PSLRA, the lead plaintiff is "the decisionmaker for the class, deciding which lawyers will represent the class and how they will be paid." *In re Cendant*, 404 F.3d at 197. Thus lead plaintiff and lead counsel's decision that non-lead counsel is entitled to some compensation is

---

[3]Each firm submitted declarations outlining the description of the work performed on behalf of the class and the lodestar calculation for that firm's work.

entitled to deference, although the Court must still independently review it.

Here, Lead Counsel requests attorneys' fees for Lowenstein Sandler for its work on behalf of the class and at the direction of Lead Counsel in monitoring the OCA bankruptcy proceedings. (Strauss Declaration, Exhibit E). Lead Counsel request attorneys' fees for Pomerantz Haudek for its work, at the direction of Lead Counsel, in researching and analyzing issues related to the motion for class certification and assisting in the drafting of the plan of allocation. (Strauss Declaration, Exhibit F). Because Lead Counsel and Lead Plaintiff both approve of the allocation of a portion of the attorneys' fee award to non-class counsel for this work completed after the appointment of Lead Plaintiff and Lead Counsel, and because the work was of a nature that substantially benefitted the class, the Court finds that the firms are entitled to a fee award.

Lead Counsel also seeks to allocate some attorneys' fees to Pomerantz Haudek for the firm's work in filing the complaint and editing the amended complaint. The Third Circuit has explained that in the securities case context, courts have the paramount role in the fee decision when the fee request is for work performed before the appointment of lead plaintiff. *See In re Cendant*, 404 F.3d at 194. "The court, not the lead plaintiff,

must decide for itself what firms deserve compensation for work done on behalf of the class prior to the appointment of lead plaintiff." *Id.* Non-lead counsel may be entitled to compensation if the attorney created a "substantial benefit for the class in this period." *Id.* Still, even at this stage, the Court may place "significant weight" on Lead Plaintiff's decision about what work conferred such benefits.

Because Lead Counsel had not explained the reasons for the award to Pomerantz Haudek for the work it performed before the appointment of Lead Counsel, the Court ordered the parties to submit evidence outlining the specific contributions of the firm to the class claims. (R. Doc. 363). In response, Pomerantz Haudek submitted a declaration lowering the number of hours in its fee request from 235.3 to 54.8, which lowered its projected lodestar from $127,898.25 to $25,188.50. (R. Doc. 364). Pomerantz Haudek asserted that its firm's work pre-appointment substantially benefitted the class because the firm drafted and filed a complaint on behalf of a plaintiff who sold OCA put options, whereas the other complaints were on behalf of plaintiffs who were holders of OCA common stock. (R. Doc. 364-1 at ¶3).

The Court takes into account Lead Counsel's and Lead Plaintiff's determination that Pomerantz Haudek's work in

drafting the complaint and editing the amended complaint entitled the firm to compensation.  Further, the Third Circuit has explained that although the filing of a complaint in itself does not merit compensation, attorneys whose complaints contain factual information or legal theories not contained in lead counsel's complaint, upon which lead counsel later rely, may be entitled to compensation. *In re Cendant*, 404 F.3d at 197. Because Pomerantz Haudek included the sellers of put options in the class defined in its complaint, and because such persons were later included in the class certified for settlement purposes, the Court finds that Pomerantz Haudek conferred a substantial benefit on the class.  Accordingly, the Court finds that Pomerantz Haudek is entitled to fees for the 54.8 hours it spent on the class claims.

### 2. Cross-check

The attorneys involved reported over 3,905.95 hours of time spent in the prosecution of this litigation.  Lead Counsel Kaplan Fox reported 3,006.5 hours, including 989.50 partner hours, 1,315.5 associate hours, 99 law clerk hours, 422.5 investigator hours, and 180 paralegal hours.  Kaplan Fox's requested average rate is $447.18 per hour.  Liaison counsel Neblett Beard & Arsenault reported 179.75 hours, including 145.5 partner hours and 34.25 paralegal hours.  Liaison counsel's requested average

rate is $404.97 per hour.  Bankruptcy counsel Lowenstein Sandler,
PC, reported 664.9 attorney hours, including 189.5 partner hours,
340.10 counsel hours, 6.7 associate hours, 25.3 law clerk hours,
33.6 paralegal hours, and 69.7 project assistant hours.
Bankruptcy counsel requested an average hourly rate of $452.26.
Finally, counsel for plaintiff Steve Klein, Pomerantz Haudek
Block Grossman & Gross, LLP, reported 54.8 hours, including 8.1
partner hours and 46.7 associate hours.  Pomerantz Haudek
requested an average hourly rate of $459.64.  In total,
plaintiffs' counsel calculated a lodestar of $1,743,123.90, for
an average hourly rate of $446.27.  If counsel received its
requested 30% fee, the resulting lodestar multiplier would be
1.12.  The lodestar multiplier for a 28.5% fee would be 1.06.

In determining the reasonable hourly rate, courts look to
the reasonable hourly rate for attorneys of a similar caliber
practicing in the community. *See Watkins v. Fordice*, 7 F.3d 453,
458 (5th Cir. 1993); *Tollett v. City of Kemah*, 285 F.3d 357, 368
(5th Cir. 2002); *In re Enron*, 586 F. Supp. 2d at 756.  To support
a proposed hourly rate, counsel must not only submit an affidavit
attesting to her customary rate, but must also address the rates
billed and paid in similar lawsuits. *See In re Enron*, 586 F.
Supp. 2d at 756 (citing *Watkins v. Input/Output, Inc*., 531 F.
Supp. 2d 777, 784 (S.D. Tex. 2007)).

Here, counsel submitted evidence of the defense attorneys'
hourly rates and of a 30% fee award in another securities action
in the Eastern District of Louisiana.  The Court found that
neither were helpful and ordered counsel to submit affidavits
from attorneys practicing in the community to assist in
computation of the lodestar. (R. Doc. 360).  Lead Counsel then
submitted an affidavit from the New Orleans firm Kahn Gauthier, a
firm specializing in plaintiffs' securities cases, whose rates
were comparable to those of Kaplan Fox - $575 per hour for
partners and $425-$465 per hour for associates. (R. Doc. 362,
Exhibit A).  Lead Counsel's affidavit from local counsel Neblett
Beard & Arsenault showed rates of $400-$500 per hour for partners
engaged in securities work. (R. Doc. 357-4, Exhibit D).  While
the Court takes note of these affidavits, the Court recognizes
that these rates are from firms that typically do not bill by the
hour, but rather, work on a contingency fee basis.  The Fifth
Circuit has noted that a court is itself an expert in attorneys'
fees and "may consider its own knowledge and experience
concerning reasonable and proper fees and may form an independent
judgment with or without the aid of witnesses as to value."
*Campbell v. Green*, 112 F.2d 143, 144 (5th Cir. 1940).  The Court
is familiar with the local legal market and finds that partner-
level attorneys performing similar securities work bill at a rate

between $400 and $450 per hour, and associates bill at a rate between $200 and $250 per hour.  The Court will thus utilize a blended rate of $350 per hour to calculate the lodestar.  The Court uses a blended rate to reflect that not all of the work was performed by the highest level attorneys.  The Court finds that $100 per hour is a reasonable rate for the work by paralegals, law clerks, investigators, and project assistants.  Using these hours and rates, the Court calculates a lodestar baseline of $1,150,995.  If counsel received the requested 30% fee, the lodestar multiplier would be 1.69.  The lodestar multiplier for a 28.5% fee would be 1.6.  Because the Court found that an increase in the fee was merited based on a few of the *Johnson* factors, the Court finds that a multiplier of 1.6 is appropriate.  This multiplier adequately accounts for the results obtained and the risks involved.

The Court thus awards a total fee of $1,852,500, or 28.5% of the settlement fund.  This fee is further confirmed by the lodestar calculation.  The fee award in this case is to be distributed among plaintiffs' counsel in the proportions reflected by agreement of the attorneys, which the Court has already analyzed. *See Longden v. Sunderman*, 979 F.2d 1095, 1101 (citation omitted).

**G.    Costs**

Class counsel requests an award of $179,466.05 in expenses. (Trans. of Settlement Fairness Hearing). Class counsel has submitted a declaration itemizing the expenses. (Strauss Decl., Exhibit B). The Court has reviewed the itemized expenses and finds that the asserted expenses are reasonable. The Court thus awards the full amount in addition to the percentage fee.

## IV. Conclusion

For the foregoing reasons, IT IS ORDERED that the Motion for Final Approval of the Class Action Settlement be GRANTED and the SETTLEMENT be APPROVED. IT IS FURTHER ORDERED that Class Counsel be awarded 28.5% of the common fund and $179,466.05 in expenses.


New Orleans, Louisiana, this 2nd day of March 2009.


_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE